1    CHRISTOPHER J. COX (Bar No. 151650)
     Email: chris.cox@weil.com
2    WEIL, GOTSHAL & MANGES LLP
     201 Redwood Shores Parkway
3    Redwood Shores, CA   94065
     Telephone: (650) 802-3000
4    Facsimile: (650) 802-3100

5    T. RAY GUY (*subject to pro hac vice admission*)
     Email: ray.guy@weil.com
6    YVETTE OSTOLAZA (*subject to pro hac vice admission*)
     Email: yvette.ostolaza@weil.com
7    WEIL, GOTSHAL & MANGES LLP
     200 Crescent Court, Suite 300
8    Dallas, TX   75201
     Telephone: (214) 746-7872
9    Facsimile: (214) 746-7777

10   Attorneys for Defendant
     Deutsche Bank AG

11

12                  UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA
13                         WESTERN DIVISION

14   MGA ENTERTAINMENT, INC., a          Case No. CV11 - 04932 PA(PZx)
     California Corporation,
15                                        DEFENDANT DEUTSCHE BANK
              Plaintiff,                   AG'S NOTICE OF REMOVAL OF
16                                         ACTION UNDER 28 U.S.C. § 1441(A)
        vs.
17                                         BY FAX
     DEUTSCHE BANK AG, a German
18   Company; BARCLAYS BANK PLC, a
     British Corporation;
19   CREDIT AGRICOLE CORPORATE
     AND INVESTMENT BANK, DBA
20   CALYON, a French Public Limited
     Company;
21   CAISSE REGIONALE DE CREDIT
     AGRICOLE DE FRANCHE COMPTE,
22   a French Cooperative Company;
     COMMERZBANK
23   AKTIENGESELLSCHAFT, a British
     Corporation;
24   DEUTSCHE BANK LUXEMBOURG
     SA, a Luxembourger Company;
25   SOCIETE GENERALE, a French Public
     Limited Company; and DOES 1 through
26   100, inclusive,

27            Defendants.

28

     **NOTICE OF REMOVAL OF ACTION UNDER**
     **28 U.S.C. § 1441(A)**

## NOTICE OF REMOVAL

Defendant Deutsche Bank AG ("Deutsche Bank") respectfully files this Notice of Removal pursuant to 28 U.S.C. § 1441(a), removing the above-captioned action (this "Action") from the Superior Court of Los Angeles County to the United States District Court for the Central District of California, and as grounds for said removal, state as follows:

1.     This Action was commenced on March 28, 2011, by the filing of a complaint (the "Complaint") in *MGA Entertainment v. Deutsche Bank AG, et al.*, Case No. BC458341, in the Superior Court for the County of Los Angeles.  On May 9, 2011, MGA Entertainment, Inc. ("MGA") filed its First Amended Complaint. True and correct copies of the First Amended Complaint and the summons are attached hereto as "Exhibit A."  All process, pleadings, and orders served on Deutsche Bank AG are attached to this Notice as required by 28 U.S.C. § 1446(a).

2.     Deutsche Bank was served on May 17, 2011.  This Notice of Removal is therefore timely under 28 U.S.C. § 1446(b).  No answers or other responsive pleadings have been filed by Deutsche Bank.

3.     The United States District Court for the Central District of California is the appropriate court for filing a Notice of Removal from the Superior Court for the County of Los Angeles, where the instant action is pending and, accordingly, Deutsche Bank removes this action to this Court.[1]

4.     All defendants who have been properly served at the time of this filing (Barclays Bank PLC, Commerzbank Aktiengesellschaft, Credit Agricole Corporate and Investment Bank, DBA Calyon, and Societe Generale) join in and consent to this Notice of Removal. 28 U.S.C. § 1441(a).[2]

---

[1] By filing this Notice of Removal, Deutsche Bank does not waive and it specifically reserves all defenses, including its right to assert that this Court lacks *in personam* jurisdiction over a Deutsche Bank and its right to dismiss this case.

[2] Caisse Regionale De Credit Agricole De Franche Compte and Deutsche Bank Luxembourg

NOTICE OF REMOVAL OF ACTION UNDER
28 U.S.C. § 1441(A)                                        2

## THE COURT HAS ORIGINAL
## JURISDICTION OVER THE PLAINTIFF'S CLAIMS

5.      Title 28 U.S.C. § 1441(a) provides that "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the … defendants …." 28 U.S.C. § 1441(a).  This Court has original jurisdiction over this action for two independent reasons: (1) this action is a suit between citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, *see* 28 U.S.C. § 1332; and (2) MGA is a corporation organized under the laws of the United States and its claims arise out of transactions involving international or foreign banking.   *See* 12 U.S.C. § 632.

## THE COURT HAS DIVERSITY JURISDICTION
## OVER THE PLAINTIFF'S CLAIMS BECAUSE
## ALL PARTIES ARE COMPLETELY DIVERSE AND
## THE AMOUNT IN CONTROVERSY EXCEEDS $75,000,
## EXCLUSIVE OF INTEREST AND COSTS

6.      Title 28 U.S.C. § 1332 provides that "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of a State and citizens or subjects of a foreign state."   28 U.S.C. § 1332(a)(2).

7.      Diversity jurisdiction warranting removal is determined, and must exist, at the time the complaint is filed and at the time removal is effected.   *Strotek Corp. v. Air Transp. Assoc. of Am.*, 300 F.3d 1129, 1131 (9th Cir. 2002).

8.      At the time the Complaint was filed, MGA was organized under the laws of California, with its principal place of business in Los Angeles, California, and MGA remains, at the time of filing this Notice of Removal, a company organized under the laws of California, with its principal place of business in Los

---

have not been served.  At the time of this removal, the consenting defendants also preserve all defenses, including their rights to contest *in personum* jurisdiction.

1   Angeles, California.

2        9.     Defendants are all foreign companies with their principal places of

3   business in foreign countries. (*See* First Am. Compl. ¶¶ 3-11.)  At the time the

4   Complaint was filed, Defendant Deutsche Bank was organized under the laws of

5   Germany, with its principal place of business in Frankfurt, Germany, and was a

6   citizen of Germany, a foreign state.  Deutsche Bank remains, at the time of filing

7   this Notice of Removal, a company organized under the laws of Germany, with its

8   principal place of business in Frankfurt, Germany, and a citizen of Germany, a

9   foreign state.

10        10.    At the time the Complaint was filed, Defendant Barclays Bank PLC

11   was organized under the laws of Britain, with its principal place of business in

12   London, United Kingdom, and was a citizen of the United Kingdom, a foreign

13   state.  Barclays Bank PLC remains, at the time of filing this Notice of Removal, a

14   company organized under the laws of Britain, with its principal place of business in

15   London, United Kingdom, and a citizen of the United Kingdom, a foreign state.

16        11.    At the time the Complaint was filed, Defendant Credit Agricole

17   Corporate and Investment Bank, DBA Caylon, was organized under the laws of

18   France, with its principal place of business in Paris, France, and was a citizen of

19   France, a foreign state.  Credit Agricole Corporate and Investment Bank, DBA

20   Caylon remains, at the time of filing this Notice of Removal, a company organized

21   under the laws of France, with its principal place of business in Paris, France, and a

22   citizen of France, a foreign state.

23        12.    At the time the Complaint was filed, Defendant Commerzbank

24   Aktiengesellschaft was organized under the laws of Germany, with its principal

25   place of business in Frankfurt, Germany, and was a citizen of Germany, a foreign

26   state.  Commerzbank Aktiengesellschaft remains, at the time of filing this Notice

27   of Removal, a company organized under the laws of Germany, with its principal

28   place of business in Frankfurt, Germany, and a citizen of Germany, a foreign state.

13.     At the time the Complaint was filed, Defendant Deutsche Bank Luxembourg SA was organized under the laws of Luxembourg, with its principal place of business in Luxembourg, and was a citizen of Luxembourg, a foreign state. Deutsche Bank Luxembourg SA remains, at the time of filing this Notice of Removal, a company organized under the laws of the Luxembourg, with its principal place of business in Luxembourg, and a citizen of Luxembourg, a foreign state.

14.     At the time the Complaint was filed, Defendant Societe Generale was organized under the laws of France, with its principal place of business in Paris, France, and was a citizen of France, a foreign state.  Societe Generale remains, at the time of filing this Notice of Removal, a company organized under the laws of France with its principal place of business in Paris, France, and a citizen of France, a foreign state.

15.     Through its First Amended Complaint, MGA seeks damages exceeding $428,815,760.   (*See* First Am. Compl. ¶ 66.)   The amount in controversy is therefore in excess of $75,000, exclusive of interest and costs.

## THE COURT ALSO HAS FEDERAL QUESTION ORIGINAL JURISDICTION OVER THE PLAINTIFF'S CLAIMS PURSUANT TO 12 U.S.C. § 632

16.     Title 12 U.S.C. § 632 ("The Edge Act") provides that "all suits of a civil nature at common law or in equity to which any corporation organized under the laws of the United States shall be a party, arising out of transactions involving international or foreign banking… shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits …." 12 U.S.C. § 632.  Defendants also remove this action under The Edge Act, as the lawsuit arises out of transactions involving international and/or foreign banking, and therefore "arise under" federal law.  (*See generally* First Am. Compl.)

17.     MGA's First Amended Complaint alleges that the Defendants directly

or indirectly caused it harm in selecting, underwriting, originating, issuing, and servicing loans to Smoby SA ("Smoby"), assisted Smoby in making false representations about its financial health to MGA, concealed the truth about the financial health of Smoby from MGA, and engaged in other behavior harmful to MGA.   (*See generally* First Am. Compl.)   Because MGA is a California Corporation and its claims arise out of transactions involving international or foreign banking, this court has original jurisdiction over this Action.   *See Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997 (9th Cir. 2006) (holding 12 U.S.C. § 632 vests in the federal courts "original jurisdiction over cases arising out of foreign banking transactions to which a U.S. corporation is a party"); *see also In re Lloyd's Am. Trust Fund Litig.*, 928 F. Supp. 333, 335 (S.D.N.Y. 1996) (holding that a suit arose out of transactions involving international or foreign banking where the complaint charged the foreign defendant bank with improper issuance of loans, failure to properly maintain bank accounts, improper transfer of money, failure to render reports for accounts, and breach of fiduciary duty).

18.    No admission of fact, law, liability or damages is intended by this Notice of Removal, and all defenses, affirmative defenses, objections and motions hereby are reserved.

19.    Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being filed with the Clerk of the Superior Court for the County of Los Angeles, and a copy is being served upon Plaintiff.

Dated: June 9, 2011

Respectfully submitted,

By: _____
                  Christopher J. Cox

CHRISTOPHER J. COX (Bar No. 151650)
Email: chris.cox@weil.com
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA   94065
Telephone: (650) 802-3000
Facsimile: (650) 802-3100

T. RAY GUY (subject to pro hac vice admission)
Email: ray.guy@weil.com
YVETTE OSTOLAZA (subject to pro hac vice admission)
Email: Yvette.ostolaza@weil.com
200 Crescent Court, Suite 300
Dallas, TX   75201
Telephone: (214) 746-7872
Facsimile: (214) 746-7777

Attorneys for Defendant

DEUTSCHE BANK AG

# EXHIBIT A

RECEIVED BY LEGAL DEPARTMENT

MAY 17 2011

DEUTSCHE BANK AG NY BRANCH

# SUMMONS
## (CITACION JUDICIAL)

**SUM-100**

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

CONFORMED COPY
ORIGINAL FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

MAR 23 2011

John A. Clarke, Executive Officer/Clerk

BY _____, Deputy
Shaunya Wesley

4:19 pm

**NOTICE TO DEFENDANT:** DEUTSCHE BANK AG, a German Company;
**(AVISO AL DEMANDADO):** BARCLAYS BANK PLC, a British Corporation;
CREDIT AGRICOLE CORPORATE AND INVESTMENT BANK, DBA CALYON,
a French Public Limited Company; CAISSE REGIONALE DE CREDIT AGRICOLE
DE FRANCHE COMPTE, a French Cooperative Company; COMMERZBANK
AKTIENGESELLSCHAFT, a British Corporation; DEUTSCHE BANK
LUXEMBOURG SA, a Luxembourger Company; SOCIETE GENERALE, a French
Public Limited Company; and DOES 1 through 100, inclusive,

**YOU ARE BEING SUED BY PLAINTIFF:** MGA ENTERTAINMENT, INC., a
**(LO ESTÁ DEMANDANDO EL DEMANDANTE):** a California corporation

BY HAND

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

| | |
|---|---|
| The name and address of the court is:<br>(El nombre y dirección de la corte es:)<br>Los Angeles Superior Court<br>Central District<br>111 N. Hill Street<br>Los Angeles, CA 90012-3014 | CASE NUMBER:<br>(Número del Caso)<br>**BC458341** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es:)

(805) 564-2444    (805) 965-5950

Matthew H. Fisher (SBN 229532)
Cappello & Noël LLP
Santa Barbara, CA 93101

JOHN A. CLARKE, CLERK    Shaunya Wesley

DATE:                                Clerk, by _____, Deputy
(Fecha) **MAR 23 2011**    (Secretario)                              (Adjunto)

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).

**NOTICE TO THE PERSON SERVED:** You are served
1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of (specify):

3. [X] on behalf of (specify): DEUTSCHE BANK AG, a German Company

under: [ ] CCP 416.10 (corporation)          [ ] CCP 416.60 (minor)
       [ ] CCP 416.20 (defunct corporation)   [ ] CCP 416.70 (conservatee)
       [ ] CCP 416.40 (association or partnership) [ ] CCP 416.90 (authorized person)
       [X] other (specify): a foreign Business Organization

4. [ ] by personal delivery on (date):

[SEAL]

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Legal
Solutions
Plus

Code of Civil Procedure §§ 412.20, 465

CM-010

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):<br>A. Barry Cappello (SBN 037835)<br>Leila J. Noël (SBN 114307)<br>Cappello & Noël LLP<br>831 State Street<br>Santa Barbara, CA 93101<br>TELEPHONE NO.: (805) 564-2444   FAX NO.: (805) 965-5950<br>ATTORNEY FOR (Name): Plaintiff MGA Entertainment, Inc. | FOR COURT USE ONLY<br><br>CONFORMED COPY<br>ORIGINAL FILED<br>SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES<br><br>MAR 28 2011<br><br>John A. Clarke, Executive Officer/Clerk<br>BY_____, Deputy<br>Shaunya Wesley |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
STREET ADDRESS: 111 N. Hill Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, CA 90012-3014
BRANCH NAME: Central District

CASE NAME: MGA ENTERTAINMENT, INC. v. DEUTSCHE BANK AG, et al.

| CIVIL CASE COVER SHEET<br>[X] Unlimited   [ ] Limited<br>(Amount   (Amount<br>demanded   demanded is<br>exceeds $25,000)   $25,000 or less) | Complex Case Designation<br>[ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | CASE NUMBER:<br>BC 458341<br>JUDGE:<br>DEPT: |
|---|---|---|

Items 1–6 below must be completed (see instructions on page 2).

1. Check one box below for the case type that best describes this case:

| Auto Tort | Contract | Provisionally Complex Civil Litigation<br>(Cal. Rules of Court, rules 3.400–3.403) |
|---|---|---|
| [ ] Auto (22)<br>[ ] Uninsured motorist (46)<br>**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**<br>[ ] Asbestos (04)<br>[ ] Product liability (24)<br>[ ] Medical malpractice (45)<br>[ ] Other PI/PD/WD (23)<br>**Non-PI/PD/WD (Other) Tort**<br>[ ] Business tort/unfair business practice (07)<br>[ ] Civil rights (08)<br>[ ] Defamation (13)<br>[ ] Fraud (16)<br>[ ] Intellectual property (19)<br>[ ] Professional negligence (25)<br>[ ] Other non-PI/PD/WD tort (35)<br>**Employment**<br>[ ] Wrongful termination (36)<br>[ ] Other employment (15) | [ ] Breach of contract/warranty (06)<br>[ ] Rule 3.740 collections (09)<br>[ ] Other collections (09)<br>[ ] Insurance coverage (18)<br>[ ] Other contract (37)<br>**Real Property**<br>[ ] Eminent domain/inverse condemnation (14)<br>[ ] Wrongful eviction (33)<br>[ ] Other real property (26)<br>**Unlawful Detainer**<br>[ ] Commercial (31)<br>[ ] Residential (32)<br>[ ] Drugs (38)<br>**Judicial Review**<br>[ ] Asset forfeiture (05)<br>[ ] Petition re: arbitration award (11)<br>[ ] Writ of mandate (02)<br>[ ] Other judicial review (39) | [ ] Antitrust/Trade regulation (03)<br>[ ] Construction defect (10)<br>[ ] Mass tort (40)<br>[X] Securities litigation (28)<br>[ ] Environmental/Toxic tort (30)<br>[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)<br>**Enforcement of Judgment**<br>[ ] Enforcement of judgment (20)<br>**Miscellaneous Civil Complaint**<br>[ ] RICO (27)<br>[ ] Other complaint (not specified above) (42)<br>**Miscellaneous Civil Petition**<br>[ ] Partnership and corporate governance (21)<br>[ ] Other petition (not specified above) (43) |

2. This case [ ] is   [X] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties   d. [ ] Large number of witnesses
   b. [ ] Extensive motion practice raising difficult or novel   e. [ ] Coordination with related actions pending in one or more courts issues that will be time-consuming to resolve   in other counties, states, or countries, or in a federal court
   c. [ ] Substantial amount of documentary evidence   f. [ ] Substantial postjudgment judicial supervision
3. Remedies sought (check all that apply): a. [X] monetary  b. [ ] nonmonetary; declaratory or injunctive relief  c. [X] punitive
4. Number of causes of action (specify): 6
5. This case [ ] is   [X] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)
Date: March 25, 2011

Leila J. Noël
(TYPE OR PRINT NAME)                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
* Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
* File this cover sheet in addition to any cover sheet required by local court rule.
* If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
* Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | CIVIL CASE COVER SHEET | Legal<br>Solutions<br>Plus | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10 |
|---|---|---|---|

## INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the Chapter Seven Rules, as applicable in the Central District, are summarized for your assistance.

### APPLICATION

The Chapter Seven Rules were effective January 1, 1994. They apply to all general civil cases.

### PRIORITY OVER OTHER RULES

The Chapter Seven Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

### CHALLENGE TO ASSIGNED JUDGE

A challenge under Code of Civil Procedure section 170.6 must be made within 15 days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

### TIME STANDARDS

Cases assigned to the Individual Calendaring Court will be subject to processing under the following time standards:

**COMPLAINTS:** All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days of filing.

**CROSS-COMPLAINTS:** Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed. Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

A Status Conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint. Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

### FINAL STATUS CONFERENCE

The Court will require the parties at a status conference not more than 10 days before the trial to have timely filed and served all motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested jury instructions, and special jury instructions and special jury verdicts. These matters may be heard and resolved at this conference. At least 5 days before this conference, counsel must also have exchanged lists of exhibits and witnesses and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Eight of the Los Angeles Superior Court Rules.

### SANCTIONS

The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Seven Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Seven Rules. Such sanctions may be on a party or if appropriate on counsel for the party.

**This is not a complete delineation of the Chapter Seven Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction. Careful reading and compliance with the actual Chapter Rules is absolutely imperative.**

# LOS ANGELES SUPERIOR COURT ADR PROGRAMS

CIVIL:
- **Civil Action Mediation** (Governed by Code of Civil Procedure (CCP) sections 1775-1775.15, California Rules of Court, rules 3.850-3.868 and 3.870-3.878, Evidence Code sections 1115-1128, and Los Angeles Superior Court Rules, chapter 12.)
- **Retired Judge Settlement Conference**
- **Neutral Evaluation** (Governed by Los Angeles Superior Court Rules, chapter 12.)
- **Judicial Arbitration** (Governed by Code of Civil Procedure sections 1141.10-1141.31, California Rules of Court, rules 3.810-3.830, and Los Angeles Superior Court Rules, chapter 12.)
- **Eminent Domain Mediation** (Governed by Code of Civil Procedure section 1250.420.)
- **Civil Harassment Mediation**
- **Small Claims Mediation**

FAMILY LAW (non-custody):
- **Mediation**
- **Forensic Certified Public Accountant (CPA) Settlement Conference**
- **Settlement Conference**
- **Nonbinding Arbitration** (Governed by Family Code section 2554.)

PROBATE:
- **Mediation**
- **Settlement Conference**

## NEUTRAL SELECTION

Parties may select a mediator, neutral evaluator, or arbitrator from the Court Party Select Panel or may hire someone privately, at their discretion. If the parties utilize the Random Select Mediation or Arbitration Panel, the parties will be assigned on a random basis the name of one neutral who meets the case criteria entered on the court's website.

## COURT ADR PANELS

| | |
|---|---|
| **Party Select Panel** | The Party Select Panel consists of mediators, neutral evaluators, and arbitrators who have achieved a specified level of experience in court-connected cases. The parties (collectively) may be charged $150.00 per hour for the first three hours of hearing time. Thereafter, the parties may be charged for additional hearing time on an hourly basis at rates established by the neutral if the parties consent in writing. |
| **Random Select Panel** | The Random Select Panel consists of trained mediators, neutral evaluators, and arbitrators who have not yet gained the experience to qualify for the Party Select Panel, as well as experienced neutrals who make themselves available pro bono as a way of supporting the judicial system. It is the policy of the Court that all Random Select Panel volunteer mediators, neutral evaluators, and arbitrators provide three hours hearing time per case. Thereafter, the parties may be charged for additional hearing time on an hourly basis at rates established by the neutral if the parties consent in writing. |
| **Private Neutral** | The market rate for private neutrals can range from $300-$1,000 per hour. |

## ADR ASSISTANCE

For assistance regarding ADR, please contact the ADR clerk at the courthouse in which your case was filed.

| COURTHOUSE | ADDRESS | ROOM | CITY | PHONE | FAX |
|---|---|---|---|---|---|
| Antonovich | 42011 4th St. West | None | Lancaster, CA 93534 | (661)974-7275 | (661)974-7060 |
| Chatsworth | 9425 Penfield Ave. | 1200 | Chatsworth, CA 91311 | (818)576-8565 | (818)576-8687 |
| Compton | 200 W. Compton Blvd. | 1002 | Compton, CA 90220 | (310)603-3072 | (310)223-0337 |
| Glendale | 600 E. Broadway | 273 | Glendale, CA 91206 | (818)500-3160 | (818)548-5470 |
| Long Beach | 415 W. Ocean Blvd. | 316 | Long Beach, CA 90802 | (562)491-6272 | (562)437-3802 |
| Norwalk | 12720 Norwalk Blvd. | 308 | Norwalk, CA 90650 | (562)807-7243 | (562)462-9019 |
| Pasadena | 300 E. Walnut St. | 109 | Pasadena, CA 91101 | (626)356-5685 | (626)666-1774 |
| Pomona | 400 Civic Center Plaza | 106 | Pomona, CA 91766 | (909)620-3183 | (909)629-6283 |
| San Pedro | 505 S. Centre | 209 | San Pedro, CA 90731 | (310)519-6151 | (310)514-0314 |
| Santa Monica | 1725 Main St. | 203 | Santa Monica, CA 90401 | (310)260-1829 | (310)319-6130 |
| Stanley Mosk | 111 N. Hill St. | 113 | Los Angeles, CA 90012 | (213)974-5425 | (213)633-5115 |
| Torrance | 825 Maple Ave. | 100 | Torrance, CA 90503 | (310)222-1701 | (310)782-7326 |
| Van Nuys | 6230 Sylmar Ave. | 418 | Van Nuys, CA 91401 | (818)374-2337 | (818)902-2440 |

Partially Funded by the Los Angeles County Dispute Resolution Program
A complete list of the County Dispute Resolution Programs is available online and upon request in the Clerk's Office

| SHORT TITLE: MGA ENTERTAINMENT, INC. v. DEUTSCHE BANK AG, et al. | CASE NUMBER: BC 458341 |
|---|---|

CONFORMED COPY
ORIGINAL FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

MAR 2 0 2011

John A. Clarke, Executive Officer/Clerk
BY _____, Deputy
Shaunya Wesley

### CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION
### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to LASC Local Rule 2.0 in all new civil case filings in the Los Angeles Superior Court.**

Item I. Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? [X] YES   CLASS ACTION? [ ] YES   LIMITED CASE? [ ] YES   TIME ESTIMATED FOR TRIAL 21 [ ] HOURS/ [X] DAYS

Item II. Select the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to Item III, Pg. 4):

**Step 1:** After first completing the Civil Case Cover Sheet Form, find the main civil case cover sheet heading for your case in the left margin below, and, to the right in Column A, the Civil Case Cover Sheet case type you selected.

**Step 2:** Check one Superior Court type of action in Column B below which best describes the nature of this case.

**Step 3:** In Column C, circle the reason for the court location choice that applies to the type of action you have checked. For any exception to the court location, see Los Angeles Superior Court Local Rule 2.0.

| Applicable Reasons for Choosing Courthouse Location (see Column C below) |
|---|

1. Class Actions must be filed in the Stanley Mosk Courthouse, Central District.
2. May be filed in Central (Other county, or no Bodily Injury/Property Damage).
3. Location where cause of action arose.
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.

**Step 4:** Fill in the information requested on page 4 in Item III; complete Item IV. Sign the declaration.

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| Auto Tort | Auto (22) | [ ] A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| | Uninsured Motorist (46) | [ ] A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| Other Personal Injury/Property Damage/Wrongful Death Tort | Asbestos (04) | [ ] A6070  Asbestos Property Damage | 2. |
| | | [ ] A7221  Asbestos - Personal Injury/Wrongful Death | 2. |
| | Product Liability (24) | [ ] A7260  Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | [ ] A7210  Medical Malpractice - Physicians & Surgeons | 1., 2., 4. |
| | | [ ] A7240  Other Professional Health Care Malpractice | 1., 2., 4. |
| | Other<br>Personal Injury<br>Property Damage<br>Wrongful Death<br>(23) | [ ] A7250  Premises Liability (e.g., slip and fall) | 1., 2., 4. |
| | | [ ] A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1., 2., 4. |
| | | [ ] A7270  Intentional Infliction of Emotional Distress | 1., 2., 3. |
| | | [ ] A7220  Other Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |

LACIV 109 (Rev. 01/11)
LASC Draft 03-04

CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION

LASC, rule 2.0
Page 1 of 4
LA-CV109

| SHORT TITLE MGA ENTERTAINMENT, INC. v. DEUTSCHE BANK AG, et al. | CASE NUMBER |
|---|---|

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Non-Personal Injury/ Property Damage/ Wrongful Death Tort** | Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1., 2., 3. |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1., 2., 3. |
| | Professional Negligence (25) | ☐ A6017  Legal Malpractice<br>☐ A6050  Other Professional Malpractice (not medical or legal) | 1., 2., 3.<br>1., 2., 3. |
| | Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 2., 3. |
| **Employment** | Wrongful Termination (36) | ☐ A6037  Wrongful Termination | 1., 2., 3. |
| | Other Employment (15) | ☐ A6024  Other Employment Complaint Case<br>☐ A6109  Labor Commissioner Appeals | 1., 2., 3.<br>10. |
| **Contract** | Breach of Contract/ Warranty<br>(06)<br>(not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction)<br>☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence)<br>☐ A6019  Negligent Breach of Contract/Warranty (no fraud)<br>☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 2., 5.<br>2., 5.<br>1., 2., 5.<br>1., 2., 5. |
| | Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff<br>☐ A6012  Other Promissory Note/Collections Case | 2., 5., 6.<br>2., 5. |
| | Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1., 2., 5., 8. |
| | Other Contract (37) | ☐ A6009  Contractual Fraud<br>☐ A6031  Tortious Interference<br>☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1., 2., 3., 5.<br>1., 2., 3., 5.<br>1., 2., 3., 8. |
| **Real Property** | Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation      Number of parcels _____ | 2. |
| | Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2., 6. |
| | Other Real Property (26) | ☐ A6018  Mortgage Foreclosure<br>☐ A6032  Quiet Title<br>☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6.<br>2., 6.<br>2., 6. |
| **Unlawful Detainer** | Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Foreclosure (34) | ☐ A6020F  Unlawful Detainer-Foreclosure | 2., 6. |
| | Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2., 6. |

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

| SHORT TITLE: MGA ENTERTAINMENT, INC. V. DEUTSCHE BANK AG, et al. | | CASE NUMBER | |
|---|---|---|---|

| | **A**<br>Civil Case Cover Sheet<br>Category No. | **B**<br>Type of Action<br>(Check only one) | **C**<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2, 6. |
| | Petition re Arbitration (11) | ☐ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2, 5. |
| | Writ of Mandate (02) | ☐ A6151  Writ - Administrative Mandamus | 2, 8. |
| | | ☐ A6152  Writ - Mandamus on Limited Court Case Matter | 2. |
| | | ☐ A6153  Writ - Other Limited Court Case Review | 2. |
| | Other Judicial Review (39) | ☐ A6150  Other Writ /Judicial Review | 2, 8. |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003  Antitrust/Trade Regulation | 1, 2, 8. |
| | Construction Defect (10) | ☐ A6007  Construction Defect | 1, 2, 3. |
| | Claims Involving Mass Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1, 2, 8. |
| | Securities Litigation (28) | ☒ A6035  Securities Litigation Case | 1, 2, 8. |
| | Toxic Tort Environmental (30) | ☐ A6036  Toxic Tort/Environmental | 1, 2, 3, 8. |
| | Insurance Coverage Claims from Complex Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8. |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ A6141  Sister State Judgment | 2, 9. |
| | | ☐ A6160  Abstract of Judgment | 2, 6. |
| | | ☐ A6107  Confession of Judgment (non-domestic relations) | 2, 9. |
| | | ☐ A6140  Administrative Agency Award (not unpaid taxes) | 2, 8. |
| | | ☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax | 2, 8. |
| | | ☐ A6112  Other Enforcement of Judgment Case | 2, 8, 9. |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1, 2, 8. |
| | Other Complaints (Not Specified Above) (42) | ☐ A6030  Declaratory Relief Only | 1, 2, 8. |
| | | ☐ A6040  Injunctive Relief Only (not domestic/harassment) | 2, 8. |
| | | ☐ A6011  Other Commercial Complaint Case (non-tort/non-complex) | 1, 2, 8. |
| | | ☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1, 2, 8. |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ A6113  Partnership and Corporate Governance Case | 2, 8. |
| | Other Petitions (Not Specified Above) (43) | ☐ A6121  Civil Harassment | 2, 3, 9. |
| | | ☐ A6123  Workplace Harassment | 2, 3, 9. |
| | | ☐ A6124  Elder/Dependent Adult Abuse Case | 2, 3, 9. |
| | | ☐ A6190  Election Contest | 2. |
| | | ☐ A6110  Petition for Change of Name | 2, 7. |
| | | ☐ A6170  Petition for Relief from Late Claim Law | 2, 3, 4, 8. |
| | | ☐ A6100  Other Civil Petition | 2, 9. |

**CIVIL CASE COVER SHEET ADDENDUM**
**AND STATEMENT OF LOCATION**

| SHORT TITLE: MGA ENTERTAINMENT, INC. v. DEUTSCHE BANK AG, et al. | CASE NUMBER |
|---|---|

Item III. Statement of Location: Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., **Step 3** on Page 1, as the proper reason for filing in the court location you selected.

| REASON: CHECK THE NUMBER UNDER COLUMN C WHICH APPLIES IN THIS CASE. | ADDRESS: No bodily injury or property damage alleged.  The subject securities transaction was negotiated at 16800 Roscoe Blvd. |
|---|---|
| ☐1. ☒2. ☐3. ☐4. ☐5. ☐6. ☐7. ☐8. ☐9. ☐10. | |

| CITY: Van Nuys | STATE: CA | ZIP CODE: 91406 | |
|---|---|---|---|

Item IV. *Declaration of Assignment*: I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above entitled matter is properly filed for assignment to the Stanley Mosk courthouse in the Central District of the Los Angeles Superior Court [Code Civ. Proc., § 392 et seq., and LASC Local Rule 2.0, subds. (b), (c) and (d)].

Dated: March 25, 2011

(SIGNATURE OF ATTORNEY/FILING PARTY)

Leila J. Noel

---

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet form CM-010.

4. Complete Addendum to Civil Case Cover Sheet form LASC Approved CIV 109 (Rev. 01/07).

5. Payment in full of the filing fee, unless fees have been waived.

6. Signed order appointing the Guardian ad Litem, JC form FL-935, if the plaintiff or petitioner is a minor under 18 years of age, or if required by Court.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

ORIGINAL

1   A. Barry Cappello (SBN 037835)
    abc@cappellonoel.com
2   Leila J. Noël (SBN 114307)
    lnoel@cappellonoel.com
3   Wendy D. Welkom (SBN 156345)
    wwelkom@cappellonoel.com
4   Matthew H. Fisher (SBN 229532)
    mfisher@cappellonoel.com
5   CAPPELLO & NOËL LLP
    831 State Street
6   Santa Barbara, California 93101
    Telephone:   (805) 564-2444
7   Facsimile:   (805) 965-5950

8   Attorneys for Plaintiff

**FILED**
LOS ANGELES SUPERIOR COURT

MAY 09 2011

JOHN A. CLARKE, CLERK

BY RAUL SANCHEZ, DEPUTY

9

10         **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

11          **FOR THE COUNTY OF LOS ANGELES**

74
By Fax

12  MGA ENTERTAINMENT, INC., a California
    Corporation,
13
          Plaintiff,
14  vs.
15  DEUTSCHE BANK AG, a German Company;
    BARCLAYS BANK PLC, a British Corporation;
16  CREDIT AGRICOLE CORPORATE AND
    INVESTMENT BANK, DBA CALYON, a
17  French Public Limited Company;
    CAISSE REGIONALE DE CREDIT
18  AGRICOLE DE FRANCHE COMPTE, a French
    Cooperative Company;
19  COMMERZBANK AKTIENGESELLSCHAFT,
    a British Corporation;
20  DEUTSCHE BANK LUXEMBOURG SA, a
    Luxembourger Company;
21  SOCIETE GENERALE, a French Public Limited
    Company; and DOES 1 through 100, inclusive,
22
          Defendants.
23

24

Case No.: BC458341

**FIRST AMENDED COMPLAINT FOR:**

1.  **JOINT AND SEVERAL
     LIABILITY OF MANAGEMENT
     PRINCIPALS OR MATERIALLY
     AIDING PERSONNEL [*Corp
     Code* § 25504]**
2.  **JOINT AND SEVERAL
     LIABILITY OF MATERIALLY
     ASSISTING PERSONS [*Corp
     Code* § 25504.1]**
3.  **BREACH OF CONTRACT**
4.  **FRAUD - CONSPIRACY**
5.  **FRAUD – NONDISCLOSURE**
6.  **FRAUD - AIDING AND
     ABETTING**
7.  **NEGLIGENCE**

**JURY TRIAL DEMANDED**

25

26

27

28

Plaintiff alleges:

1. All allegations made in this complaint are based upon information and belief, except those allegations which pertain to the named plaintiff, which are based on personal knowledge. The allegations of this complaint stated on information and belief are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

## **PARTIES**

2. Plaintiff MGA ENTERTAINMENT, INC. ("MGA") is a California corporation with its headquarters in the County of Los Angeles, California.

3. Defendant Deutsche Bank AG ("DB") is a German company with offices in Los Angeles, Century City, Irvine, Anaheim, Santa Ana, Santa Monica and Costa Mesa, California.

4. Defendant Barclays Bank PLC ("Barclays") is a British Corporation with an office in Los Angeles, California.

5. Defendant Credit Agricole Corporate and Investment Bank, formerly known as Caylon ("Caylon"), is a French public limited company with offices in the County of San Francisco, California.

6. Defendant Caisse Regionale de Credit Agricole de Franche Compte ("CAFC") is a French cooperative company with offices in Besancon, France.

7. Defendant CAFC is an affiliate of Credit Agricole SA, which MGA is informed and believes, has offices in San Francisco, California.

8. Defendant Commerzbank Aktiengesellschaft ("Commerzbank") is registered in the United Kingdom with offices in the county of Los Angeles, California.

9. Defendant Deutsche Bank Luxembourg SA ("DBL") is a Luxembourger company that docs business in the United States.

10. Defendant Societe Generale ("SG") is a French public limited company that does business in the United States.

11. Barclays, Calyon, CAFC, Commerzbank, DB, DBL and SG are referred herein collectively as "The Banks."

10012.003 - 184730.4

12. The Banks have purposely availed themselves of California law by materially assisting the sale of securities in the State of California, all of which has caused in-state injury to California residents.

13. The true names and capacities, whether individual, corporate, associate or otherwise, of the defendants named herein under the fictitious names of DOES 1 through 50, inclusive, are unknown to plaintiff, who therefore sues said defendants by such fictitious names. Plaintiff will ask leave of Court to amend this complaint and insert the true names and capacities of said defendants when the same have been ascertained. Each of the defendants designated herein as a DOE is legally responsible in some manner for the events and happenings herein alleged, and plaintiff's damages as alleged herein were proximately caused by such defendants.

14. At all times material herein, each of the defendants named herein under the fictitious names of DOES 1 through 50, inclusive, was the agent, servant and employee of each of the remaining defendants, and acting within the purpose, scope and course of said agency, service and employment, with the express and/or implied knowledge, permission and consent of the remaining defendants, and each of them, and each of said defendants ratified and approved the acts of the other defendants.

15. At all times material herein, each defendant was the agent, servant and employee of certain remaining defendants, and acting within the purpose, scope and course of said agency, service and employment, with the express and/or implied knowledge, permission and consent of those remaining defendants, and each of them, and each of said defendants ratified and approved the acts of the other defendants.

## VENUE

16. Venue is appropriate pursuant to California *Corporations Code* section 2105(a)(3) as defendants are foreign corporations who maintain principal local offices Los Angeles County, or who are not qualified to do business in California. Venue is further appropriate pursuant as the obligations and liabilities that are the subject of this litigation arose in Los Angeles County.

/ / /

2

10012.003 - 184730.4

# GENERAL ALLEGATIONS

**In 2002, Jean-Christophe Breuil is appointed CEO of Smoby Group and Embarks**
**On a Multi-Year International Embezzlement Scheme**

17. Smoby SA ("Smoby") was France's leading toy manufacturer and number three in Europe. Posting sales of more than two hundred and eighty million euros, Smoby primarily targeted the infant through age ten market with its stable of toy companies, which included Smoby, Majorette Solido, Ecoiffier, Monneret, Pico, Unice, and Smoby Baby (formerly Lardy).

18. The Breuil family held a controlling stake in Smoby. The Breuils are a wealthy French family well-connected in the French legal, political, and financial community. In or around 2002, Jean-Christophe Breuil was appointed CEO of Smoby Group.

19. Shortly after acquiring control of the company, Breuil embarked on a campaign of embezzlement, assisted by his CFO and right-hand man, Gerard Bondier. Jean-Christophe Breuil adopted a new strategy of drastic external growth and international expansion beginning with the acquisition of Majorette Group in August 2003, and the setting up of three new subsidiaries, in Mexico, Moscow and Shanghai. The second major step of the company expansion was the acquisition in July 2005 of long-time rival toy company Berchet.

20. Under the cover of these acquisitions, Breuil created a sophisticated network of offshore front companies in which he funneled Smoby assets to entities under his personal ownership and/or control.

21. The embezzlement, fraud, and related money laundering was accomplished through several transactions, including but not limited to the following:

      a. *Effective Label Limited*: Breuil set up a shell Hong Kong company, Effective Label Limited ("ELL"), in which to funnel Smoby assets. ELL purchased Chinese toys, then sold them to Smoby Hong Kong for a 6% surcharge. The 6% surcharge was funneled to holding companies Corinvest Group and MHI Consulting, located in the Caribbean and the Isle of Mann, respectively. Breuil further attempted to conceal the existence of these illicit entities behind

10012.003 - 184730.4

1    a Swiss front company.

2    b.  *Smoby Espana*:  Breuil set up a fraudulent system of invoicing in Smoby

3         Espana to enrich himself and/or other subsidiaries under his control.  Records

4         were faked at Smoby Espana to conceal illicit transactions, including:  The

5         unjustified waiver of claims of 1 million euros owed to Smoby Hong Kong;

6         "disappearance" of a stock of toys worth six million and six hundred thousand

7         euros; and millions of sales made far under cost price by Smoby Espana to

8         Dutch subsidiary Euro Toys.  Smoby Spain's invoices were then overvalued

9         by at least 1 million euros.

10   c.  *Oyonnax Berchet*:  Smoby made improper overpayments for the acquisition of

11        Oyannax Berchet from its purported rival, Jean-Louis Berchet, in 2005.

12   d.  *SCI du Marai ("SCI")*:  Breuil orchestrated overpayments of rents from

13        Smoby to Breuil-family controlled property, including property held by SCI in

14        Ain, France.

15   e.  *Improper withdrawals*:  Breuil allowed his confederates, CFO Bondier and

16        Ecoffier to embezzle 400,000 and 500,000 euros from Smoby, respectively.

17   22. Breuil further covered up his embezzlement scheme through falsified financial

18   statements concealing his draining of assets from the company.

19

20                    **The Smoby Banks Enter Into a Joint Venture With Breuil**

21                            **to Finance The Fraudulent Expansion**

22   23. Breuil's scheme was not – and could not have been – accomplished single-handedly.

23   It required a massive infusion of capital to cover up Breuil's diversions.  The original impetus

24   behind the expansion plan in fact came not from Breuil, but from Smoby's lender, Societe Generale.

25   24. In 2005, defendant SG had a serious problem.  Societe Generale was heavily invested

26   not only Smoby, but its former rival, toy company Berchet.  But in 2005, Berchet was at the point of

27   insolvency.  SG faced a total loss on this credit.

28   / / /

---

4

FIRST AMENDED COMPLAINT

10012.003 - 184730.4

25. SG turned to its connection with the Breuil family. The Breuil family is deeply rooted in the Jura region of France where Smoby is centered. It has a long history and several upper-level connections with executives at Societe Generale, with which the family conducts its private banking, which predates World War II.

26. Societe Generale pressured the Breuil family outside the presence of Smoby's Board of Directors to acquire Berchet and take on its debt. Societe Generale used its controlling interest in the company to approve the merger.

27. SG in turn orchestrated an enormous 250M EUR ($327,200,000 USD) credit to Smoby that would (1) fund partial payment of the Berchet debt; (2) consolidate Smoby's debts incurred from its continuing growth, and (3) allow for further expansion. The joint venture was finalized in a September 6, 2005 Granting of Credit Agreement, attached hereto as Exhibit "A."

28. The new credit also provided Societe Generale and the other participating Banks a dominant position of control and oversight over Smoby's future. Going forward, Smoby was required to obtain lender approval before making any significant decisions, including the following:

      a.  Incurring any financial debt in an amount higher than five million Euros (Granting of Credit, Exhibit "A," Section 19.1.15);

      b.  Entering into any lease in an amount higher than 15 million Euros (Section 19.1.16);

      c.  Allowing the debt of Smoby's foreign subsidiaries to exceed thirty million Euros (Section 19.1.7);

      d.  Disposing of assets in excess of 15 million Euros (Section 19.1.13);

      e.  Entering into any mergers with outside companies (Section 19.1.14);

      f.  Entering into any expansion efforts over 20 million Euros (Section 19.1.15); or;

      g.  Participating in any other joint venture operations (Section 19.1.16)

29. In addition, the Banks were made privy to Smoby's inner operations. For example, Smoby was required to submit to the Banks all annual consolidated Accounts and all other information relative to its financial situation on demand. (See Granting of Credit, sections 17.1.1 &

17.2.) Smoby was also required to organize an annual information meeting with the Banks and present its business plan and financial situation to the Banks. (Id. at section 19.1.10.)

30. After the deal was finalized, Breuil began utilize the 250M Euro credit line at a rapid pace, diverting a significant portion to his own private enrichment as described above.

31. The Banks inevitably became aware of Breuil's misconduct through: (1) their personal connection to Breuil; (2) their private access to Breuil outside the presence of the Board of Directors; (3) their regular review of Smoby's expenditures, in-group transfers, and subsidiary reports over a two-year period; (3) their receipt, review, and approval of Smoby's continual credit requests for that same period; (4) their participation in annual financial presentations and projections mandated by the loan documents; and (5) Breuil's rapid depletion of the 250M Euro credit. Such a large amount of debt relative to Smoby's revenues would have been a red flag to any arms-length bank.

32. Yet, The Banks turned a willful blind eye to Smoby's internal fraud, failing to report Breuil's wrongdoing to the authorities, auditors, or potential investors. Instead, The Banks extended the entire credit to Breuil. Instead of a legitimate enterprise, Smoby became a shell for The Banks to write off their bad debts and play for time.

33. When it became clear in 2006 that Smoby could not repay its debt, The Banks granted Smoby yet another loan – this time a "bridging" loan on October 30, 2006 in the amount of 27,000,000 Euros. But Breuil quickly drew down this amount as well.

34. The Bridging Loan in turn came due in March, 2007. When Smoby again became unable to pay its debts, The Banks finally defaulted it. On March 19, 2007, the French Commercial Court of Lons Le Saunier initiated a "safeguarding procedure" against Smoby, a form of pre-bankruptcy debtor protection under French law.

### Breuil Lures American Investor MGA into Purchasing Smoby
### by Providing it With Falsified Financial Statements

35. Plaintiff MGA is known worldwide as a toy company manufacturing the popular "Bratz" doll brand. In or around January or February of 2007, Jean Christophe-Breuil called MGA

6

10012.003 - 184730.4

owner Isaac Larian, asking him whether he was interested in buying the Breuils' shares in Smoby.

36. MGA, knowing of Smoby's dominant position in the European toy market, was interested. MGA reasonably believed Smoby to be a lawful enterprise. The Breuils were a well known family. Breuil did not mention Smoby's losses, but only the existence of the Bank loans. Smoby, a household name in France, is listed on the French Stock Market, which is supervised by the AMF. MGA entered into preliminary negotiations to purchase its shares in or around March 2007.

37. On April 5, 2007 MGA issued an initial offer from its Van Nuys office to purchase a controlling interest in Smoby in exchange for an 80M EUR investment in the company, and payment of 35% of outstanding debt (87.5M EUR) to the Banks. The offer was contingent upon, among other things, MGA's review of Smoby's accounting records.

38. On April 6, 2007, the Breuils sent correspondence to Smoby's Van Nuys office agreeing to open exclusive negotiations with MGA for purchase of Smoby shares.

39. On or around April 13, 2007, Mr. Larian and Mr. Breuil met in New York and reached an agreement detailing Breuil's compensation going forward if MGA acquired Smoby and Breuil remained aboard as a manager.

40. MGA thereupon entered a due diligence period for the purchase of Smoby. Breuil continued to represent to MGA that, despite its current troubles, Smoby was a legitimate business conducted for a legitimate purpose. Smoby submitted facially valid due diligence materials to MGA, including but not limited to financial data, records, spreadsheets, and reports. MGA also relied on information provided by Ernst & Young and the statutory auditors Grant Thornton, which certified financial statements for Smoby for the years 2005 and 2006 as accurate and true.

41. The due diligence materials were in fact false in several material respects. They omitted the existence and nature of Breuil's offshore companies, and the improper diversions of money to entities under Breuil's control. In particular:

    a.   The commercial operations made by Breuil's holding company CGM until 2002 were omitted from Smoby Group's reports;

    b.   Numerous and substantial advances made by Smoby to the Breuil-controlled

1  companies CGM, FRM, RP2M, were omitted from the 2005 and 2006 reports;

2     c.  Advances of several hundred thousands of euros in 2006 by Smoby to SMG

3      were omitted from the reports;

4     d.  The accounts of SMG for the periods ending in September 30, 2004, 2005 and

5      2006 were materially inaccurate;  and

6     e.  The accounts of Smoby Spain (and consequently the consolidated accounts of

7      the group Smoby) for 2005 and 2006 were materially inaccurate.

8      42. MGA also retained Ernst & Young to develop forecasts on the financial information

9  provided to it by Smoby.  Despite Smoby's problems, Ernst & Young predicted a profitable

10  EBITDA of 22M Euros for 2007 based on the anticipated additional investments in Smoby.  On this

11  understanding, MGA pressed forward with the deal.

12

13  **The Banks Take Advantage of the Actions of MGA's Counsel to**

14  **Unload Smoby's Toxic Debt on the Unsuspecting MGA**

15      43.  Meanwhile, MGA presented the perfect target for the Smoby lenders to shift their

16  huge exposure on the Smoby credit from an insolvent fraudster to a well-known American company.

17  The Banks began to maneuver to do so without alerting MGA of the true state of Smoby's affairs.

18  As lenders, all The Banks had access to information regarding Smoby.  They knew of Smoby's

19  financial situation and that the accounts were not reflective of the actual operations of Smoby.

20      44. In April, MGA held meetings with all of The Banks to discuss the Smoby debt.  All

21  of The Banks deceived MGA and withheld information regarding Smoby.  MGA was induced by all

22  of The Banks to invest in Smoby.  The Banks refused to negotiate the price down despite their

23  acquisition of Smoby's debt at a discounted price.  The Banks also did not disclose to MGA the

24  frauds occurring at Smoby.  Instead, in an attempt to make Smoby appear more attractive to MGA,

25  The Banks (through Deutsche Bank) submitted a shill bid offering to convert Smoby's debt to

26  equity.  The conduct of The Banks further led MGA to believe that Smoby was a valuable,

27  legitimate enterprise.  It was to the benefit of all The Banks not to disclose what they knew about

28  Smoby to MGA, because MGA would be lured into making The Banks' bad debt good.

10012.003 - 184730.4

45. In reliance on the facts that: (1) Smoby was a listed company; (2) Smoby had Societe Generale as a long-time lender and investor; (3) Smoby had Deutsche Bank as a major new lender and investor; (4) Smoby had all of the additional banks as lenders and investors; (5) MGA had been provided due diligence materials purportedly showing Smoby was a legitimate company; and (6) the representations of the Breuils and all of The Banks, MGA exercised via a letter from Van Nuys, California its call option purchasing the Smoby shares on May 7, 2007. Smoby's shares were transferred to MGA on May 11, 2007.

46. Because MGA was unfamiliar with the French language and local customs, it needed to rely on local counsel to finalize the purchase of Smoby. However, due to influence by powerful French banks, MGA was unable to secure a quality law firm.

47. The Banks have subsequently initiated a lawsuit against MGA alleging damages in the amount of 250 Million Euros on the basis of a letter sent by the counsel they did retain, Jean-Paul Poulain, to the President of the Commercial Court of Lons le Saunier on April 17, 2007.

48. According to the Banks, in this letter, MGA undertook to repay 100% of The Banks' claims over 10 years pursuant to a safeguard plan. In fact, MGA never made such an undertaking, the letter sent by Poulain is irrelevant, and The Banks' assertion is contradicted by other offers MGA made to The Banks, all of which provided for a purchase of the claims at a reduced rate. The Banks' attempt to force MGA to pay off the bad debt of Smoby, after MGA put over $50 million into the company, is tantamount to bad faith.

**The Banks Force Smoby Into Bankruptcy Despite MGA's Attempts to Perform The Contract**

49. Unaware of the fraud that had been committed on it, MGA proceeded in good faith to perform its side of the deal. MGA made substantial contributions in the amount of 53.2 Million Euros to Smoby. These included the following:

    a. 12.5 Million Euros in cash infusions from June through August, 2007;

    b. A 29 Million Euro letter of credit from HSBC (drawn down in October 2007); and

    c. 11.7M Million Euros in additional investments in October 2007.

10012.003 - 184730.4

50. MGA also paid Breuil 5 Million Euros from MGA in connection with the deal, as well as $4.8 million in legal fees, Ernst & Young bills, and miscellaneous deal fees.

51. Despite MGA's contributions, Smoby's financial performance inevitably fell far below expected, because the forecasts were based on Smoby's false financial data. In September of 2007, as real numbers emerged, Smoby's forecasted performance plummeted from a 22 Million Euro profit, to a 20-30 Million Euro loss.

52. In the face of Smoby's losses – and The Banks' refusal to meaningfully negotiate down the debt – the French Commercial Court ordered Smoby into bankruptcy ("redressement judicaire") in October, 2007.

53. In the course of these proceedings, MGA continued to submit several proposals to settle the Banks' debt, all of which were ultimately rejected.

54. Despite its best efforts, MGA was unable to present a safeguard procedure that would resuscitate Smoby to the satisfaction of the French Commercial Court. In or around March 2008, the Court ordered the assignment of Smoby's assets to the German company Cimba and put Smoby into judicial liquidation.

55. Despite the fact that MGA had done little more than pump millions of euros into a defunct company that it held for less than a year, the Banks instituted an action against MGA in or around July 2008 for the entire 250M+ EUR debt acquired by Smoby prior to MGA's ownership of the company.

**The French Government Builds a Criminal Case Against Breuil and His Collaborators**

56. The French Public Prosecutor subsequently raided Breuil's home and opened a criminal investigation against Breuil for his misuse of Smoby assets. Because Breuil succeeded in keeping his and The Banks' complex fraudulent corporate transactions hidden from view, it has taken the Public Prosecutor years to build the case. Investigations are still continuing under the auspices of the investigating magistrate.

57. In 2009 criminal investigations were also opened against Berchet, Bondier, and Ecoiffer in connection with their role in the Smoby scheme.

10012.003 - 184730.4

58. In 2009, the nature of Breuil's fraud was finally brought to light. In July 23, 2009, Government-appointed experts Jean-Luc Moncorge, Edouard Thalgott, and Michel Bryas published a detailed report in the Court of Appeal of Nancy, France disclosing Breuil's criminal scheme. The report traced the illegal flows of money between Effective Label Limited, Smoby Espana, Oyonnax Berchet, SCI du Marais, Bondier, Ecoffier, and other persons and/or entities affiliated with Smoby.

59. The report also exposed material omissions of fact in statutory audit reports, which were in turn compiled from data supplied by Smoby.

60. As a result of the wrongdoing of Breuil and The Banks, MGA has lost approximately 53.2 Million Euros in investments. MGA has also incurred 250M+ Euros in purported liability to the Banks, $4.8 million in legal fees, Ernst & Young bills, and miscellaneous deal fees, and 5 Million Euros in payments to Breuil for a total of over 300 Million Euros in damages.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (Joint and Several Liability of Management Principals or Materially Aiding Personnel

### [*Corp Code* § 25504])

### By MGA Against Defendant Banks and DOES 1-50

61. Plaintiff realleges and incorporate by reference all of the allegations contained in the preceding paragraphs, inclusive, as though fully set forth herein.

62. In or around April, 2007, Breuil offered for sale shares providing a controlling interest in Smoby in exchange for an 80M EUR investment in the company, and payment of 35% of outstanding in debt (87.5 EUR) to The Banks. The transaction was made by means of both written and oral communications, including the following: (1) January and February, 2007 oral communications from Mr. Breuil to Mr. Larian; (2) an April 6, 2007 letter opening negotiations with MGA; (3) financial records, including 2006 consolidated financial statements and cash flow analyses prepared by Smoby management, Grant Thornton and Ernst & Young; and (4) an "Impairment Test" dated October 11, 2006.

11

10012.003 - 184730.4

63. The above communications represented Smoby to be a legitimate enterprise run for a legitimate purpose. These representations were false. Smoby omitted the following material facts establishing pervasive criminal conduct throughout the enterprise:

    a. The transferring of funds across national boundaries to related companies in order to obscure transfers of money to the Company's owner;

    b. The issuing of deliberately false balance sheets of foreign subsidiaries;

    c. The falsifying of client receivables;

    d. The issuing, and paying of invoices to, foreign shell companies set up for the owner's personal benefit;

    e. The organized laundering of misused corporate funds;

    f. The forging of invoices;

    g. The paying of deliberately over-valued rents to related companies; and

    h. The diverting of incoming payments to the owner's own accounts.

64. The financial statements and projections provided to MGA also omitted the following key material facts:

    a. That commercial operations made by Breuil's holding company CGM until 2002 were omitted from Smoby Group's reports;

    b. That numerous advances made by Smoby to the companies the Breuil controlled companies CGM, FRM, RP2M were omitted from Smoby's 2005 and 2006 financial reports;

    c. That Advances of 205K EUR and 221K EUR made in 2006 by Smoby to SMG were omitted from the reports; and

    d. That Smoby had wrongfully overvalued the consolidated net worth of its accounting orders made by Smoby Spain since March 31, 2005 by 1M EUR

65. The Defendant Banks were entities who, directly or indirectly, controlled Smoby through a joint venture. The joint venture was established both through conduct, oral and written communications, including:

///

12

10012.003 - 184730.4

    a.  A longstanding banking relationship between Societe Generale and the Breuil family, which had upper level contacts at the bank and used it for its personal banking;

    b.  A backdoor management relationship, by which Societe Generale would dictate to the Breuil family key company decisions at Smoby outside the presence of the Company's Board of Directors;

    c.  An oral joint agreement to fund the 250M EUR Smoby expansion in exchange for offloading the Berchet bad debt;  and

    d.  A September 26, 2005 "Granting of Credit" agreement giving the Banks the right to review and approve: (1) Smoby's acquisition of any substantial financial debt; (2) Smoby's entering into any significant leases; (3) Smoby's disposal of any significant companies; (4) Smoby's entering into any expansion efforts; and (5) Smoby's participation in any other joint venture operations.

66. In justifiable reliance on Defendants' conduct, MGA has invested 53.2M EUR in Smoby, a total loss.  MGA has also been subjected to alleged liability to the Banks in the amount of 250M+ EUR resulting in a total potential loss of $428,815,760 (303.2M EUR).

## SECOND CAUSE OF ACTION

**(Joint and Several Liability of Materially Assisting Persons *Corp Code* § 25504.1)**

**By MGA Against Defendant Banks and DOES 1-50**

67. Plaintiff realleges and incorporates by reference all of the allegations contained in the preceding paragraphs, inclusive, as though fully set forth herein.

68. On information and belief, The Banks knowingly, willfully, and materially assisted Breuil in his embezzlement scheme by:

    a.  Pressuring the Breuil family outside the presence of the Smoby Board of Directors to acquire the bad debt of Berchet in exchange for additional expansion euros;

10012.003 - 184730.4

    b.  Funding the expansion of Smoby;

    c.  Failing to disclose to MGA, the French Government, or statutory auditors their knowledge of Breuil's frauds gained through their personal relationship to the Breuil family, their regular review of Breuil's internal financial records and business plans over a two year period, and their privity to all of Smoby's key financial decisions;

    d.  Continuing to extend credit and bridge loans to Breuil despite their knowledge of his criminal activities and the disproportionate size of the debt to Smoby's gross revenues;

    e.  Failing to disclose to MGA the criminal fraud that had occurred at Smoby both prior to the sale during the course of extensive negotiations with the bank, and afterwards throughout the course of the borrower-lender relationship;

    f.  Submitting a shill bid for Smoby in an attempt to give the company false legitimacy in MGA's eyes; and

    g.  Actively pursuing the full 250M+ EUR debt against MGA, despite MGA's investment of over $50 million in the company and its total loss of the company only a few months after acquiring it.

69. The Banks undertook these acts with intent to deceive or defraud MGA.

70. In justifiable reliance on Defendants' conduct, MGA has invested 53.2M EUR in Smoby, a total loss. MGA has also been subjected to alleged liability to the Banks in the amount of 250M+ EUR, resulting in a total potential loss of $428,815,760 (303.2M EUR).

## THIRD CAUSE OF ACTION

### (Breach of Contract)

### By All Plaintiffs Against The Banks and Does Nos. 1-50

71. Plaintiff realleges and incorporates by reference all of the allegations contained in the preceding paragraphs, inclusive, as though fully set forth herein.

16012.003 - 184730.4

72. Plaintiff was a successor-in-interest to an Agreement with The Banks as evidenced by the September 26, 2005 Granting of Credit (See Credit Agreement, attached as **Exhibits A and B** hereto.)

73. Plaintiff performed all obligations it was required to perform under the contract or its obligations were otherwise excused because of The Banks' breach.

74. There was implied in the Agreement between The Banks and MGA and related loan documents, a covenant of good faith and fair dealing whereby The Banks impliedly covenanted that they would in good faith and in the exercise of fair dealing deal with MGA fairly and honestly and do nothing to impair, interfere with, hinder, or potentially injure MGA rights.

75. The Banks breached the Agreement by, among other things:

    a.  Failing to disclose to MGA at any time frauds occurring at Smoby which materially impacted MGA's ability to repay Smoby's debt; and

    b.  Refusing to negotiate with MGA in good faith to repay Smoby's debts, driving the company into bankruptcy, and seeking to collect the debt in full against MGA, despite MGA's investment of over $50 million in the company and its total loss of the company only a few months after acquiring it.

76. As a result of the Banks' breaches, plaintiff has sustained damages in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION

### (Fraud (Conspiracy))

### By MGA Against the Defendant Banks and Does 1-50

77. Plaintiff realleges and incorporates by reference all of the allegations contained in the preceding paragraphs, inclusive, as though fully set forth herein.

78. Plaintiff believes and thereupon alleges that Breuil's misrepresentations were part and parcel of a conspiracy to overleverage Smoby, run it into default, and then unload the bad debt onto an unsuspecting investor, MGA. Each of the participants, including the above-named defendants, actively conspired to effectuate Breuil's misrepresentations and conceal the truth from MGA.

79. The defendant Banks affirmatively forwarded the conspiracy with intent to defraud plaintiff by:

    a. Pressuring their crony Breuil to acquire Berchet and its bad debt in exchange for Smoby expansion funds;

    b. Turning a blind eye to Breuil's fraudulent diversions and embezzlements to play for time;

    c. Continuing to extend credit to Breuil despite their knowledge of his continuing frauds and the disproportionate size of the debt to Smoby's gross revenues;

    d. Failing to report the criminal frauds to auditors or the authorities;

    e. Intentionally concealing the frauds of Breuil in their negotiations with MGA;

    f. Submitting a shill bid for Smoby to legitimize the company in MGA's eyes; and

    g. Actively pursuing the full 250M+ EUR debt against MGA, despite MGA's investment of over $50 million in the company and its total loss of the company only a few months after acquiring it.

80. MGA, at the time it took the actions herein alleged, was ignorant of the true facts regarding Smoby.

81. In reasonable reliance on defendants' representations, MGA took the actions herein alleged. Had MGA known the true facts, it would not have taken such action.

82. MGA's reliance was justified because of its belief that defendants were dealing with it fairly, honestly, and in good faith; because of its lack of knowledge of French culture, court system, or language; because of defendants' reputation as allegedly honest and reputable banks; because Smoby was a publicly listed company; and because there was nothing that led MGA to believe that defendants or Smoby would defraud and exploit them.  MGA's level of due diligence was completely adequate in light of Smoby's listed status, its partnership with legitimate banks, and its long history with Societe Generale.

/ / /

10012.003 - 184730.4

83. Defendants' fraud has caused substantial damages to plaintiff, including but not limited to the full amount of its 53.2M EUR investment in Smoby, a total loss.  MGA has also been subjected to alleged liability to the Banks in the amount of 250M EUR+, resulting in a total potential loss of $428,815,760 (303.2M EUR).

84. As alleged above, these defendants are guilty of oppression, fraud, and/or malice as defined in *Civil Code* section 3294, and plaintiff should recover, in addition to actual damages, exemplary and punitive damages to make an example of and to punish defendants, in an amount according to proof.

## FIFTH CAUSE OF ACTION

### (Fraudulent Nondisclosure)

### By MGA against The Banks, and Does 1-50

85. Plaintiff realleges and incorporates by reference all of the allegations contained in the preceding paragraphs, inclusive, as though fully set forth herein.

86. As alleged herein, by virtue of The Banks' superior knowledge of material facts which they knew were neither known by nor readily accessible to MGA, they owed plaintiff a duty to disclose the facts that:

    a. Breuil had committed multiple criminal acts of embezzlement and fraud at Smoby;

    b. Breuil's unauthorized diversion of assets to shell entities had drained Smoby of millions of Euros;

    c. Breuil's submission of fraudulent financial records relied on by MGA in acquiring Smoby materially misstated the value of the company and its projected future cash flow, and concealed its losses.

87. The Banks breached their duty to disclose with the intent to defraud and deceive MGA, and with the intent to induce it to act in a manner herein alleged.

88. MGA, at the time it took the actions herein alleged, was ignorant of the facts defendants failed to disclose, and of their secret intent not to fully and truthfully disclose all facts

10012.003 - 184730.4

1 | regarding the Smoby transaction.

2 | 89. In reasonable reliance on defendants' representations and failures to disclose, MGA
3 | took the actions herein alleged. Had MGA known the true facts, it would not have taken such
4 | action.

5 | 90. MGA's reliance was justified because of its belief that defendants were dealing with
6 | it fairly, honestly, and in good faith; because of defendants' reputation as allegedly honest and
7 | reputable banks; because of its lack of knowledge of French culture, court system, or language;
8 | because of Smoby's reputation as a publicly-listed company; because of the Breuil's reputation in
9 | the region; and because there was nothing that led MGA to believe that defendants would defraud
10 | and exploit it. MGA's level of due diligence was completely adequate in light of Smoby's listed
11 | status, its partnership with legitimate banks, and its long history with Societe Generale.

12 | 91. As a proximate result of defendants' fraud and deceit, and the facts alleged herein,
13 | MGA has sustained damage in an amount to be proved at trial.

14 | 92. As alleged above, these defendants are guilty of oppression, fraud, and/or malice as
15 | defined in *Civil Code* section 3294, and MGA should recover, in addition to actual damages,
16 | exemplary and punitive damages to make an example of and to punish defendants, in an amount
17 | according to proof.

18 |

19 | **SIXTH CAUSE OF ACTION**

20 | **(Fraud (Aiding and Abetting))**

21 | **By MGA Against the Defendant Banks and Does 1-50**

22 | 93. Plaintiff realleges and incorporates by reference all of the allegations contained in the
23 | preceding paragraphs, inclusive, as though fully set forth herein.

24 | 94. Plaintiff believes and thereupon alleges that Breuil's misrepresentations were
25 | intended to overleverage Smoby, run it into default, and then unload the bad debt onto an
26 | unsuspecting investor, MGA.

27 | 95. The defendant Banks gave material assistance to Breuil and encouraged its conduct
28 | by the following:

a.     Pressuring their crony Breuil to acquire Berchet and its bad debt in exchange for Smoby expansion funds;

b.     Turning a blind eye to Breuil's fraudulent diversions and embezzlements to play for time;

c.     Continuing to extend credit to Breuil despite their knowledge of his continuing frauds and the disproportionate size of the debt to Smoby's gross revenues;

d.     Failing to report the criminal frauds to auditors or the authorities;

e.     Intentionally concealing the frauds of Breuil in their negotiations with MGA;

f.     Submitting a shill bid for Smoby to legitimize the company in MGA's eyes; and

g.     Actively pursuing the full 250M+ EUR debt against MGA, despite MGA's investment of over $50 million in the company and its total loss of the company only a few months after acquiring it.

96. MGA, at the time it took the actions herein alleged, was ignorant of the true facts regarding Smoby.

97. In reasonable reliance on defendants' representations, MGA took the actions herein alleged.  Had MGA known the true facts, it would not have taken such action.

98. MGA's reliance was justified because of its belief that defendants were dealing with it fairly, honestly, and in good faith; because of its lack of knowledge of French culture, court system, or language; because of defendants' reputation as allegedly honest and reputable banks; because Smoby was a publicly listed company; and because there was nothing that led MGA to believe that defendants or Smoby would defraud and exploit them.  MGA's level of due diligence was completely adequate in light of Smoby's listed status, its partnership with legitimate banks, and its long history with Societe Generale.

99. Defendants' fraud has caused substantial damages to plaintiff, including but not limited to the full amount of its 53.2M EUR investment in Smoby, a total loss.  MGA has also been subjected to alleged liability to the Banks in the amount of 250M EUR+, resulting in a total potential loss of $428,815,760 (303.2M EUR).

19

FIRST AMENDED COMPLAINT

10012.003 - 184730.4

100.     As alleged above, these defendants are guilty of oppression, fraud, and/or malice as defined in *Civil Code* section 3294, and plaintiff should recover, in addition to actual damages, exemplary and punitive damages to make an example of and to punish defendants, in an amount according to proof.

## SEVENTH CAUSE OF ACTION

### (Negligence)

### By MGA against The Banks and Does 1-50

101.     Plaintiff realleges and incorporates by reference all of the allegations contained in the preceding paragraphs, inclusive, as though fully set forth herein.

102.     Defendants had a duty to use an appropriate level of skill, prudence and diligence in discharging the duties owed to plaintiff. Defendants were required to use as much skill, prudence and diligence as members of their applicable profession commonly possess and exercise.

103.     The Banks failed to use reasonable care, skill and diligence in selecting, underwriting, originating, issuing, and servicing their loan to Smoby by:

    a.  Extending hundreds of millions of Euros to Smoby despite their knowledge of Breuil's ongoing criminal activity at the company, and the disproportionate size of the debt to Smoby's gross revenues;

    b.  Failing to disclose to MGA prior to its acquisition of Smoby of the pervasive frauds; and

    c.  Failing to negotiate in good faith with MGA for a reasonable reduction of the Smoby debt that would have preserved both The Banks' and MGA's interests in Smoby.

104.     As a proximate result of defendants' negligence alleged herein plaintiff has suffered damages in an amount to be proved at trial.

///

///

///

20

FIRST AMENDED COMPLAINT

10012.003 - 184730.4

## PRAYER

WHEREFORE, plaintiff prays judgment against defendants, and each of them, as follows:

**Causes of Action One and Two**

For restitution of plaintiff's investment and restitution of any judgment obtained by The Banks or their successors-in-interest against MGA for the debt purchased by MGA.

**Causes of Action Three and Seven**

For compensatory damages exceeding $428,815,760 according to proof.

**Causes of Action Four, Five, and Six**

1. For general damages exceeding $428,815,760 according to proof.

2. For punitive damages according to proof at trial.

**On All Causes of Action**

1. For interest at the legal rate;

2. For attorney fees on all applicable claims;

3. For costs of suit incurred herein; and,

4. For such other further relief as the Court deems just and proper.

DATED: May 9, 2011

CAPPELLO & NOËL LLP

By:

A. Barry Cappello
Leila J. Noël
Wendy D. Welkom
Matthew H. Fisher
Attorneys for Plaintiff

10012.003 - 184730.4

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues so triable in this action.

DATED:  May 9, 2011

CAPPELLO & NOËL LLP

By:

A. Barry Cappello
Leila J. Noël
Wendy D. Welkom
Matthew H. Fisher
Attorneys for Plaintiff

22

FIRST AMENDED COMPLAINT

10012.003 - 184730.4

Dated 26th September 2005
**SMOBY**
Company
and
**CALYON**
**SOCIETE GENERALE**
Mandated Arrangers
and
**CALYON**
Credit Agent and GuaranteeAgent
et
**THE BANKS AND CREDIT ESTABLISHMENTS**
Banks


**GRANTING OF CREDIT**
**EUR 250.000.000**
Herbert Smith LLP

SUMMARY

| | |
|---|---|
| 1. DEFINITIONS AND INTERPRETATION | 5 |
| 2. THE CREDIT | 16 |
| 3. PRECONDITIONS OR CONCOMITANT CONDITIONS | 17 |
| 4. CONDITIONS OF USE | 19 |
| 5. MODES OF WITHDRAWAL | 19 |
| 6. REIMBURSEMENT | 20 |
| 7. MANDATORY ADVANCE REIMBURSEMENT | 21 |
| 8. VOLUNTARY ADVANCE REIMBURSEMENT | 21 |
| 9. ADVANCE RENUNCIATION | 22 |
| 1O. INTEREST | 22 |
| 11. COMMISSIONS AND FEES | 24 |
| 12. ILLEGALITY | 26 |
| 13. OCCURENCE OF NEW CIRCUMSTANCES | 26 |
| 14. MARKET DISTURBANCES | 28 |
| 15. PAYMENTS | 29 |
| 16. DECLARATIONS AND GARANTEES | 31 |
| 17. INFORMATION COMMITMENTS | 33 |
| 18. FINANCIAL COMMITMENTS | 34 |
| 19. OTHER COMMITMENTS | 34 |
| 20. ADVANCE PAYABILITY | 36 |
| 21. LATE INTEREST | 38 |
| 22. GUARANTEE DOCUMENTS | 38 |
| 23. CREDIT AGENT AND GUARANTEE AGENT | 39 |
| 24. ADJUSTMENT OF PAYMENTS | 43 |
| 25. AMENDMENTS | 43 |
| 26. CHANGE IN BORROWERS | 45 |

27. TRANSFER BY THE BANKS                                            46
28. NOTIFICATIONS                                                    47
29. NON-RENUNCIATION                                                 49
30. INTERPRETATION AND AUTONOMY OF STIPULATIONS                      49
31. APPLICABLE LAW AND COMPETENCE                                    49
ANNEX 1 PART 1 LIST OF INTITIAL BORROWERS OTHER THAN THE
COMPANY                                                              50
ANNEX 1 PART 2 LIST OF BANKS                                         51
ANNEX 2 PART 1 MODEL NOTIFICATION OF WITHDRAWAL OF THE
TRANCHE A OF CREDIT                                                  53
ANNEX 2 PART 2 MODEL NOTIFICATION OF WITHDRAWAL OF THE
TRANCHE B OF CREDIT                                                  55
ANNEX 2 PART 3 MODEL NOTIFICATION OF WITHDRAWAL OF THE
TRANCHE C OF CREDIT                                                  57
ANNEX 3 MODEL NOTIFICATION OF PERIOD OF INTEREST                     59
ANNEX 4 MODEL NOTIFICATION OF TRANSFER                              60
ANNEX S MODEL LETTER OF ADHESION                                    62
ANNEX 6 MODEL LETTER OF WITHDRAWAL                                  63
ANNEX 7 MODEL CERTIFICATE OF RESPECT OF FINANCIAL RATIOS  64
ANNEX 8 MODEL CERTIFICATE OF LENDING BANKS FOR
EXISTING BANKING EXAMINATIONS                                       65
ANNEX 9 CALCULATION OF MANDATORY COSTS                              66
ANNEX 10 MODEL CONTRACT OF TRANSFER OF PROFESSIONAL ACCOUNTS
RECEIVABLE                                                          69
ANNEX 11 LIST OF EXISTING GUARANTEES                                89
ANNEX 12 LIST OF EXISTING LITIGATION                                90

**EXHIBIT A**                                                        24

Opeing of Credit in amount of 250.000.000 EUR

BETWEEN:
SMOBY, limited liability company with board of directors and supervisory board with
capital of 7306,672 EUR, headquartered at Quartier Bourg. Dessus, 39170 Lavans Les St
Claude, France, registered at Registre du Commerce et des Sociétés de Lons-Le-Saunier
under the number 646 050 351, represented by Mr. Jean-Christophe BREUIL, duly
authorized for this purpose, hereinafter called "The Company",
as one party,

The subsidiaries of the Company enumerated in Part 1 of Annex 1 in quality of initial
borrowers,
as second party,

CALYON, limited liability company with capital 3.119.771.484 EUR headquartered at
9 quai Paul Doumer, 92920 Paris La Défense Cedex, France, registered at Registre du
Commerce et des Sociétés de Nanterre under the number 304 187 701,

SOCIETE GENERALE, limited liability companywith capital 550.181.598,75 EUR,
headquartered at 29, boulevard Haussmann, 75009 Paris, France, registered at Registre
du Commerce et des Sociétés de Paris under the number 552120222,

Calyon and Société Générale hereinafter named the "Mandated Arrangers",
As third party,

THE BANKS AND FINANCIAL ESTABLISHMENTS designated in Part 2 of Annex 1
(defined hereinafter individually as a "Bank" − including all successors, entitled parties or
assignees under the terms of Article 27 (Transfer by the Banks) of the present Contract - and
collectively the "Banks')
as fourth party,

AND

CALYON, limited liability company with capital 3.119.771.484 EUR headquartered at
9 quai Paul Doumer, 92920 Paris La Défense Cedex, France, registered at Registre du Commerce
et des Sociétés de Nanterre under the number 304 187 701, hereinafter called the "Credit Agent"
and the "Guarantee Agent ",  including all successors of the Credit Agent and the Guarantee
Agent under the terms of Article 23.9 (Succession of the Credit Agent or the Guranty Agent) of
the present Contract,
as fifth party.

AFTER HAVING RECALLED THAT:

The Banks are able to make available to the Borrower a Credit in the maximum amount in
principal of 250.000.000 EUR (two hundred and fifty million euros) according to the terms of the
present Contract.

**EXHIBIT A**                                                                 25

IT HAS BEEN AGREED THAT :
1. DEFINITIONS AND INTERPRETATION
1.1 Definitions
For the application of the present Contract, except stipulations to the contrary, the terms and expressions below will have the following meaning attributed to them:

"Acquisition" designates any acquisition of immobile asset, real estate, corporeal or incorporeal by a Borrower.

"Credit Agency" designates for each Bank the agency (or agencies) at which its participation in any Withdrawal is posted under the Contract and whose contact information on the Signature Date figures in Part 2 of Annex l, it is understood that the Credit Agent and each Bank reserves the right to modify at any time their domicile on the condition that this new domicile is situated in a State of the European Union as it is in May 2004 which has signed with France an international tax treaty in order to prevent double taxation and allowing to make payments under tht terms of the Credit without withholding at the source, tax or deduction of any nature.

"Notification of Withdrawal" designates Notification of Withdrawal of Tranche A of Credit, the Notification of Withdrawal of Tranche B of Credit and the Notification of Withdrawal of Tranche C of Credit.

" Notification of Withdrawal of Tranche A of Credit" designates Notification in accordance with the model figuring in Part 1 of Annex 2 relative to the request to Withdraw of Tranche A of Credit.

" Notification of Withdrawal of Tranche B of Credit" designates a Notification in accordance with the model figuring in Part 2 of Annex 2 relative to the request to Withdraw of Tranche B of Credit.

" Notification of Withdrawal of Tranche C of Credit" designates a Notification in accordance with the model figuring in Part 3 of Annex 2 relati ve to the request to Withdraw of Tranche C of Credit.

"EURIBOR Reference Banks" designates the principal agent in Paris of the following Banks: Calyon and Société Générale or any other establishment of Credit designated by common agreement between the Borrower and the Majority of Banks in the case where one of the EURIBOR Reference Banks can no longer or no longer accepts to act as such.

"LIBOR Reference Banks" designates the principal agent in London of the following Banks: Calyon and Société Générale or any other establishment of Credit designated by common agreement between the Borrower and the Majority of Banks in the case where one of the LIIBOR Reference Banks can no longer or no longer accepts to act as such.

"Case of Advance Payability" designates any event foreseen in Article 20 (Advance Payability).

"Case of Potential Advance Payability" designates any event susceptible of constituting a Case of Advance Payability from the time of receipt of a notification to this effect or after running of a certain time period or the occurrence of a condition in accordance with Article 20.1 (Case of Advance Payability).

"Authorized Transfers" designates any sale, rental, transfer or other disposal of assets to third parties:
(i) carried out intra-Group ;
(ii) carried out within the framework of normal activities of the Group;
(iii) totally amortized on the balance sheeet;
(iv) carried out with prior approval of the Majority of Banks; or
(v) carried out in the limit of (i) 5% (five per cent) of total assets immobile corporeal, incorporeal, or financial net of provisions and amortizations consolidated of the Group by corporate action, and (ii) 20% (twenty per cent) of total assets immobile corporeal, incorporeal, or financial net of provisions and amortizations consolidated of the Group on the entire duration of the Credit.

"Change of Regulation" designates:
(i) entry into effect, after the Signature Date, of legislation or regulation, new directive or recommendation;
(ii) a modification made, after the Signature Date, to any legislation or regulation, or any directive or recommendation of general application or in the interpretation which is made of it by any competent authority; and
(iii) any recommendation or instruction made, after the Signature Date by a central Bank (including the European Central Bank) or from a tax authority, monetary authority or other competent authority or any association or professional organisation of which a Bank is a member, and notably any recommendation or instruction affecting the constitution of reserves or mandatory deposits, to maintain a minimum level of owned funds, to respect liquidity ratios or relative to modes in which a Bank applies its own funds to its commitments, as well as any change in the interpretation of such recommendations or instructions.

"Contract" designates the present Contract, its annexes and any later amendement to it as well as the separate letter referred to in Article 10.7 (Effective Global Rate).

"Contracts for Transfers of Professional Accounts Receivable" designates the Contracts for transfers of professional accounts receivable concluded on 26th September 2005 between each Initial Borrower as transferor, Guarantee Agent and the Banks as transferees as well as the Contracts for transfer of professional accounts receivable to conclude between the Additional Borrowers as transferors, Guarantee Agent and the Banks as transferees of which a model figures in Annex 10.

"Contract of Autonomous Garantee on First Demand" designates the Contract of autonomous garantee on first demand concluded on the 26th September 2005 between the Company as guarantor and the Banks as beneficiaries.

"Contract of Security of Account of Financial Instruments Concerning the Shares of Majorette Solido" designates
(i) the Contract of security account of financial instruments concluded on 26th September 2005 between the Company as constituent, Guarantee Agent, the Banks as beneficiaries, and Calyon as holder of secured bank account, and concerning the account of financial instruments in which are included the securities of Majorette Solido held by the Company,
(ii) the declaration of security of the account of financial instruments signed by the Company as constituent,
(iii) the certificate of security of the account of financial instruments signed by Majorette Solido as holder of the account, and
(iv) the certificate of security of the special account of financial instruments signed by Calyon as holder of the secured bank account.

"Contract of Security of Account of Financial Instruments Concerning the Shares of J.L.B. Development" designates
(i) the Contract of security of the account of financial instruments concluded on 26th September 2005 between the Company as constituent, Guarantee Agent, the Banks as beneficiaries and Calyon as holder of the secured bank account, and concerning the account of financial instruments in which figure the securities of J.L.B. Development held by the Company,
(ii) the declaration of security of the account of financial instruments signed by the Company as constituent,
(iii) the certificate of security of the account of financial instruments signed by J.L.B. Development as holder of the account, and
(iv) the certificate of security of the special account of financial instruments signed by Calyon as holder of the secured bank account.

"Contract of Security Account of Financial Instruments Concerning Shares of Group Berchet" designates
(i) the Contract of security of the account of financial instruments concluded on 26th September 2005 between the Company as constituent, Guarantee Agent, the Banks as beneficiaries and Calyon as holder of the secured bank account, and concerning the account of financial instruments in which figure the securities of Berchet Group held by the Company,
(ii) the declaration of security of the account of financial instruments signed by the Company as constituent,
(iii) the certificate of security of the account of financial instruments signed by Berchet Group as holder of the account, and
(iv) the certificate of security of the special account of financial instruments signed by Calyon as holder of the secured bank account.

"Contract of Security of the Trademark Smoby" designates the Contract of security of the trademark SMOBY concluded on 26th September 2005 between the Company as constituent, Guarantee Agent and the Banks as beneficiaries.

**EXHIBIT A**                                                    **28**

"Exchange Value" designates, as concerning any Withdrawal to be carried out in Dollars under the terms of Tranche B of Credit or any sum labeled in Dollars on a given date, the amount determined by the Credit Agent (on the basis of the average reference exchange rate of Euros versus Dollars, fixed by the – European Central Bank at 14h00 (two o'clock in the afternoon), on the third prior Working Day) and communicated to the Company and the Borrower concerned, and corresponding to the exchange value (rounded up to the ten thousandth unit below) in Euros of the amount in Dollars of the Withdrawal under consideration as indicated in the Notification of Withdrawal of Tranche B of Credit corresponding to the sum under consideration.

"Costs of Refinancing" designates the positive difference, as the case may be, between:
(i) the amount of interest a Bank should have received between the Advance effective payment date of a sum and the date on which this sum should have been paid, and
(ii) the amount of interest the said Bank could have received by depositing the same sum in a first rate Bank on the European interbank market during the period running from its effective payment date and the date on which this sum should have been paid.

" Mandatory Costs " designates all future costs imposed on the Banks, within the framework of their financing of Credit, by the European Central Bank or the *Financial Services Authority,* as communicated by the Banks concerned to the Company in the 8 (eight) days from its decision to invoice these Mandatory Costs to the Borrower, and calculated in accordance with the stipulations in Annex 9 of the present Contract.

"Credit" designates the Tranche A of Credit, the Tranche B du Credit and the Tranche C of Credit.

"Bridge Loan" designates le Bridge Loan of 10.000.000 EUR (ten million Euros) granted to the Company on 30th June 2005 by Calyon and Société Générale to finance the contribution in the current account made at Berchet Group, the said current account having to be incorporated into the capital before the 31st December 2006 at the latest, up to the minimum sum of  10.000.000 EUR (ten million Euros).

"Final Maturity Date of Tranche A of Credit" designates the 7th (seventh) anniversary date from the Signature Date.

"Final Maturity Date of Tranche B of Credit" designates the 5th (fifth) anniversary date from the Signature Date.

"Final Maturity Date of Tranche C of Credit" designates 7th (seventh) anniversary  date from the Signature Date.

"Interest Payment Date" designates the last day of an Interest Period, under reserve of stipulations in Article 15.7 (Payments made on a Working Day) of the present Contract.

"Signature Date" designates the date of signature of the Contract.

**EXHIBIT A**                                                                                                    **29**

"Withdrawal Date" designates the day funds are made available under the terms of a Withdrawal as referenced in the corresponding Notification of Withdrawal.

"Derniers Accounts Annuels Consolidés" designates à tout moment the accounts annuels (balance sheet and income account) consolidated of the Company, relative to the last fiscal year closed, as certified by its auditors, and established in accordance with accounting principes used to establish accounts in the prior fiscal year, under reserve of stipulations in Article 19.1.1 of the Contract.

"Last Anuual Corporate Accounts" designates at any moment  the annual corporate accounts (balance sheet and income account) of a Borrower, relative to the last fiscal year closed of the said Borrower, as certified by the auditors, and established in accordance with accounting principes used to establish accounts in the prior fiscal year, under reserve of stipulations in Article 19.1.1 of the Contract.

"Last Consolidated Bi-Annual Accounts" designates à tout moment the consolidated bi-annual accounts (balance sheet and income account) of the Company, relative to the first six month period of the current fical year established in accordance with accounting principles used for the establishment of accounts in the prior fiscal year, under reserve of stipulations in Article 19.1.1 of the Contract.

"Last Corporate Bi-Annual Accounts" designates at any moment the corporate bi-annual accounts (balance sheet and income account) of the Borrowers, relative to the first six month period of the current fiscal year and established in accordance with accounting principles used for the establishment of accounts in the prior fiscal year, under reserve of stipulations in Article 19.1.1 of the Contract.

"Financial Debt" designates any Payment obligation (inscribed on the balance sheet or theAnnex of the balance sheet and required by the accounting rules in effect) including:
(i) all borrowed debt, in whatever form it may be, including all bond debt, convertible or not;
(ii) all financial instruments (with the exception of shares) within the definition of article L. 211-1 of the Monetary and Financial Code, in French or Foreign law, including all debt under a Foreign Exchange Contract or of rates or another conversion Contract;
(iii) all debt (existing or potential) in the form of a garantee in whatever form it may be;
(iv) all Contracts of finacial rental or Lease ;
(v) all debt in the form of cash vouchers, promissory notes or bills of exchange;
(vi) all deferred Payment obligations contracted on the occasion of acquisition of any asset in the measure that the Payment period agreed to constitutes the means of financing the acquisition.

"Availiability" designates, on the basis of Last Annual Consolidated Accounts, the sum between
(i) the Creditor position of bank current accounts of the Company and its Subsidiaries, and
(ii) the Mobile Values of Placement.

"Financing Documents" designates the present Contract, the Guarantee Documents, the Autonomous Garantee on First Demand Contract, the Letters of Commissions, the Notifications of Withdrawal, all Letters of Adhesion and all Letters of Withdrawal.

"Guarantee Documents" designates:
(i) the Contract of security of the Financial Instruments Account Concerning Shares in the Berchet Group;
(ii) the Contract of security of the Financial Instruments Account Concerning Shares in J.L.B. Development;
(iii) the Contract of security of the Financial Instruments Account Concerning Shares of Majorette Solido;
(iv) the Contract of Security of the Trademark Smoby ;
(v) the Contracts of Transfers of Professional Accounts Receivable;
(vi) all Contracts of security concerning the Mobile Values of Placement held by the Company and concluded on demande of the Majority of Banks in accordance with Article 19.2.1 below; and
(vii) all Contracts constituting a Guarantee concluded in accordance with Article 19.2.2. below.

"Dollar" or "USD" designates the money in legal circulation in the United States of America.

"Significant Disfavorable Effect" designates any event that can have a significant disfavorable effect (i) on the financial situation or activity or the perspective of a Borrower or the consolidated financial situation or activity or the perspective of the Group, and (ii) on the capacity of a Borrower to meet its obligations under the Contract.

"Borrower" designates an Initial Borrower or an Additional Borrower, until the moment it stops being a Borrower in accordance with the stipulations of Article 26.3 (Withdrawal of a Borrower).

" Additional Borrower" designates a Company that has become an Additional Borrower in accordance with the stipulations of Article 26.2 (Additional Borrowers).

"Initial Borrower" designates (i) the Company under the terms of Tranche A of Credit and Tranche C of Credit, and (ii) the Company and Subsidiaries enumerated in Part 1 of Annex 1 under the terms of Tranche B of Credit.

"Outstanding Debt" designates, at a given date, the amount determined by the Credit Agent equal to the sum
(i) of total Amounts in Euros of Withdrawals made and not repaid on this date and
(ii) of total Amounts in Euros of all Withdrawals requested and not yet made available to the Borrowers on this date (it is understood that if a Withdrawal intervened on the same day as Reimbursement of another Withdrawal, only the part of the Amount in Euros of

the new Withdrawal exceeding the Amount in Euros of this Withdrawal will be taken into account in this case).

"Financial Debt" designates, on the basis of the Last Annual Consolidated Accounts, all loans, bank and financial debts including the outstanding debt of Lease and financial rental, the Credit-sellers, the factoring transactions, securitization or all other similar transactions concerning the commercial accounts receivable reintegrated in the balance sheet according to international rules called "IFRS" *(International Financial Reporting Standards).*

"Net Financial Debt" designates, on the basis of the Last Annual Consolidated Accounts, the Financial Debt minus Availability.

"Commitment" designates, for a given Bank and under reserve of the stipulations of the Contract, the sum of the Commitment of Tranche A of Credit, of Commitment of Tranche B of Credit and Commitment of Tranche C of Credit. The initial amount of the commitment of each Bank figures in its name in Part 2 of Annex 1.

"Commitment of Tranche A of Credit" designates, for a given Bank and under reserve of stipulations in the present Contract, the amount (eventually modified by virtue of stipulations in the Contract and notably in Article 9 (Early Renunciation) or in Article 13 (Occurrence of new circumstances) that the said Bank commits to put at the disposal of the Company under the terms of Tranche A of Credit in accordance with Article 2.1.

"Commitment of Tranche B of Credit" designates, for a given Bank and under reserve of stipulations in the present Contract, the amount (eventually modified by virtue of stipulations in the Contract and notably in Article 9 (Early Renunciation) or in Article 13 (Occurrence of new circumstances) that the said Bank commits to put at the disposal of the Borrowers under the terms of Tranche B of Credit in accordance with Article 2.1.

"Commitment of Tranche C of Credit" designates, for a given Bank and under reserve of stipulations in the present Contract, the amount (eventually modified by virtue of stipulations in the Contract and notably in Article 9 (Early Renunciation) or in Article 13 (Occurrence of new circumstances) that the said Bank commits to put at the disposal of the Company under the terms of Tranche C of Credit in accordance with Article 2.1.

"Total Commitment" designates at any moment, the sum of the Total Commitment of Tranche A of Credit, of the Total Commitment of Tranche B of Credit and the Total Commitment of Tranche C of Credit.

"Total Commitment of Tranche A of Credit" designates at any moment, the sum of the Commitments of Tranche A of Credit the amount of which is, on the Signature Date, 52.000.000 EUR (fifty two million Euros).

**EXHIBIT A**                                             **32**

"Total Commitment of Tranche B of Credit" designates at any moment, the sum of Commitments of Tranche B of Credit the amount of which is, on the Signature Date, the Maximum Authorized Amount.

"Total Commitment of Tranche C of Credit" designates at any moment, the sum of Commitments of Tranche C of Credit the amount of which is, on the Signature Date, 20.000.000 EUR (twenty million Euros).

"EONIA" designates, for the day under consideration, *the European Overnight Index Average,* the interbank day to day rate on the deposits in Euros and published on page 247 of the Telerate (or on such other possible substitute page or service) the next day. In the case of unavailability of rate thus distributed, EONIA will be determined on the basis of the day to day rate offered on the interbank market by the first rate Banks to the EURIBOR Reference Banks. The Credit Agent will calculate the mathematical average (rounded up, if need be, to the sixteenth per cent 1/16%) higher) of the rates communicated by each of the EURIBOR Reference Banks as dact as possible and the result of such calculation will provide the EONIA applicable to the Payment under consideration.

"EURIBOR" designates the interbank rate published on page 248 of the Telerate (or on such other possible substitute page or service) at around 11h00 (Paris time) on the second Working Day preceding the first day of the Interest Period considered, on whci deposits in Euros are offered for a period equivalent to the said Interest Period. In the event of unavailability of rates thus published, l'EURIBOR will be determined on the basis of annual rates on which deposits in Euros for the same amount as the Withdrawal concerned, are offered for a period equivalent to the Interest Period considered on the interbank market by the first rate Banks to the EURIBOR Reference Banks. Each EURIBOR Reference Bank should indicate, by fax, this rate on request by the Credit Agent. The indicated rate will be the rate gotten at around 11h00 (Paris time) the second Working Day preceding the first day of the Interest Period considered. The Credit Agent will calculate the mathematical average (rounded up, if necessary to the sixteenth per cent (1/16%) higher) of the rates communicated by each EURIBOR Reference Bank as fast as possible and the result of this calculation will provide the EURIBOR applicable to the Interest Period considered.

"Euro" ot "EUR" designates the currency created by the provisions in the European Union Treaty that took effect on lst January 1999 and having legal effect in France.

"Brut Operating Surplus" designates, on the basis of the Last Annual Consolidated Accounts, the amount equal to the sum of operating income, subsidies to net repeat amortizations, and net subsidies to provisions for depreciation of assets, as such posts figure in the Last Annual Consolidated Accounts of the Group, and established in accordance with international rules called "IFRS" *(International Financial Reporting Standards).*

"Breuil Family" designates (i) Mrs. Dany Breuil born Boussant residing Moulin de Marignat, 39360 Chassal, (ii) Mr. Jean Christophe Breuil residing 8, rue du Curé Marquis, 39170 St Lupicin and (iii) Miss Karine Breuil residing Moulin de Marignat, 39360 Chassal.

"Moquin Family" designates (i) Mr. Roger Moquin residing at Bourg Dessus, 39170 Lavans Les St Claude, (ii) Mrs. Danielle Moquin born Clerc residing at Bourg Dessus, 39170 Lavans Les St Claude,(iii) Mrs. Anne Marie Roy born Moquin residing at Vescles (39240), (iv) Mrs. Chantal Lafuitte born Moquin residing at Chemin de Fontanette Lavans, 39170 Lavans Les St Claude, (v) Mr. Pierre Moquin residing at rue F. Bourdeaux, 39170 Lavans Les St Claude et (vi) Mr. Jean Paul Moquin residing at rue de la Fortune, 39170 Lavans Les St Claude.

"Subsidiary" designates any Company of which more than 50% (fifty per cent) of the capital or voting rights are directly or indirectly held by the Company and entering in the perimeter of consolidation of the Company on the basis of the Last Annual Consolidated Accounts, excluding MOB and Giochi Preziosi France.

"Principal Subsidiary" designates any Subsidiary whose income or total assets on the balance sheet or the turnover is superior to 5% respectively of the consolidated income or the consolidated assets on the balance sheet or the consolidated turnover as calculated on the basis of the Last Annual Consolidated Accounts.

"Owned Funds" designates, on the basis of Last Annual Consolidated Accounts, the amount of consolidated owned capital of the du Group established in accordance with international rules called "IFRS" *(International Financial Reporting Standards).*

"Giochi Preziosi France" designates the Company Giochi Preziosi France, simplified joint stock company with capital 100.000 EUR headquartered at rue Blaise Pascal 39000 Lons-Le-Saunier, France, registered at Registre du Commerce et des Sociétés de Lons-Le-Saunier under the number 437 491 566.

"Group" designates the Company and its Subsidiaries.

"Berchet Group" designates the Company Berchet Group, limited liability company with capital 39.500.000 EUR headquartered at 31, Couts de Verdun 01100 Oyonnax, France, registered at Registre du Commerce et des Sociétés de Bourg-En-Bresse under the number 400 432 381.

"J.L.B. Development" designates the Company J.L.B. Development, simplified joint stock company with capital 1.750.000 EUR headquartered at 31, Cours de Verdun 01100 Oyonnax, France, registered at Registre du Commerce et des Sociétés de Bourg-En-Bresse under the number 351 020 474.

"Working Day" designates any entire day (except Saturday and Sunday) when the international interbank market functions and when the Credit establishments are open in Paris and Londres.

"Letter of Adhesion" designates a document substantielly in the format of the model figuring in Annex 5.

"Commission Letters" designate the letters determining commissions provided for in Article 11.1.1 (Commission of the Credit Agent and the Guarantee Agent) and 11.1.2 (Commission for arrangement and participation).

"LIBOR" designates for the Dollar and a given Interest Period, the rate published on page 3570 of the Telerate screen (or any other substitute page or service) at around 11h00 (London time), on the second Working Day preceding the day forseen for a Withdrawal under the terms of Tranche B of Credit, of which the deposits in Dollars are offered for a period equivalent to the said Interest Period.
In the event of unavailability of the rate thus published, LIBOR will be determined on the basis of the rated at which deposits in Dollars of an amount comparable to that of the Withdrawal concerned, are offered for a period equivalente to the Interest Period concerned on the London interbank market by the first rate Banks at LIBOR Reference Banks. Each LIBOR Reference Bank should indicate, by fax, this rate at the request of the Credit Agent. The rate indicated will be the rate acquired at about 11h00 (London time), 2 (two) Working Days before the day appointed for the Withdrawal concerned. The Credit Agent will calculate the mathematical average (rounded up, if necessary, to the sixteenth per cent (1/116%) higher) than the rate communicated by the LIBOR Reference Banks as fast as possible and the result of this calculation will provide the LIBOR applicable to the Withdrawal considered.

"Day to day LIBOR " designates, for the Dollar, the rate established by the Credit Agent as being equal to the mathematical average (rounded up if necessary to the sixteenth per cent (1/16%) higher) than the annual rate indicated to the Credit Agent by the LIBOR Reference Banks as being the rate at which the deposits in Dollars, of an  amount comparable to the amount concerned is offered to them on the London interbank market, for the Working Day for which the rate must be fixed, for a period beginning this Working Day and ending the following Working Day.

"Majorette Solido" designates the Company Majorette Solido, limited liability company with capital 9.4 11.380 EUR headquartered at l0, rue du Companet 69143 Rillieux La Pape, France, registered at Registre du Commerce et des Sociétés de Lyon under the number 391 579836.

"Majority of Banks" designates:
(i) in the absence of Withdrawal, one or more Banks whose Commitment represents more than 66 % of the Total Commitment; or

(ii) in the event Withdrawals are in process, one or more Banks whose cumulative participation amount in the Withdrawals, represents more than 66 % of the Outstanding Debt.

"Margin" corresponds to the Signature Date on :
(i) 0,85 % (zero comma eighty five per cent) per year concerning Tranche A of Credit and Tranche C of Credit;
(ii) 0,60 % (zero comma sixty per cent) per year concerning Tranche B of Credit; under reserve of stipulations in Article 10.2 (Adjustment of the Margin) of the present Contract.

"MOB" designates the Company MOB, simplified joint stock company with capital 3.063.840 EUR headquartered  at 39170 Lavans Les St Claude, France, registered at Registre du Commerce et des Sociétés de Lons-Le-Saunier under the number 403 243 066.

"Amount in Euros" designates, concerning all sums labeled in Euros, the said sum and, concerning all sums labeled in Dollars, the amount in Euros of which the said sum is the Exchange value.

" Maximum Amount-Authorized" designates the maximum amount  made available to the Borrowers by the Banks under tht terms of Tranche B of Credit, adjusted monthly as indicated in the following table:
January 140.000.000 EUR July 160.000.000 EUR
February 135.000.000 EUR August 165.000.000 EUR
March 130.000.000 EUR September 170.000.000 EUR
April 135.000.000 EUR October 178.000.000 EUR
May 140.000.000 EUR November 178.000.000 EUR
June 150.000.000 EUR December 178.000.000 EUR
The amounts indicated in the table above can be modified at the request of the Company and by agreement of the Banks in the month of June each year in order to adapt them to the provisional treasury plan of the Group.

"Notification of Interest Period" designates the notification substantielly in the form of the model figuring in Annex 3 of the present Contract and relative to the notification by the Company to the Credit Agent of the duration of successive Interest Periods applicable to the unique Withdrawal made under the terms of Tranche A of Credit or the Withdrawals made under the terms of Tranche C of Credit.

"Interest Period" designates, for all Withdrawals, the period of 1 (one), 2 (two), 3 (three) or 6 (six) months (or any other period agreed between the Borrower concerned and all of the Banks) indicated in the corresponding Notification of Withdrawal or a Notification of Interest Period.

"Program of Securitization" designates le programme de securitization put in place by Berchet Group on 30th November 2004.

"Financial Ratio no.1" designates the result of the report of Net Financial Debt on the Brut Operating Surplus, calculated on the basis of the Last Annual Consolidated Accounts.

"Ratio Financier no.2" designates the result of the report of Net Financial Debt on Owned Funds, calculated on the basis of the Last Annual Consolidated Accounts.

"Guarantee" designates all guarantees real or personal, that is any security, privilege, easement, mortgage, deposit, guarantee or any other right with the goal of burdening one or more present or future goods in the patrimony of a Borrower with the goal of guaranteeing execution of obligations contracted by the Borrower (or by third parties for whom the said Borrower guarantees execution of obligations) or with the goal of transferring property under the title of a guarantee of all present or future goods belonging to a Borrower in view of guaranteeing execution of all obligations contracted by the said Borrower or a third party.

"Authorized Guarantees" designates any Guarantee created or agreed to by a Borrower :
(i) in the normal framework of its activity;
(ii) in a contentieux, fiscal or corporate framework;
(iii) with prior written consent of the Majority of Banks;
(iv) in guarantee of debts not exceeding a cumulative amount of 30.000.000 EUR.

"Reference Rate" designates:
(i) in the case of an Interest Period, concerning all sums labeled :
• Euro, EURIBOR ;
• Dollar, LIBOR ;
(ii) in the case of any sum due otherwise than under an Interest Period concerning all sums labeled:
• Euro, EONIA ;
• Dollar, LIBOR Day to Day.

"Withdrawals" designates use by the Borrowers of Credit or, according to the context, the non repayed amount of Withdrawals made by the Borrowers.

"Tranche A of Credit" designates the non re-usable Credit of 52.000.000 EUR (fifty two million Euros) granted by the Banks to the Company according to the terms and conditions of the present Contract.

"Tranche B of Credit" designates the re-usable Credit of an amount equal to the Maximum Authorized Amount grantd by the Banks to the Borrowers according to the terms and conditions of the present Contract.

"Tranche C of Credit" designates the non re-usable Credit of 20.000.000 EUR (twenty million Euros) granted by the Banks to the Company according to the terms and conditions of the present Contract.

"Mobile Values of Placement" designates the mobile values held by the Company, other than the mobile values held in one of the Companies in the Group, as an investment or placement without the objective of exercising a particular influence on the Companies issuing the titles.

1.2 Interpretation
In the present Contract, except where indicated to the contrary,
1.2.1 "assets" mean goods, revenue and rights of any nature, present or future;
1.2.2 any reference to "Credit Agent", "Guarantee Agent", "Mandated Arranger", "Bank", one "party" includes its successors, assigns and entitled parties;
1.2.3 "authorization" means any authorization, consent, approval, resolution, licence, exemption or registration;
1.2.4 "merger" means a merger made in application of articles L. 236-1 to L. 236-24 of the Commerce Code;
1.2.5 "month" means any period beginning on a given day in a calendar month and the corresponding numeric day in the following month;
1.2.6 any reference to a legal provision extends to this provision as later amended;
1.2.7 except stipulation to the contrary, time references are references to French time and references to Articles and Annexes refer to the present Contract.

2. THE CREDIT
2.1 Credit
Under reserve of the stipulations of the Contract, the Banks consent:
2.1.1 to the Company, from the Signature Date until the Final Maturity Date of Tranche A of Credit, a non-reusable Credit in an amount equal to the Total Commitment of Tranche A of Credit;
2.1.2 to the Borrowers, from the Signature Date until the Final Maturity Date of Tranche B of Credit, a reusable Credit in an amount equal to the Total Commitment of Tranche B of Credit; and
2.1.3 to the Company, from the Signature Date until the Final Maturity Date of Tranche C of Credit, non-reusable Credit in an amount equal to the Total ommmitment of Tranche C of Credit.
2.2 Purpose of the Credit
Tranche A of Credit is destined to refinance the existing medium and long term debt of the Group, including the Bridge Loan but excluding the medium term debt of 20.000.000 EUR of Berchet Group subject of an agreement with the Banks and the French Government and as referenced in the table of flux referenced in Article 3.1.12 (Delivery of documents). Tranche B du Credit is destined to refinance the existing short term debt of the Borrowers including the outstanding debt existing under the terms of the Program of Securitization. Tranche C of Credit is destined to finance future Acquisitions. Neither the Credit Agent nor the Banks will have to verify that the funds borrowed by the Borrowers under the terms of the Contract will be attributed in accordance with the present Article 2.2 (Purpose of the Credit).
2.3 Participation of the Banks
In accordance with the terms of the Contract and under reserve of respect of the conditions stipulated therein, each Bank individuelly commits to participating, by

intermediary of its Credit Agency, to every Withdrawal for an amount calculated prorata of its Commitment in the corresponding tranche of Credit. Failure of one or more Banks in the execution of its obligations will not in any event free the other Banks, or Borrowers (of their obligations vis-a-vis the other Banks) of their own obligations.

2.4 Rights and obligations of the Banks

2.4.1 The rights and obligations of each Bank are distinct, joint and Divisible and there exists no solidarity, active or passive between the Banks. In consequence, no Bank will be responsable for the obligations of any other Bank. One Bank's ommission concerning all or part of it obligations under the terms of the Contract cannot have the effect of exonerating the non defaulting Borrowers or the Banks of their own respective obligations to the non defaulting Banks or to the Borrowers, as the case may be.

2.4.2 The unpaid sums due to the Banks at any given moment constitute separate and independant debts.

2.4.3 .Under reserve of stipulations in the Contract relative to decisions or Shares that cannot be taken or acquired except by the Majority of Banks or unanimous decision of the Banks, each Bank has the right to protect and exercise its rights under the Contract, under reserve of first informing the Credit Agent who will inform the other Banks, and, to protect or exercise its rights under the Contract, it is not necessary a Bank to be joined as a party to a case brought by the Credit Agent or any other Bank.

3. PRECONDITIONS OR CONCOMITANT CONDITIONS

3.1 Delivery of documents

The first Notification of Withdrawal cannot be presented to the Credit Agent before the delivery by the Company to the Credit Agent of the following documents, judged to be satisfying in substance as well as form by the Credit Agent:

3.1.1 a certified up to date copy of the statutes of each Initial Borrower;

3.1.2 a K-bis extract of each Initial Borrower dated less than a month before the Withdrawal Date mentioned in the first Notification of Withdrawal ;

3.1.3 a non-bankruptcy certificate of each Initial Borrower dated less than a month before the Withdrawal Date mentioned in the first Notification of Withdrawal ;

3.1.4 un état of inscriptions of privileges and securities of each Initial Borrower dated less than a month before the Withdrawal Date mentioned in the first Notification of Withdrawal ;

3.1.5 a certified copy by the legal representative of each of the Initial Borrowers of the minutes of the decisions of its competent organs approving the negociation, conclusion, signature and execution of the Financing Documents they are party to;

3.1.6 an original copy of powers of the signatories of the Financing Documents or any document having to be delivered by the Initial Borrowers in accordance with the Financing Documents;

**EXHIBIT A**                                                     **39**

3.1.7 a document signed by the legal representative of each Initial Borrower
Containing the names and signature specimens of the signatories authorized to sign
the Financing Documents and make Withdrawals in the name and for the account of the
Initial Borrower concerned;

3.1.8 a copy of the Last Annual Corporate Accounts of each Initial Borrower
and the Last Annual Consolidated Accounts;

3.1.9 one or more documents, substantielly in the form of the model figuring in
Annex 8, attesting all the funds currently made available to the Initial Borrowers,
and notably the Bridge Loan, except (i) the Credit and (ii) the medium term debt of
20.000.000 EUR of Berchet Group subject of an agreement with the Banks and the
French Government will be reimbursed and/or totally annuled, including in advance;

3.1.10 any document attesting to the attainment of release (i) on all of the
existing cash-guarantee up to 15.000.000 EUR (fifteen million Euros) except the cash-
guarantee guaranteeing the securities on Chile, Mexico andArgentina and (ii) on all
securities of the financial instrument account
Existing before the Signature Date and concerning the Shares issued respectively by
Berchet Group, J.L.B. Development and Majorette Solido ;

3.1.11 a copy of the business plan of the Group including the financial projections of the
Group for 3 (three) years;

3.1.12 a table of the fluctuations;

3.1.13 a copy of the authorization of the DGCCRF or all other competent authorities
relative to the acquisition of Berchet Group;

3.1.14 any document attesting to the cease in the Securitization Program after exhaustion
of the accounts receivable transferred before the date of delivery of the first Notification
of Withdrawal; any document attesting to Payment by the Initial Borrowers of fees and
commissions due in accordance with Article 11 (Commissions and fees);

3.1.15 Guarantee Documents and the Contract of Autonomous Garantee on First Demand
to which the Initial Borrowers are duly signed parties;

3.1.16 a legal Notification from counsel to the Borrowers; and

3.1.17 a legal Notification from the firm Herbert Smith LLP, counsel to the Banks,

3.2 Information by the Credit Agent
The Credit Agent will, without delay, inform all the Banks of receipt of all these
documents.

**EXHIBIT A**                                                    **40**

## 4. CONDITIONS OF USE

4.1 Any Withdrawal made under the terms of Tranche A of Credit or Tranche C of Credit will be made in Euros and any Withdrawal made under the terms of Tranche B of Credit will be made either in Euros or in Dollars.

4.2 The obligations of the Banks pertaining to Withdrawals are subordinated to the respect of conditions stipulated in the Contract and notably:

4.2.1 that there be no Case of Advance Payability or Case of Potential Advance Payability;

4.2.2 that the declarations made and the guarantees given in Article 16.1 (Declarations and guarantees) be correct;

4.2.3 that the Outstanding debt does not exceed at any given moment the amount of the Total Commitment;

4.2.4 that the total amount of Withdrawals in process under the terms of Tranche B of Credit do not exceed at any given moment the Maximum Authorized Amount;

4.2.5 as the case may be and in accordance with stipulations in Article 19.2 of the Contract, that the Company gave as a security for the benefit of the Banks, all Mobile Value of Placement held by the Company, as well as all type of capital and all assets acquired by the Company under the terms of use of Tranche C of Credit;

4.2.6 that the Borrowers have paid all fees and commissions payable in accordance with Article 11 (Commissions and Fees).

## 5. MODES OF WITHDRAWAL

The modes applicable to Withdrawals will be the following, it being clear that all Withdrawals made under the terms of the Tranche B of Credit are renewable at the request of the Borrower concerned:

5.1 the Borrower will give the Credit Agent a Notification of Withdrawal at the latest at ten o'clock (10h00), 3 (three) Working Days before the Withdrawal Date;

5.2 at the latest at nine o'clock (9h00) on the Working Day following the receipt date of the Notification of Withdrawal, the Credit Agent will communicate to the Banks the terms of the Notification of Withdrawal ;

5.3 the Withdrawal Date will be a Working Day;

5.4 the Notifications of Withdrawal will irrevocably commit the Borrower who will be held to make theWithdrawal in accordance with the conditions of the Contract;

5.5 each Bank will make available to the Borrower, on the Withdrawal Date, in accordance with Article 15 (Payments), the amount of its participation to the Withdrawal calculated prorata of its Commitment in the tranche of Credit considered;

5.6 in the case of unavailability of Euros or Dollars (concerning a Withdrawal under the terms of Tranche B of Credit) for the Bank on the occasion of any Withdrawal, the stipulations of the Article 14.2 (Unavailability for a Bank of Euro or Dollars) will apply;

5.7 the uniqueWithdrawal under the terms of Tranche A of Credit should be made before the 31st October 2005;

5.8 in the event of renewal of Withdrawal made under the terms of Tranche B of Credit, the Borrower concerned will give the Credit Agent a Notification of Withdrawal of the Tranche B of Credit at the latest at ten o'clock (10h00), 3 (three) Working Days before the renewal date of theWithdrawal considered, it being understood that no Withdrawal

under the terms of the Tranche B of Credit can be made after the date corresponding to a month before the Final Maturity Date of the Tranche B of Credit;

5.9 any Withdrawal made under the terms of theTranche C of Credit should have a Withdrawal Date included between the Signature Date and the 2nd (second) anniversary date from the Signature Date; and

5.10 each request for Withdrawal made under the terms of theTranche C of Credit should be made for a minimum amount of 1.500.000 EUR (one million five hundred thousand Euros) except a Withdrawal which, if it was made, would allow use of the Total Commitment of Tranche C of Credit.

## 6. REIMBURSEMENT

6.1 Reimbursement under the terms of the Tranche A of Credit

The amount of the unique Withdrawal made under the terms of the Tranche A of Credit will be annually amortized up to the amount of:

6.1.1 7.428.571 EUR (seven million four hundred and twenty eight thousand five hundred and seventy one Euros) from the 1st (First) anniversary date anniversaire of its Withdrawal Date until the 6th (sixth) anniversary of its Withdrawal Date, and

6.1.2 7.428.574 EUR (seven million four hundred and twenty eight thousand five hundred and seventy four Euros) on the Final Maturity Date of the Tranche A of Credit.

On the Final Maturity Date of Tranche A of Credit, all sums in principal, interest and incidentals due under the terms of the Withdrawal made under the terms of theTranche A of Credit should be repayed or payed by the Company.

6.2 Reimbursement under the terms of theTranche B of Credit

Each Borrower having made a Withdrawal under the terms of the Tranche B of Credit will repay the entire Withdrawal on the last day of the Interest Period applicable to theWithdrawal, it being understood that the amounts thus repayed may, under reserve of the stipulations of Contract, be the object of new Withdrawals until the Final Maturity Date of the Tranche B of Credit

On the Final Maturity Date of Tranche B of Credit, all sums in principal, interest an incidentals due under the terms of all the Withdrawals in process made under the terms of the Tranche B of Credit should be repayed or ou payed by the Borrowers concerned.

The Reimbursement of a Withdrawal, or part of it, will be made at the moment of its Reimbursement in the currency in which the said Withdrawal was made.

6.3 Reimbursement under the terms of theTranche C of Credit

Each Withdrawal made under the terms of the Tranche C of Credit will be amortized in 5 (five) equal annuities from the 3rd (third) anniversary date of the Signature Date of the Contract.

On the Final Maturity Date of theTranche C of Credit, all sums in principal, interest and incidentals due under the terms of all the Withdrawals in process made under the terms of the Tranche C of Credit should be repayed or payed by the Company.

## 7. MANDATORY ADVANCE REIMBURSEMENT

7.1 In the event that:

7.I.l the Family Breuil and the Family Moquin cease jointly holding, directly or indirectly, more that 40% of the capital or more than 50% of the voting rights of the Company and its Subsidiaries; or

7.1.2 any entity, acting alone or in concert with another entity acquire control of the Company; the Company will inform the Credit Agent as soon as it knows about it. On request of the Majority of Banks, the Credit Agent should notify by pre-Notification of at least 15 (fifteen) days of annulment of the Total Commitment and the immediate payability of Withdrawals in process and all interest and other amounts due under the terms of the Financing Documents. The Total Commitment will thus be annuled and all these amounts will become payable immediately.

7.2 For the needs of paragraph 7.1 above,

7.2.1 the term "control" will have the meaning given in article L. 233-3 of the Commerce Code; and

7.2.2 the term "acting in concert" has the meaning given to it in article L. 233-10 of the Commerce Code.

## 8. VOLUNTARY ADVANCE REIMBURSEMENT

8.1 Conditions

The Borrowers will have the ability to reimburse in advance all or part of the Withdrawals under reserve:

8.1.1 of haqving informed the Credit Agent, at least 5 (five) Working Days before the date set for advance reimbursement; and

8.1.2 that the part of the Withdrawal reimbursed be a minimum amount of 5.000.000 EUR (five million Euros) and, over and above this sum, an entire multiple of 5.000.000 EUR (five million Euros), with the exception of any amount under the terms of an advance reimbursement allowing reimbursement of the Total Commitment of Tranche A of Credit, of Total Commitment of Tranche B of Credit or of Total Commitment of Tranche C of Credit as the case may be.

8.2 Reuse of funds reimbursed

8.2.1 Any amounts reimbursed in accordance with the present Article 8 (Voluntary Advance Reimbursement) under the terms of Tranche A of Credit and Tranche C of Credit will no longer be available, Total Commitment of Tranche A of Credit or Total Commitment of Tranche C of Credit, as the case may be, being reduced in consequence.

8.2.2 Any amounts reimbursed in accordance with the present Article 8 (Voluntary Advance Reimbursement) under the terms of theTranche B of Credit may, under reserve of stipulations of the Contract, be the object of new Withdrawals.

8.2.3 Any amount reimbursed in principal in accordance with the present Article 8 (Voluntary Advance Reimbursement) will be accompanied by interest due and all other fees and incidentals due under the terms of the Contract, including Refinancing Costs.

## 9. ADVANCE RENUNCIATION

The Company will have the ability to renounce in advance and without penalty all or part of the non-used part, on the effective date of the said renunciation, of the Total Commitment of Tranche A of Credit, of Total Commitment of Tranche B of Credit or Total Commitment of Tranche C of Credit as the case may be, under reserve of a written pre-Notification at least 30 (thirty) Working Days before the effective date of the said renunciation adressed to the Credit Agent. Any amount the Company renounces under

**EXHIBIT A**                                                                 **43**

the terms of the present Article 9 will no longer be available, the Maximum Authorized Amount being reduced in consequence.

10. INTEREST
10.1 Rate of interest
The rate of interest applicable to each Interest Period of a Withdrawal will be established by the Credit Agent, definitively and without recourse of the Banks as well as Borrowers (except in the case of manifest error), and will be equal to the sum between:
(A) the Reference Rate,
(B) the Margin, and
(C) as the case may be, the Mandatory Costs.
10.2 Adjustment of the Margin
The Margin will be adjusted annuelly in function of the level of Fiancial Ratio no.1 from the date of receipt by the Credit Agent of the certificate referenced in Article 17.1.3 and will correspond to the rate indicated in regard to the level of Financial Ratio no.1 figuring in the following table:

2,5 :5: RI < 3,5
1,5:5: RI < 2,5
RI < 1,5
0,85 % par an
0,80% paran
0,75 % par an
0,60 % par an
0,50 % par an
0,40 % par an

10.3 Basis of the calculation
The interest relative to the Withdrawals will be calculated by the Credit Agent on the basis of the exact number of days that have run (the first day of each period will be included and the last day excluded) divided by 360.
10.4 Notification of the Interest Period
10.4.1 The Company will give the Credit Agent, at the latest 4 (four) Working Days before each Interest Payment Date relative to the unique Withdrawal made under the terms of theTranche A of Credit and to each Withdrawals made under the terms of Tranche C of Credit, a Notification of Interest Periode indicating the chosen duration for the following Interest Period. In the event that delivery by the Company to the Credit Agent of such Notification of Interest Period, is not made, the duration of the Interest Period concerned will be indentical to the Interest Period at that time.
10.4.2 Each Interest Period under the terms of theTranche A of Credit and under the terms of Tranche C of Credit will begin on the last day of the Interest Period of Tranche A of Credit or the Tranche C of Credit preceding.
10.4.3 Each Withdrawal made under the terms of the tranche B of Credit will have a single Interest Period which will begin on the Withdrawal Date concerned.

**EXHIBIT A**                                                                 **44**

10.5 Notification of rates

After having established the interest rate applicable to an Interest Period, the Credit Agent will Notify the Borrower concerned, the Company and the Banks. The Credit Agent will also Notify the Borrower concerned, the Company and the Banks of the amount of interest corresponding, once it has been calculated.

10.6 Payment

The interest applicable to an Interest Period will be paid by the Borrower concerned to the Credit Agent, for the common account of the Banks, on each Interest Payment Date. If the Interest Period is superior to 6 (six) months, the interest will be paid on the last day of the First period of 6 (six) months of the Interest Period then the last day of the said period, under reserve of application of the stipulations of Article 15.7 (Payments made on a Working Day).

The interest applicable to an Interest Period relative to a Withdrawal under the terms of the Tranche B du Credit will be paid by the Borrower concerned in the currency in which the said Withdrawal is labeled in the Notification of Withdrawal of Tranche B it relates to.

10.7 Effective Global Rate

The Borrowers expressly recognize that owing to the particularity of the stipulations of the Contract, notably the possibility offered to the Borrowers to choose the duration of the Interest Periods, it is not possible, on the Signature Date, to determine precisely the global effective rate applicable to the Credit in accordance with provisions of articles L. 313-1 and L. 313-2 of the Cosumer Code.

However the Borrowers declare to havinf received from the Credit Agent numbered examples, by separate letters but integrated as part of the Contract, on the basis of different hypotheses of Interest Periods, providing the corresponding global effective rate.


11. COMMISSIONS AND FEES

11.1 Commissions

11.1.1 Commission of the Credit Agent and the Guarantee Agent

The Company will pay the Credit Agent and the Guarantee Agent, for their own account, on the Signature Date and on each anniversary date from the Signature Date, a commission determined in the Commission Letter.

11.1.2 Commission for Arranging and Participating

The Company will pay the Mandated Arrangers, on their own account, on the Signature Signature, a commission for arranging and participating determined in a Letter of Commission.

11.1.3 Commission for non-use

(A) Commission for non-use under the terms of theTranche A of Credit

(i) The Company will pay the Credit Agent, for the Banks' account,
prorata of their Commitment of the Tranche A of Credit, a commission for non-use equal to 0,25 % (zero comma twenty five per cent) a year calculated on the difference between Total Commitment of Tranche A of Credit (after advance renunciation as the case may be) and the unique Withdrawal amount made under the terms of theTranche A of Credit.

(ii) The commission for non-use will be payable every trimester at the expiry date until the Withdrawal Date pertaining to the unique Withdrawal made under the terms of the

**EXHIBIT A** 45

Tranche A of Credit and calculated by the Credit Agent on the basis of the exact number of days that have run in relation to a 360 day year.

(B) Commission for non-use under the terms of the Tranche B of Credit

(i) The Company wil pay the Credit Agent, for the Banks' account, prorata of their Commitment of the Tranche B of Credit, a commission for non-use equal to 0,25 % (zero comma twenty five per cent) a year calculated on the difference between the Total Commitment of the Tranche B of Credit (after advance renunciation as the case may be) and the Withdrawal amount made under the terms of theTranche B of Credit.

(H) The commission for non-use will be payable every trimester at the expiry date until the Final Maturity Date of the Tranche B of Credit calculated by the Credit Agent on the basis of the number of exact days in relation to a 360 day year.

(C) Commission for non-use under the terms of theTranche C of Credit

(i) The Company will pay the Credit Agent, for the Banks' account, prorata of their Commitment of the Tranche C of Credit, a commission for non-use equal to 0,25 % (zero comma twenty five per cent) a year calculated on the difference between Total Commitment of the Tranche C of Credit (after advance renunciation as the case may be) and the Withdrawal amount made under the terms of the Tranche C of Credit.

(ii) The commission for non-use will be payable every trimester on the expiry date until the 2nd (second) anniversary date from the Signature Date and calculated by the Credit Agent on the basis of the exact number of days that have run in relation to a 360 day year.

11.2 Fees

11.2.1 The Company will reimburse the Mandated Arrangers all the fees (VAT included when this is payable) incurred by the Mandated Arrangers for the drafting, negociation or the syndication of Credit.

11.2.2 The Company will reimburse the Credit Agent and the Guarantee Agent all the fees (including related taxes), notably legal fees incurred, for the execution of Financing Documents on request by the Credit Agent or, as the case may be, the Guarantee Agent, and on presentation of appropriate proof. The Company will equally indemnify, on presentation of any proof, the Banks, the Credit Agent and the Guarantee Agent for all reasonable fees accounted in any way by reason of preservation or exercise of their rights against the Borrowers running from the Financing Documents in the event of non respect by the Borrowers of their obligations under the terms of the Financing Documents (including related taxes).

11.3 VAT

All commissions and fees due by virtue of the Contract are expressed without tax. If the commissions or the fees concerned should be liable to value added tax, this will be paid by the Borrower concerned under the terms in effect and on the same date as the commissions or the fees which are the basis of it.

11.4 Stamp duty

The Company will pay any stamp duty payable on signature of the Financing Documents.

12. ILLEGALITY

In the event that any new legislation or regulation or any modification concerning any regulation ot the interpretation which is amde of it by an official competent authority,

**EXHIBIT A**                46

renders impossible, for one of the Banks, the execution of its obligations under the Contract:

12.1 The Credit Agent, adter having been informed by the Bank or Banks concerned, will immediatley Notify the Borrower concerned;

12.2 each Bank concerned, the Credit Agent and the Borrower will consult each other and make their best efforts to find a solution in good faith that can be acceptable by each Bank concerned as well as by the Borrower, without each of the said Banks and the Credit Agent incurring any responsability vis-à-vis the Borrower if such a solution is not found, it being understood that among the solutions envisaged each Bank concerned will research the possibility of loaning by the intermediary of a Credit Agent situated in another jurisdiction or transferring its rights and obligations running from the Contract to another financial establishment;

12.3 in the absence of a solution acceptable to the parties concerned, the Borrower will reimburse (in the measure permitted by the law) as quickly as possible, and in any event within 30 (thirty) days counting from entry into force of the aforementioned regulation, the entire participation in the Withdrawal of the Banks for which no solution has been found and will pay these Banks any sum due to them under the terms of the Contract on the date of the said reimbursement, including the Costs de Refinancing.

## 13. OCCURENCE OF NEW CIRCUMSTANCES

13.1 Basis of the Commitment of the Banks

The conditions for remuneration of the Banks under the terms of the Contract have been fixed in function of the Credit, tax, monetary and professional regulations applicable to them on the Signature Date and, more generally, the tax, monetary and professional legal data in effect on the Signature Date.

13.2 Increase in costs

If it results from a Change in Regulations:

13.2.1 that a Bank (or any financial establishment controlling it) is not able to obtain remuneration net of its capital which it would have normally received if it did not have the obligation of a Bank under the terms of the Contract; or

13.2.2 a Bank (or any financial establishment controlling it) incurs a cost (or, as the case may be, a supplementary cost) due to the obligations of a Bank under the terms of the Contract; or

13.2.3 a Bank (or any financial establishment controlling it) incurs a cost (or, as the case may be, a supplementary cost) due to financing a category of assets which the participation of this Bank to Withdrawals is a part of ; or

13.2.4 a Bank (or any financial establishment controlling it) is subjected to any tax (except tax on net income of its Credit Agency paid in a State it is centrally headquartered in or of its Credit Agency), calculated by reason of participation by this Bank to Withdrawals or by function of sums paid to it under the tersm of the Contract; the measures referred to in Article 13.3 (Measures) will apply.

13.3 Measures

In the event of occurrence of one of the events described in Article 13.2 (Increase in costs) :

13.3.1 the Bank concerned will immediately Notify the Credit Agent by indicating in a reasonably detailed manner,

the amount of increase for the Bank concerned (or any financial establishment controlling it) of cost of its participation in the Contract or the reduction for the Bank concerned (or any Credit establishment controlling it) of its net renumeration as well as the corresponding amount of indemnity;

13.3.2 the Credit Agent will pass on this Notification to the Borrower concerned as quickly as possible;

13.3.3 the Bank concerned will research in good faith, during a maximum period of 30 (thirty) days from the Notification date referred to in Article 13.3.1 above, a resonable solution which will allow minimization of the negative consequences of this event it being understood that these solutions should not affect the interest of the Bank concerned (or of any establishment of Credit controlling it); amif these solutions notbaly figures the transfer of the participation of the said Bank to a branch or another establishment acceptable by the parties;

13.3.4 in the absence of a satisfying solution for the Bank concerned (or any Credit establishment controlling it) :

(A) the Borrower will on presentation of proof entirely take over the amount of the increase or reduction, the calculation by the Bank concerned of the corresponding indemnity having to be proven; or

(B) the Borrower will have the ability, on notification to the Credit Agent, who will Notify the Bank concerned, to reimburse in advance of the date indicated in the notification, the entire participation of the said Bank to Withdrawals, under reserve of Payment by the Borrower to the said Bank of all sums which will be due to it in whatever way (including under the terms of the increase or reduction referred to in Article 13.2 (Increase in costs) above) on the date of the advance reimbursement by virtue of the Contract. Moreover, the Borrower will reimburse the said Bank the Costs of Refinancing on presentation of proof.

## 14. DISTURBANCES IN THE MARKET

14.1 Unavailability of the Reference Rate

If, on the date of determining the Reference Rate:

14.1.1 the Credit Agent is informed of the fact that, for a Bank or a group of Banks for which the sum of participations in the Withdrawals represents more than 51% of the amount of Withdrawals, the EURIBOR, LIBOR, EONIA or the day by day LIBOR, as the case may be, does not reflect the cost of financing their participation to the Withdrawals or an unpaid sum, or

14.1.2 the Credit Agent receives an indication of the rate of less than two EURIBOR Reference Banks or two LIBOR Reference Banks, or

14.1.3 for any reason, the EURIBOR, LIBOR, EONIA or the day by day LIBOR ceases to be published, the Credit Agent will Notify Borrowers without delay.

In each of these cases, the Interest Period concerned will be the 30 (thirty) days and the Credit Agent, will consult with the Banks and the Borrowers, to negociate in good faith to agree on (i) a substitute interest rate satisfying to the Borrowers and the  Banks or (ii) modes acceptables for the Banks and for the Borrowers, allowing to continue to finance the Credit.

In the absence of determining a substitute rate or acceptable modes, in a 30 (thirty) day period following the aforementioned notification, the Credit Agent will determine one or

more interest rates applicable to the participation of each Bank in the Withdrawals and will inform the Borrowers; the said rate will apply between the parties from the beginning of the said Interest Period of 30 (thirty) days and corresponding to the cost of financing of the participation of each Bank in the Withdrawal for the said Interest Period, as justified by this Bank. The Borrowers will pay the Credit Agent for the Banks' account interest on the amount of participation of each Banks to the Withdrawals at the rate thus determined increased by the Margin, the said interest being payable on the last day of the Interest Period of 30 (thirty) days aforementioned.

Any agreement between the Borrowers and the Credit Agent (after consultation of the Banks), in the 30 (thirty) days following the aforementioned notification date relative to the Reference Rate, will apply, except if this is impossible, from the beginning and for the duration of the Interest Period agreed.

14.2 Unavailability for a Bank of Euros or Dollars

At the latest at 10h00 (ten o'clock), on the Withdrawal Date, any Bank stating that it is unable to loan in Euros or Dollars, because of unavailabilty of Euros or Dollars for the Bank, or in the event of changes, either in the national or international, political, financial or economic conditions, or the exchange rates of money, or in the regulation of exchanges, or in the availability on the interbank market of deposits in Euros or in Dollars (the "Unavailable Currency"), which would render any Withdrawal in the Unavailable Currency impossible for the Bank tout, will let the Credit Agent know who will immediately notify the Borrower concerned and the said Bank will not be held to make available to the Borrower an amount in the Unavailable Currency.


15. PAYMENTS

15.1 Payments to a Borrower

Under reserve of any stipulation to the contrary in the Contract, any payment to a Borrower under the Terms of the Contract will be made by the Banks concerned in funds available on the day, before 10h00 (Paris time) on the Payment date, to the account of the Credit Agent at such Bank in the corresponding financial location that the Credit Agent designated. The Credit Agent will pay the total amount to the Borrower concerned, value on the day of Payment according to its instructions and up to the amounts received by the Banks concerned.

15.2 Payments to the Banks

Under reserve of any stipulation to the contrary in the Contract, any Payment to the Banks should be made by withdrawal by the Credit Agent for the account of the Banks concerned before 10h00 (Paris time) on the Payment day, from the account of the Borrower concerned whom the Borrower designated (i) on the Signature Date, or (ii) in the event of change of account after the Signature Date, at the latest 3 (three) Working Days before the Payment date concerned. Any Payment will be increased by the Borrowers, by the related and applicable value added tax.

The Credit Agent will pay the Banks the amounts received as stipulated above, the value on the day of Payment date by the Borrowers, according to their instructions, and up to the amounts received by the Borrowers.

15.3 Payments in full discharge

Any Payments under the Contract will not be in full discharge unless they are made such that the funds are available and freely transferable at the place and on the date fixed for the said Payment and value on the day of Payment.

15.4 Taxes

15.4.1 The Payment of any sum due by the Borrowers by virtue of the Contract will be made net of any tax (excluding income tax), withheld or tax of any nature, present or future.

15.4.2 In the event that an interest Payment or anyother revenue gives rise to any withholding or deduction, or any tax or withdrawal in the jurisdiction of a Borrower, the Borrower commits, in any measure permitted by the applicable legislation, to increase the amount to pay in such a way that after deduction of this withholding or withdrawal or tax or of this deduction, the Banks concerned receive the amount they would have received in the absence of this withholding, withdrawal, tax, or deduction. The Borrower will pay the Credit Agent in the 30 (thirty) days following this Payment, appropriate proof will attest to the Payment of the deduction or withholding in question.

15.4.3 If the said applicable legislation does not permit such an increase, the Banks concerned and the Borrower will consult during a period of 30 (thirty) days and research in good faith a solution that can be acceptable by the Banks concerned as well as the Borrower without the Banks running any responsability vis-à-vis the Borrower if such a solution is not found for any of the said Banks. In the absence of an agreement at the end of this period, the Borrower will immediately reimburse the entire participation in the Withdrawals of the Banks concerned, and indemnify the Banks concerned for the Costs of Refinancing.

15.5 Offsetting

Each Borrower is expressly forbidden from operating an offsetting between any sum it owes under the terms of the Contract and any account receivable it could hold elsewhere against a Bank.

Each Borrower is equally forbidden from making a Payment by submitting it to any condition or reserve or making any exception or reconventional request.

15.6 Posting

Each of the Banks, as concerning its own participation to the Withdrawals and the Credit Agent for all the Withdrawals, will maintain in their respective books of special accounts, which will not produce the legal effects attached to the current accounts, on which will be reported the amounts in principal, interest, commissions and any other amounts which are due to them as well as amounts paid.

The said accounts, which will be communicated to the Borrowers, on request, after being transmitted to the Credit Agent, will provide proof, except manifest error, to the amounts owed under the terms of the Contract. In the event of disagreement between the the accounts of the Credit Agent and those of a Bank, in the absence of manifest error, the accounts of the Bank will provide proof.

15.7 Payments made on a Working Day

All Payment should be made on a Working Day. Except express stipulation to the contrary, in the event a Payment falls on a date date which is not a Working Day, the said Payment will be made on the following Working Day in the same calendar month. In the

absence of a following Working Day in the same calendar month, the Payment will be made on the immdiately preceding Working Day.

15.8 Imputation of Payments

Notwithstanding all instructions to the contary that could be given by a Borrower, Credit Agent shoudl apply all sums received from the Borrowers to the reduction or reimbursement of all unpaid amounts under the terms of the Contract in the following order:

15.8.1 the costs and expense incurred by the Credit Agent and Guarantee Agent under the terms of the Financing Documents;

15.8.2 the costs and expenses incurred by the Banks under the terms of the Financing Documents which were previously communicated to the Credit Agent, as the cse may be;

15.8.3 all commissions owed to the Banks, the Credit Agent and the GuaranteeAgent;

15.8.4 the late interest mentioned in Article 21 (Late Interest) ;

15.8.5 the sums owed by virtue of Articles 13 (Occurence of New Circumstances) and 15.4 (Taxes);

15.8.6 any other sum (other than the principal) payable by virtue of the Contract;

15.8.7 reimbursement of theWithdrawals.


16. DECLARATIONS AND GARANTEES

16.1 Declarations and garantees

Each Borrower declares and garantees to the Credit Agent, Guarantee Agent and the Banks on the Signature Date:

16.1.1 that it is a Company under French law duly formed and registered, with legal personality et possessing full legal capacity and power to sign the Financing Documents to which it is a party and to execute and respect the terms and conditions;

16.1.2 that it has the capacity required to validly own its assets and to excercise its activity as it does presently;

16.1.3 that the concluded, signature and execution of the Financing Documents to which it is party and the resulting obligations have been regularly authorized by its competent organs;

16.1.4 that the Financing Documents to which it is a party and the resulting obligations do not in any way contradict neither the statutes nor legal texts or regulations whicg are applicable to them, nor any commitment it can be held to, in which case, a conflict can have a Significant Disfavorable Effect;

16.1.5 that the Financing Documents to which it is a party are valid commitments that can be held against them in accordance to their terms;

16.1.6 that their Payment obligations under the terms of the Contract are debts unsecured and non-subordinated at least at the same level as its other unsecured debts, under reserve of obligations that are privileged by the law;

16.1.7 that all the Payments under the terms of  Contract are made nets of all taxes and deductions ;

16.1.8 that no stamp duty or other similar right  is due under the terms of the Financing Documents;

16.1.9 that no change in its activity, its assets or its financial situation or in the activity, the assets and the financial situation of the Group can have a Significant Disfavorable Effect since the publication of its Last Annual Corporate Accounts;

16.1.10 that it respects the legislative and regulatory provisions that are applicable to it;

16.1.11 that it has made Payment of all the corporate expenses, taxes owed, unless the Payment has been legitimately contested according to the proper procedure or if the delay or absence of Payment has been accepted by the creditor concerned;

16.1.12 that on the Signature Date, it has made complete reimbursement, including in advance, of all of the bank funds made available to it, and notably the Bridge Loan, except the medium term debt of 20.000.000 EUR of Berchet Group having been subject of an agreement with the Banks and the French Government;

16.1.13 that the assets constituting its patrimony are free of any guarantees, except the Authorized Guarantees and  Guarantees exisiting on the Signature Date of which a list appears in Annex II ;

16.1.14 that the Contract does not need to be registered with any authority;

16.1.15 that it has subscribed to all the insurance policies normally required in the profession for the amounts and coverage of risk, damages and liability in accordance with general practice in its domain of activity;

16.1.16 that all information concerning it or any of the Companies in the Group (including financial information, and all accounting documents it is held to produce) provided to the Credit Agent or the Banks before the Signature Date as well as during the validity period of the Contract, are or will be sincere, correct and conform to applicable regulation or, as the case may be, applicable to the Company in the Group concerned, gives a reliable image of the income from operation during the fiscal years concerned as well as its financial situation and its patrimony or, as the case may be, of the Company in the Group concerned, at the closure of the fiscal year and that it is not aware of any events not revealed to the Banks that, if they'd been known, would have changed the Banks' decision to loan;

16.1.17 that it is not in default of any of its obligations under the terms of the Financing Documents to which it is a party and is not aware of any event that constitutes or is susceptible of constituting such a default, a Case of Advance Payability or a Case of Advance Potential Payability;

16.1.18 that no instance, action, case or administrative procedure is in process, or to the knowledge of the Borrower is on the verge of being brought or begun, having or susceptible of having a Significant Disfavorable Effect, except instances, cases and administrative procedures existing on the Signature Date of which a list appears in Annex 12; and

16.1.19 that it has not ceased Payments within the definition of Article L. 621-1 of the Commerce Code and that it is not subject or, to its knowledge, is not on the verge of being subject of any procedure, regulation, safeguarding, receivership or judicial liquidation, or any other analogous procedure, except the tax and corporate debt of Berchet Group validated by the Interministerial Comittee on Industrial Restructuring.

16.2 Repetition

All the declarations and garantees figuring in Article 16.1 (Declarations and garantees) above will be reputed to be repeated by each Borrower on the foundation of existing debts and circumstances:

16.2.1 on the date of each Notification of Withdrawal , on each Withdrawal Date and on each Interest Payment Date; and

16.2.2 in the case of an Additional Borrower, on the date on which it becomes (or is required to become) an Additional Borrower.

## 17. INFORMATION COMMITMENTS

The Company for the duration of the Contract commits to :

17.1 provide the Credit Agent, in sufficient number for the Banks:

17.1.1 the Last Annual Consolidated Accounts and the Last Annual Corporate Accounts of each Borrower certified by the auditor and approved by the general assembly of shareholders, as soon as possible and in any case before the expiry of a period of 180 (one hundred and eighty) days from closure of the fiscal year under consideration;

17.1.2 the Last Biannual Consolidated Accounts and the Last Biannual Corporate Accounts certified by a legal representative of the Company, as soon as possible and in any event before expiration of a period of 120 (one hundred and twenty) days after the end of each first semester;

17.1.3 at the same time as provision of the Last Annual Consolidated Accounts provided for in Article 17.1.1 above, a certificate certified by the auditor of the Company in the form of Annex 7 indicates the level of the Financial Ratio no.1 and attests to respect of the Financial Ratio no.2 figuring in Article 18 (Financial Commitment) on the dates considered, as well as the elements of calculation of these;

17.1.4 at the same time as provision of the Last Annual Consolidated Accounts provided for in Article 17.1.1 above, the list of Principal Subsidiaries;

17.1.5 at the same time as provision of the Last Biannual Consolidated Accounts provided for in Article 17.1.2 above, a valuation of the Mobile Values of Placement titles susceptibles of being subject of a security on First demand of the Majority of Banks in accordance with Article 19.2.1 ;

17.2 provide as soon as possible all information relative to the financial situation, activity and operations of the Group that the Credit Agent (or one of the Banks by intermediary of the Credit Agent) can reasonably request of him;

17.3 notify the Credit Agent without delay of the occurrence of any event or administrative procedure susceptible of having a Significant Disfavorable Effect; and

17.4 inform the Credit Agent of any significant modification in the distribution of its majority shareholding.

## 18. FINANCIAL COMMITMENTS

18.1 The Company commits for the duration of the Contract to maintain:

18.1.1 a Financial Ratio no.1 below 3,5 ; and

18.1.2 a Financial Ratio no.2 below :

(A) 1,6 on 31st March 2006,

(B) 1,5 on 31st March 2007, et

(C) 1,4 on 31st March of each year from on 31st March 2008 inclusive.

18.2 The ratios in Article 18.1 above could be subject to revision in the framework of International rules called "IFRS" *(International Financial Reporting Standards).*

**EXHIBIT A**                                                              53

19. OTHER COMMITMENTS

19.1 Each Borrower for the duration of the Contract commits to:

19.1.1 establish its annual and biannual corporate accounts (balance sheet, income account and annexes) and, as the case may be, its annual accounts and biannual consolidated accounts in respecting the same accounting principles as those used for establishing its annual accounts and biannual corporate accounts and, as the case may be, its annual accounts and biannual consolidated accounts relative to the preceding fiscal year, or, in the event of a change in accounting method, in being careful to clearly mention the modifications adopted and in providing the Credit Agent an adjustment report  allowing it to appreciate the said accounts;

19.1.2 hold accounting conform to generally accepted accounting rules notably respecting the principle of permanence of accounting methods and providing a reliable and sincere of its financial situation and its operating income;

19.1.3 respect the applicable legislative and regulatory provisions;

19.1.4 to not create or grant any creditor Guarantees of any nature unless they are Authorized Guarantees;

19.1.5 to not contract any Financial Debt in an amount higher than 5.000.000 EUR (five million Euros) without having first obtained agreement of the Majority of Banks and under reserve that the new Financial Debt be contracted from a Bank;

19.1.6 to not conclude any financial lease operations or Lease, notably in the framework of Civil Real Estate Companies, in an annual cumulated  amount higher than 15.000.000 EUR (fifteen million Euros);

19.1.7 limit the indebtedness of the foreign Subsidiaries of the Group to a total of 30.000.000 EUR (thirty million Euros);

19.1.8 obtaining and maintaining in effect all the agreements and authorizations necessary to assure validity and challenge to the Financing Documents to which it is a party; .

19.1.9 obtain and maintain in effect all the autorizations relative to its rights to intellectual property necessary or useful to the exercise of its activity and to take all necessary measures to preserve its rights under the terms of its intellectual property;

19.1.10 as concerning the Company, to organise an annual information meeting with the Banks at which the Company presents the business plan and financial situation of the Group;

19.1.11 arrange it so that its Payment obligations under the terms of the Contract always be unsecured debts and non subordinated to the same level as its other unsecured debts;

19.1.12 to not substantially modify its corporate objective or the nature of its activities unless such a change results in a transfer of all or part of its activity to a Company or Subsidiary that is or will become on the occasion of the said transfer a Principal Subsidiary;

19.1.13 to not transfer, sell, or more generally dispose, of any of its immobile assets to en entity not belonging to the Group without prior authorization from the Majority of  Banks if the amount of operations (being isolated or bound, voluntary or involuntary), exceeds a cumulative annual amount of 15.000.000 EUR (fifteen million Euros), except Authorized Transfers;

19.1.14 to not begin or participate to operations of merger, demerger, or partial sale of

Assets with entites outside the Group, except operations of merger, demerger, or partial sale of assets in which
(i) the surviving entity is the Borrower concerned or a Principal Subsidiary or
(ii) the Borrower concerned is a beneficiary of the sale or demerger;

19.1.15 to not complete operations of external development in an amount superior to 20.000.000 EUR (twenty million Euros) without prior agreement of the Majority of Banks ;

19.1.16 to not participate in *joint venture* operations engaging joint responsability of a Borrower or Subsidiary, such as groups of economic interest or Companies in collective name, under reserve of prior authorization by the Banks;

19.1.17 contract insurance policies normally required in the profession for the amounts and risk and damages coverage and responsabilities conform to generally accepted practice in its domain of activity;

19.1.18 conclude with the Mandated Arrangers within a period of 3 (three) months following the Signature Date one or more Contracts for coverage of rate risk for an amount at least equal to 60% of the Outstanding debt and for a period of three years minimum;

19.1.19 in the event of occurrence of a Case of Advance Payability or a Case of Advance Potential Payability, permit the Credit Agent, after having consulted the Banks, all visits to sites and buildings of the member Companies in the Groupe and to permit the Credit Agent, on consultation of the Banks, and the fees of the Company, to complete or have completed all expertise or audit on the accounts of the Borrowers.

19.2 Further, the Company commits to :

19.2.1 give as security to the Banks, on First demand of the Majority of Banks, all Mobile Value of Placement held by the Company in garantee of the obligations of Borrowers under the terms of the Tranche B of Credit; and

19.2.2 to give as security any type of capital and any asset acquired under the terms of use of Tranche C of Credit in garantee of its obligations under the terms of theTranche C of Credit.

## 20. ADVANCE PAYABILITY

20.1 Case of Advance Payability

In the event of the occurence of any of the events provided for below, (i) all of the sums owed to the Banks by virtue of the Contract, in principal, interest, commissions, fees and incidentals will be immediately and fully legally payable, and (ii) the Total Commitment will be immediately reduced to zero, on decision of the Majority of Banks notified by the Credit Agent to the Borrowers, without serving notice, formal demand or any legal formality whatsoever:

20.1.1 non-Payment by a Borrower of any sum due under the terms of the Contract (i) at its maturity, or (ii) expiration of a period of 3 (three) Working Days from its expiry in the event of delay for technical reasons bound to systems of transfer of funds or for administrative reasons;

20.1.2 ommission of any of the Financial Ratios provided for in Article 18 (Financial Commitments) or non delivrance to the Credit Agent of the certificate referred to in Article 17.1.3 ;

20.1.3 ommission to any of the obligations of a Borrower under the terms of

the Contract or, as the case may be, the Guarantee Documents or the Contract of Autonomous Garantee on First Demand to which it is a party, and notably under the terms of commitments in Articles 17 (Information Commitments) and 19 (Other commitments) of the Contract other than the Payment obligations;

20.1.4 any of the declarations and garantees made, given or repeated in accordance with Article 16 (Declarations and garantees) or made, given, or repeated in any document or any certificate provided under the terms of the Financing Documents are revealed to be false or incorect at the time they are made, given or repeated or at the moment it is considered made, given or repeated if this false declaration or incorrectness is susceptible of having a Significant Disfavorable Effect;

20.1.5 in the event of default of Payment on its usual maturity date (or as the case may be, before expiration of a grace period) by a Borrower or a Principal Subsidiary of any debt, except a default in Payment under the terms of the Financial Debt of a Borrower or Principal Subsidiary if the global amount payable on the said Financial Debt is below 5.000.000 EUR (five million Euros);

20.1.6 in the event of manifestation or triggering of a Guarantee on one of the assets of a Borrower or Principal Subsidiary;

20.1.7 in the event where a conservatory seizure or executory seizure is put into practice on any asset of one or more Borrowers, under reserve that the assets subject to such a measure are of a global value of 3.000.000 EUR (three million Euros);

20.1.8 in the event that any of the authorizations necessary to the execution of the Financing Documents by the Borrowers are voided or modified in such a way that the voiding or modification render it impossible for one of the Borrowers to execute its obligations under the terms of the Financing Documents to which it is a party;

20.1.9 in the event of judicial, administrative or arbitration procedure affecting the capacity of a Borrower to execute its obligations under the terms of the Financing Documents to which it is a party;

20.1.10 in the event that, for any reason whatsoever, the Financing Documents are nul or illegal;

20.1.11 in the event that, for any reason whatsoever, the Guarantee Documents and the Contract of Autonomous Garantee on First Demand ceases to be valid or does not completely benefit the Banks any longer;

20.1.12 in the event of loss by a Borrower of any right of intellectual property, and notably, of any trademark, licence or patent necessary or useful to the exercise of its activity;

20.1.13 in the event that a Borrower or Principal Subsidiary ceases to make Payments within the definition of article L. 621-1 of the Commerce Code or is subject to a regulatory procedure with its creditors, a safeguarding procedure or a receivership procedure or judicial liquidation or any similar procedure in any competent jurisdiction;

20.1.14 in the event that the auditor refuses to certify the corporate accounts of the Borrowers or one of the Principal Subsidiaries or certifies with significant reserves mentioned in the report ;

20.1.15 the occurrence of any event having or susceptible of having a Significant Disfavorable Effet.

**EXHIBIT A**                                                                       **56**

20.2 Indemnity

In any event, the Borrowers will indemnify, upon proof, the Credit Agent for the account of the Banks, all reasonable fees or losses incurred by the Credit Agent or by the Banks, notably the Costs of Refinancing, due to one or more of the events defined above and notably due to the advance reimbursement which is the consequence.

21. LATE INTEREST

21.1 Any sum payable by virtue of the Contract which is not paid on the correct date will be charged day to day interest from the payability date until the date of Payment, in the measure allowed by the law of Reference Rate increased by the Margin, the total increased by 1% (one per cent) per year. The unpaid interest will be capitalized at the above rate when they are due for at least an entire year.

21.2 The Credit Agent will calculate the amount of late interest on the basis of the exact number of late days that have run divided by 360, and will inform the Banks concerned and the Borrower concerned.

21.3 The receipt of late interest payable at any moment will not implicate concession to late Payment and the advance payability clauses will be maintained.

22. GUARANTEE DOCUMENTS

22.1 Contracts of Transfer of Professional Accounts Receivable

The Borrowers commit, as transferors, to grant, on the Signature Date, Contracts of Transfer of Professional Accounts Receivable as garantees of Payment or reimbursement of any sum due by the Borrowers, in principal, interest, late interest, commissions, fees and incidentals under the terms of Tranche B of Credit, understanding that the nominal amount of accounts receivable transferred by each Borrower under the terms of the Contracts of Transfer of Professional Accounts Receivable should, at any moment, be at least equal to 70% (seventy per cent) of Withdrawals made by the Borrower concerned under the terms of Tranche B of Credit. By exception, it is agreed that during the annual period running from Janary to May included, the nominal amount of accounts receivable transferred by the Company under the terms of the Contract of Transfer of Professional Accounts Receivable to which it is a party should be at least equal to the difference between (i) 50% (fifty per cent) of Withdrawals made by the Company under the terms of the Tranche B of Credit, and (ii) as the case may be, the total amount of Mobile Values of Placement given as security to the Banks under the terms of Article 19.2.1 of the Contract.

22.2 Contract of Security of Financial Instruments Account on the Shares of Majorette Solido

The Company commits, as constituent, to grant, on the Signature Date, the Contract of Security of Financial Instruments Account on the Shares de Majorette Solido in guarantee of Payment or reimbursement of any sum due by the Company under the terms of the Tranche A of Credit, in principal, interest, late interest, commissions, fees and incidentals.

22.3 Contract of Security of Financial Instruments Account on the Shares de J.L.B. Development

The Company commits, as constituent, to grant, on the Signature Date, the Contract of Security of Financial Instruments Account on the Shares de J.L.B. Development in

**EXHIBIT A**                                                            57

guarantee of Payment or reimbursement of any sum due by the Company under the terms of the Tranche A of Credit, on principal, interest, late interest, commissions, fees and incidentals.

22.4 Contract of Security of Financial Instruments Account on the Shares of Berchet Group

The Company commits, as constituent, to grant, on the Signature Date, the Contract of Security of Financial Instruments Account on the Shares of Berchet Group in guarantee of Payment or reimbursement of any sum due by the Company under the terms of theTranche A of Credit, in principal, interest, late interest, commissions, fees and incidentals.

22.5 Contract of Security of the Trademark Smoby

The Company commits, as constituent, to grant, on the Signature Date, the Contract of Security of the Trademark Smoby in guarantee of Payment or reimbursement of any sum due by the Company under the terms of the Tranche A of Credit and the Tranche B of Credit, in principal, interest, late interest, commissions, fees and incidentals.

23. CREDIT AGENT AND GUARANTEE AGENT

23.1 Mandate.

By the Contract, each Bank gives mandate to the Credit Agent and the Guarantee Agent, who accept, to take, in its name and in its place, any measure and excercise all powers expressly delegated to them under the terms of the Financing Documents, and notably, sign the Guarantee Documents and the Contract of Contract of Autonomous Garantee on First Demand, as well as those which will reasonably result. Outside the cases expressly provided for in the Financing Documents, the Credit Agent and Guarantee Agent will not have to take any initiative under their own responsability, but will act or not act, without responsability on their part, validly in accordamce with instructions received by the Majority of Banks (or, as the case may be, all Banks), on the understanding that the Credit Agent and Guarantee Agent cannot compromise in the name of a Bank or begin any procedure against the Borrowers for the account of a Bank without instructions from the Bank to this effect.

23.2 Responsability

The Credit Agent and Guarantee Agent, and their directors, agents and employees will not incur any responsability for their action or inaction within the framework of their mandate above, except for major or intentional fault. Without limitation of this list, it is expressly stipulated that the Credit Agent and Guarantee Agent:

23.2.1 can resort when they judge it useful to the services of attorneys, experts accounting and other experts of their choice and trust in good faith to their Notification and counsel;

23.2.2 can act or abstain from acting by confiding in the declarations of the Borrowers and the contents of any Notification, certificate, other document or act that theu can legitimately believe to be authentic and coming from a competent person;

23.2.3 they will have no obligation to complete inquiries or verifications concerning respect and execution of obligations and commitments of the Borrowers or their financial or legal situation, their obligation to Notify the Banks of any facts and conditions within the framework of the Financing Documents limited to the transmission of information

**EXHIBIT A**                                                                 58

they receive in the execution of their mandate;

23.2.4 can in particular legitimately consider that no Case of Advance Payability or event constitutes or susceptible of constituting a Case of Advance Payability has occurred, unless, concerning the defaults in Payment only, the Credit Agent has not, on the occasion of its activity under the terms of the Contract, effective knowledge to the contrary on the understanding that, in this case, the Credit Agent should inform the Banks;

23.2.5 can abstain from taking measures to protect or execute by force the rights of a Bank stipulated in the Financing Documents until they have been indemnified or guaranteed agaisnt all costs, losses, expenses and liability *(including* the fees and legal fees) incurred or bale to be incurred because of this;

23.2.6 will not be responsible for the proper execution, delivery, legality, validity, adequacy, challengeability, possibility of forced execution or production in court or the contents of the Financing Documents;

23.2.7 will not be responsable, nor any of their personnel, for sufficiency, precise or complete of the declarations and guarantees, accounts-rendered or iuformation contained in the documents which have been delivered by the Borrowers or Guarantors in accordance with the Financing Documents except in the event of major fault;

23.2.8 will not be responsable for failure by one of the Borrowers, or the Banks to respect and duly punctually execute their respective obligations under the Financing Documents;

23.2.9 will not in any way be obliged to transmit to the other Banks information relative to one of the parties to the Financing Documents which they could have been communicated in any other way than in relation to the Financing Documents;

23.2.10 will not be held to exercise of their own initiative recourse against a Defaulting Bank or against a Borrower;

23.2.11 will have no obligation to provide to a Bank either on conclusion of the Financing Documents, or during their execution, once or continually, any information concerning the Borrowers, their situation or permitting their analysis except concerning the information having to be communicated by the Borrowers under the terms of the Financing Documents;

23.2.12 will not have the obligation to take into account or pay any sum, profit or asset received by them due to their present, future relations with the Borrowers with any sum which will be due by the Borrowers to the Credit Agent, Guarantee Agent or any Bank aunder the terms of the Financing Documents.

23.3 Each Bank individually declares and guarantees to the Credit Agent, Guarantee Agent and Mandated Arrangers that it has made, and will make at any moment, without relying on any Notification or any information given by the Credit Agent, Guarantee Agent or the Mandated Arrangers, its own independent syudy of the situation of the Borrowers. In consequence, the Credit Agent, Guarantee Agent or the Mandated Arrangers can incur no responsability concerning any information or Notification provided or not provided by them or by their intermediaries to the Banks.

23.4 Transfers

23.4.1 The role of the Credit Agent notably includes transfer to the Borrowers of sums received by the Banks, and the Banks concerned of sums received for their account, the Borrowers or any third party in the framework of the Contract. In no case will the Credit

Agent be held to advance funds to the Borrowers that they have not receieved from the Banks nor advance the Banks`any funds they have not received from the Borrowers. In the event that the Credit Agent has at least adavanced funds not received under the terms of the Contract, the Borrower concerned or, as the case may be, the Banks commitment to reimburse the Credit Agent on First demand of its part and to indemnfy it for any costs of financing it would have shouldered. In the event that any of the Banks do not satisfy their obligations, the Credit Agent will not in any way be held responsable vis-à-vis the Borrowers.

23.4.2 The Credit Agent will inform the Banks of any notification received by the Borrowers and will distribute, prorata the Commitment of each, diligently and under correct value, between all the Banks concerned of all sums provided to them by the Borrowers for the account of the Banks.

23.4.3 The Credit Agent will be able to, unless it received a written Notification to the contrary, in accordance with stipulations in the Contract, treat any Bank which makes available its participation to Withdrawal as beneficiary of reimbursement of the said participation.

23.5 Renunciations and Modifications

23.5.1 The Credit Agent will be able to, under reserve of stipulations in the following line, with prior consent of the Majority of Banks (or, as the case may be, of all the Banks in accordance with Article 25 (Amendments)), in the name of the Banks renounce using any of the stipulations of the Contract or agree with the Borrowers as agent of the Banks of any modification of any stipulation in the Contract.

23.5.2 It is understood that, as concerning any decision taken or any act concluded by the Credit Agent in the name and in the place and after consultation with the Banks in accordance with preceding line, or in accordance with the terms of the Contract (notably Article 25 (Amendments)), that) the Credit Agent and all of the Banks (including, those consulted by the Credit Agent, that will have voted differently) will be bound by such decisions and such acts.

23.6 Reimbursement of fees and indemnity

The Borrowers commit to reimbursing the Credit Agent and the Guarantee Agent, on presentation of proof and in the shortest possible time, all the reasonable costs incurred by the Credit Agent and Guarantee Agent in the framework of executing their mandate and indemnfying the Credit Agent and Guarantee Agent, on presentation of proof, of all reasonable costs, damages, disbursements, fees, penalties, losses and expenses (including notably all attorneys fees) and consequently any complaint or any judgment supported by the Credit Agent or Guarantee Agent due to the non-respect by the Borrowers of their obligations under the terms of the Financing Documents. If the Borrowers do not reimburse the Credit Agent or Guarantee Agent, the Banks will substitute themselves in their place in proportion to their respective participation in the Withdrawals. Moreover, the Banks commit to indemnifying the Credit Agent and the Guarantee Agent, on presentation of proof, of all costs supported by them due to any action begun by them on request by the Majority of Banks or all the Banks.

23.7 Rights as Bank

The Credit Agent will have, as a Bank, the same rights and obligations under the terms of the Contract as every other Bank and will be able to exercise them as if he were not Credit Agent and, in particulier, can accept deposits from Borrowers and lend them

**EXHIBIT A**                                                                    60

money or grant them Credit facilities Credit and generally do business with each without rendering an account to the Banks or incurring any particular responsability on account of this vis-à-vis the Banks.

23.8 Separation of functions

The Credit Agent and Guarantee Agent are reputed to exercise their functions under the terms of the Financing Documents by via one department, distinct from its other departments. Any information received by the other departments can be considered confidential by the Credit Agent and Guarantee Agent and any information or notification under the terms of the Financing Documents received by the Credit Agent or Guarantee Agent at another address than the one mentioned in Article 28 (Notifications) will be reputed not received by the Credit Agent or the GuaranteeAgent.

23.9 Successor of the Credit Agent or the Guarantee Agent

The Credit Agent and Guarantee Agent can step down from their functions under the terms of the Financing Documents or request to be replaced by a Company in their groupe at any time under reserve of having notified, respecting a pre-Notification of at least 90 (ninety) days, to the Banks and Borrowers. Further, the Credit Agent and the Guarantee Agent's functions can be ended at any time by the Majority of Banks without need to justify their decision. Any revocation by the Credit Agent or Guarantee Agent will be notified to the Borrowers. Following such a decision, request for replacement or revocation, the Majority of Banks will designate or agree, as the case may be, a new Credit Agent or Guarantee Agent under reserve of acceptance by the Borrowers that cannto be refused without a valid reason and which will be considered as having been accorded in the absence of a response from them within 30 (thirty) days from the request of acceptance by the Credit Agent, GuaranteeAgent or by the Majority of Banks. By their nomination as Credit Agent or Guarantee Agent, the new Credit Agent or Guarantee Agent will succeed to all the rights and obligations of the preceding Credit Agent or Guarantee Agent who will be discharged of all its obligations under the terms of the Financing Documents.

In the event that at the end of the pre-Notification period granted by the Credit Agent or Guarantee Agent, the Majority of Banks have not named a new Credit Agent or GuaranteeAgent, in the conditions above or that the new Credit Agent or Guarantee Agent thus chosen has not accepted this function or was refused by the Borrowers, the Credit Agent or Guarantee Agent will have the right from then on, with agreement from the Borrowers, to designate a new Credit Agent or Guarantee Agent on its own which must be a first rate Bank having offices in Paris and having the capacity to fill the functions attributed to the Credit Agent or the Guarantee Agent by the Financing Documents. As long as a new Credit Agent or Guarantee Agent has not been designated and has not accepted its functions, the exisiting Credit Agent or Guarantee Agent will remain in function.

23.10 The Credit Agent and Guarantee Agent can conserve for themselves and will not be obliged to pay other Banks sums received by them as reimbursement of disbursements supported by them.

## 24. ADJUSTMENT OF PAYMENTS

24.1 If for any reason whatsoever (except as providd in Article 13 (Occurrence of New Circumstamces) or in Article 15.4 (Taxes)), a Bank receives a Payment of

any sum due by virtue of the Contract exceeding the amount due to it proportionally to the amounts due to the other Banks, the Credit Agent will as soon as possible, make or proceed to make necessary adjustments for the excess to be distributed between all the Banks prorata of the amounts due to them respectively. The Banks having received such a Payment should repay the Credit Agent the sums thus received in excess within 2 (two) Working Days from receipt.

24.2 In the event that it transpires, that after such Payment has been restituted by a Bank to the Credit Agent and that the latter hs already redistributed the sum received between the different Banks, that the said Payment comes back entirely to the Bank having originally received it, each Bank to whom any aprt of the Payment has been distributed should repay this sum on request by the Credit Agent to the Bank concerned.

24.3 It is understood however that, once a Bank has recovered sums following legal action begun independantly, after having Notified the Credit Agent who will Notify the other Banks of its intention to begin the legal actions and having given them the opportunity to join these actions, the sums thus recovered wil be for the sole benefit of the Banks having participated to this action who will thus not in any way nbe held to share these sums with the Banks who did not participate to the actions.

25. AMENDMENTS

25.1 Under reserve of stipulations in Article 25.2 above, the terms and conditions of the Contract can be modified by agreement etween the Borrowers and the Majority of Banks.

25.2 For any other modification to the terms of the Contract, the Banks will make their best efforts to respond to requests by the Borrowers as soon as possible taking into account the constraints of time the Borrowers will be under;

25.3 No modification can be made to the Financing Documents nor any renunciation to any right without prior unanimous agreement by the Banks and Borrowers, or the Bank concerned as the case may be, if the modification or renunciation has the effect of:

25.3.1 increasing the participation to the Credit ;

25.3.2 extending the Final Maturity Date of the Tranche A of Credit, the Final Maturity Date of Tranche B of Credit or the Final Maturity Date of Tranche C of Credit;

25.3.3 extending the date on which any sum is due to the Banks, reducing any amount due to the Banks or modifying the Payment money in which such amount is labelled on the understanding that such stipulation does not reduce the capacity of a Bank to independently accept, a reduction in the amount due to this Bank by a Borrower;

25.3.4 modifying the monthly amounts of Maximum Authorized Amount figuring in the related table under the definition " *Maximum Authorized Amount* " in Article 1.1 (Definitions);

253.5 modifying the interest rate/s, the Reference Rate, the Margin or the amount of commissions due to the Banks under the terms of the Contract;

25.3.6 modifying the definition of Majority of Banks;

25.3.7 modifying Article 4 (Conditions of use), Article 24 (Adjustment of Payments), the present Article 25 (Amendments), Article 26 (Change of Borrowers) or Article 27 (Transfer by the Banks);

25.3.8 modifying the Guarantee Documents or the Contract of Autonomouse Guarantee on First Demand;

**EXHIBIT A** 62

25.3.9 modifying any stipulation in the Contract that expressly provides for notification or a decision cannot be brought about without unanimous agreement of the Banks, under the terms of such stipulation.

25.4 No modification can be made to the stipulations relative to rights and obligations of the Credit Agent under the terms of the Contract without prior consent of the Credit Agent.

25.5 All fees related to negociation, drafting and signature of an amendment or any document modifying the terms of the Contract on requst of one or more Borrowers (including, notably, the legal fees for which a ceiling would have been approved beforehand by the Company) and reasonably incurred by the Credit Agent to respond to such a request, evaluate it or negotiate it, will be undertaken by the Company, who will reimburse the Credit Agent at its First request and in any event within 3 (three) Working Days following such request.

26. CHANGE OF BORROWERS

26.1 Transfer by the Borrowers

The Borrowers cannot in any event transfer all or part of their rights and obligations under the terms of the Financing Documents.

26.2 Additional Borrowers

26.2.1 The Company can request that any of the Subsidiaries registered in France (except MOB) become an Additional Borrower. This Subsidiary will become an Additional Borrower if:

(A) all the Banks approve the addition of this Subsidiary;

(B) the Company gives the Credit Agent a Letter of Adhesion duly completed and signed;

C) the Company confirms the addition of this Subsidiary to the Contract as an Additional Borrower does not entail and is not susceptible of entailing a Case of Advance Payability; and

(D) the Credit Agent has received the following documents for the Additional Borrower that are satisfying in form as well as substance:

(i) a Letter of Adhesion duly signed by the Credit Agent and by the Company;

(ii) a signed Contract of Transfer of Professional Accounts Receivable;

(iii) a certified up to date copy of its statutes;

(iv) a K-bis extract dated less than a month ago;

(v) a non bankruptcy certificate dated less than a month ago

(vi) an inventory of inscriptions, privileges and securities dated less than a month ago;

(vii) a copy of the minutes certified by the legal representative of the Additional Borrower of decisions by its competent organs approving the conclusion, signature and execution of the Letter of Adhesion;

(viii) an original copy of the powers of the sigantories of the Letter of Adhesion or any document having to be provided by the Additional Borrower in accordance with the Financing Documents;

(ix) a document signed by the legal representative of the Additional Borrower containing the names and signature specimens of the signatories Authorized to sign the Letter of Adhésion and to make Withdrawals in the name and for the account of the Additional Borrower;

(x) a copy of the Last Annual Corporate Accounts.

**EXHIBIT A**                                                            **63**

26.2.2 The Credit Agent will Notify the Company and the Banks as soon as possible after receipt of all the documents enumerated in Article 26.2.1(D), as soon as they find them satisfying in substance as well as form.

26.2.3 Provision of the Letter of Adhesion by the Subsidiary concerned supplies its confirmation only on this date of the correctness of declarations and guarantees referred to in Article 16.1 (Declarations and guarantees) as concerning them.

26.3 Withdrawal by a  Borrower

26.3.1 The Company can request, by providing the Agent with a Letter of Withdrawal, that a Borrower (other than the Company) cease to be the Borrower.

26.3.2 The Credit Agent will accept the Letter of Withdrawal and  Notify the Company and the Banks of this acceptance if:

(A) no Case of Advance Payability is in process or is susceptible to come about due to acceptance of the Letter of Withdrawal (and on condition that the Company has confirmed it on its side) ; and

(B) the Borrower concerned no longer has any existing or future obligation under the terms of the Financing Documents.

26.3.3 If the conditions posed in Articles 26.3.2(A) and 26.3.2(B) are fulfilled, the Company will cease to be a Borrower and will no lobger have any obligation under the terms of the Financing Documents.

27. TRANSFER BY THE BANKS

27.1 Any transfer by a Bank of its rights and obligations running from the Contract ("Transferor Bank") to any Credit establishment or financial institution which will accept transmission under the conditions here-after ("Transferee Bank"), will require prior written agreement of the Company, which cannot refuse it without legitimate reason. It is however accepted by the Company that the agreement of the Company will be reputed to be given if refusal of the Company has not been received by the Credit Agent 8 (eight) Working Days following notification proposing transfer.

27.2 It is equally accepted by the Company that this agreement will be reputed given in the event of occurence of an Case of Advance Payability, as provided in Article 20 (Advance Payability) above, or a transfer by the Transferor Bank of its rights and obligations running from the Contract to a Transferee Bank being a Bank within the definition of the present Contract or Credit establishment or financial institution controlled by a Transferor Bank, controlling a Transferor Bank or jointly controlled with the Transferor Cédante by the same Company. The term "controlled" above is understood within the definition of article L. 233-3 of the Commerce Code.

27.3 The minimum amount transferred must be equal or superior to 5.000.000 EUR (five million euros) and, above this sum, must be an entire multiple of 1.000.000 EUR (one million euros), except (i) transfer by a Bank of its rights and obligations under the Contract the consequence of which would be for the Transferor Bank that it would no longer be a Bank under the terms of the present Contract and (ii) any transfer made on the Signature Date.

27.4 The Borrowers recognize that following a transfer, the Transferee Bank will substitute itself in the rights and obligations of the Transferor Bank for the transferred quote-part of the participation of the Transferor Bank to the Credit.

**EXHIBIT A**                                                                                         **64**

27.5 Any transfer will give rise to Payment to the Credit Agent, from the Transferor Bank, of a forfeiture commission of 2.000 EUR (two thousand euros) excluding taxes, destined to cover administrative fees incurred due to the transfer, except transfersby a Transferor Bank to a Credit establishment or financial institution controlled by the Transferor Bank, controlling the Transferor Bank or jointly controlled with the Transferor Bank by the same Company. The term "control" above is understood within the definition of article L. 233-3 of the Commerce Code.

27.6 Transfer by one or more Banks of their participation in the Contract will not become effective until the Transferee Bank has mde known to the Credit Agent in writing that it commits to take over all the rights and obligations of the Transferor Bank, as they appear in the Contract or in any related document, in sending the Credit Agent an original signed copy of the notification of transfer in the form in Annex 4.

27.7 The Transferee Bank will signify its fees for the transfer to the Borrowers concerned, in accordance with article 1690 of Civil Code. ·

28. NOTIFICATIONS

28.1 Mode of notification

Ecept express stipulations provided in the Contract or agreed afterward by the parties concerned, any communications made under the terms of the Contract will be sent by :

28.1.1 certified mail with Notice of receipt if it is notification of a Case of Advance Payability or a Case of Potential Advance Payability;

28.1.2 certified mail with Notification of receipt accompanid by a fax or an email if it is a notification proposing transfer under the terms of Article 27 (Transfer by the Banks) ;

28.1.3 email, simple letter or fax for the administrative management of the Contract; or

28.1.4 simple letter with delivery of receipt request or Notice of receipt, accompanied by originals in paper, concerning communication of documents provided for in Article 17.1 or concerning respect of obligations of the Borrowers, specifying that the certificate provided for in Article 17.1.3 should be equally sent to the Credit Agent by fax; at the address and number following (or to any other address or number notified afterward by the recipient to the other parties at least five (5) Working Days prior), on the understanding that the Credit Agent will not have to verify the signatures nor the powers of the signatories of the said communications

Parties to the Contract and their Contact Information -
Company:
Smoby Quartier Bourg Dessus
39170 Lavans Les St Claude, France
attention M. Gérard Bondier
Tel. :+333 8441 3826
Fax : + 33 3 84 42 29 65
e-mail : nroZ@Smoby.fr

Other Initial Borrowers
Addresses and respective numbers indicated in
Part 1 of Annex 1

**EXHIBIT A**                                                                                    **65**

Credit Agent /Guarantee Agent :
CALYON
9 quai du Président Paul Doumer
92920 Paris la Défense Cedex, France
attention Sophie Robert / Sylvie Charre
Tel.:+33 141 893801/6070
Fax : + 33 1 41 89 60 73
e-mail: sophie.robert@calyon.com /
sylvie.charre@calyon.com

Mandated Arrangers :
CALYON
9, quai du Président Paul Doumer, 92920 Paris
la Défense Cedex, France
attention  Patrick Josse / Ghislain Descamps
Tel. : + 33 1 41 8966 *881* + 33 472 40 76 28
Fax: + 33 1 41 89 60 73/ + 33 4 72 40 76 19
e-mail: patrickjosse@calyon.fr/ ghislain.descamps@calyon.com

SOCIETE GENERALE
7, rue Voirin
BP1049-25001 Besançon Cedex, France
attention Jacky Quettier
Tel. :+33 3 81845712
Fax: + 33 3 81 84 57 49
e-mail: jacky.quettier@socgen.com

Banks
Addresses et respective numbers in
Part 2 of Annex 1

28.2 Receipt
Any communication made in application of preceding stipulations will be reputed to be received:
28.2.1 in the case of simple letter referenced in Article 28.1.3 above, as soon as the provision of this letter;
28.2.2 in the case of  simple letter with delivery of a receipt or Notifice of receipt referenced in Article 28.1.4 above, as soon as the provision of the receipt or Notice of receipt;
28.2.3 in the case of email, as soon as receipt of the electronic proof of receipt;
28.2.4 in the case of sending certified mail with request to Notify receipt, the date on the Notice of receipt; and
28.2.5 in the case of transmission by fax, the Working Day in Paris of its transmission (indicated by the sent receipt) or, if the transmission is made after five o'clock in the afternoon (17h00), on the following Working Day.

**EXHIBIT A**                                                          **66**

29. NON-RENUNCIATION
The fact that one of the Banks, Credit Agent or the Borrowers does not exercise a right or recourse or exercises it only in part, or late, does not constitute renunciation to right or recourse.

30. INTERPRETATION AND AUTONOMY OF STIPULATIONS
30.1 The titles of Articles and Annexes are agreed with the only goal of facilitating the reading of the Contract and cannot in any case be used by the parties for interpretation.
30.2 In the vent that any of the stipulations in the Contract become or will be declared void, forbidden or without effect, the validity of other stipulations in the Contract will not be put into question.

31. LAW APPLICABLE AND COMPETENCE
The Contract will be governed and interpreted in accordance with french law.
The parties accept that all differences between them as to interpretation or execution will be brought before the Tribunal de Commerce in Paris.

ANNEX 1
PART 1
LIST OF INITIAL BORROWERS OTHER THAN THE COMPANY
Initial Borrowers other than the Company and Contact Information

Etablissements Ecoiffier Albert & Fils,
Simplified joint stock Company with capital 180.000 EUR headquartered at
12 bis, avenue de la Gare Bellignat 01810, France, registered at Registre du Commerce et des Sociétés de Bourg-eu-Bresse under the number 773 201 330
c/o Smoby Quartier Bourg Dessus
39170 Lavans Les St Claude, France
attention M. Gérard Bondier
Tel.: +33 3 84413826
Fax: + 33 3 84 42 29 65
e-mail: nroZ@Smoby.:fr

Berchet Group,
Limited liability company with capital of 39.500,000 EUR headquartered at 31, Cours de Verdun 01100 Oyonnax, France, registered at the Registre du Commerce et des Sociétés of Bourg-En-Bresse under the number 400432381
c/o Smoby
Quartier Bourg Dessus
39170 Lavans Les St Claude, France
attention M. Gérard Bondier
Tel. : + 33 384413826
Fax : + 33 3 84 42 29 65
e-mail: nroZ@smoby.fr

Majorette Solido,
Simplified joint stock company with capital of 10.000.000 EUR headquartered at
110, rue du Companet 69140 Rillieux La Pape, France, registered at Registre du
Commerce et des Sociétés de Lyon under the number 391 579 836
c/o Smoby
Quartier Bourg Dessus
39170 Lavans Les St Claude, France
attention M. Gérard Bondier
Tel. : + 33 384413826
Fax : + 33 3 84 42 29 65
e-mail: nroZ@smoby.fr


ANNEX 1
PART 2
LIST OF BANKS

Bank Populaire Bourgogne Franche Comté
1, place de la 1ère Aimée Française 25087. Besançon Cedex, France
Attention : Christine Rozet / Jocelyne Girardi
Telephone: +33381652846/91 24
Fax: +33 1 3 81652885
e-mail : christine.rozet@bpbfc.bankpopulaire.fr/
jocelyne.girardi@bpbfc.ballquepopulaire.fr
Commitment to Tranche A of Credit : 2.600.000
Commitment to Tranche B of Credit : 8.900.000
Commitment to Tranche C of Credit : 1.000.000


BECM
6 rue de Ventadour 75001 Paris, France
Attention: Back Office Credit
Telephone: + 331 445.84234
Fax: + 33144584147
e-mail : bocredit@e-i.com .
Commitment to Tranche A of Credit : 3.120.000
Commitment to Tranche B of Credit : 10.680.000
Commitment to Tranche C of Credit : 1.200.000

Calyon
9 quai du Président paul Doumer, 92920 Paris la Défense, France
Attention: Laurence Lebeau /Brigitte Boddaert
Telephone: +33 141 893770/1546
Fax: +33 1 41 89 Il 14
e-mail: laurence.lebeau@calyon.com /

**EXHIBIT A**                                    **68**

brigitte.boddaert@calyon.com
Commitment to Tranche A of Credit : 7.800.000
Commitment to Tranche B of Credit : 26.700.000
Commitment to Tranche C of Credit : 3.000.000


CIC Lyonnaise de Bank
8, rue de la République, 69001 Lyon, France
Attention: Cécile Pueyo Cointepas / Alain Buathier
Telephone: + 33 47892 08 43./08 78
Fax: +33 4 78 92 04 14
e-mail : pueyocce@lb.cic.fr / buathia@lb.cic.rr
Commitment to Tranche A of Credit : 7.280.000
Commitment to Tranche B of Credit : 24.920.000
Commitment to Tranche C of Credit : 2.800.000


Credit Agricole de Franche Comté
340, avenue Offenbourg 39000 Lons Le Saunier, France
Attention: Jean-Pierre- Baud
Telephone: + 33 3 84 87 8016
Fax: + 33 3 84 8782 26
e-mail : jean-pietre.baùd@ca-.francheconte.fr
Commitment to Tranche A of Credit : 6.240.000
Commitment to Tranche B of Credit : 21.360.000
Commitment to Tranche C of Credit : 2.400.000

Credit Lyonnais .
US Contracts 23170, 136, cours Lafayette 69489 Lyon Cédex 3, France
Attention: Maria de Lorette Cayet / Isabelle Cherchelay
Téléphone: + 33 4.72 606227/68 13
Télécopie :+33 4.72.60.66.41/+33 1.45.16.76.07
Commitment to Tranche A of Credit : 4.160.000
Commitment to Tranche B of Credit : 14.240.000
Commitment to Tranche C of Credit : 1,600.000


KBCBank
Synergie Park, 6 rue Nicolas Appert, 59260 Lezennes, France
Attention: Yvon Vasseur /Delphine Schelfhout
Telephone: + 33 3 20 11 61 62/61 08
Fax : + 3-3 3 20 1161 50
e-mail: yvon.vasseur@kbc.be/ delphine.schelfhout@kbc.be
Commitment to Tranche A of Credit : 2.600.000
Commitment to Tranche B of Credit : 8.900.000
Commitment to Tranche C of Credit : 1.000.000

**EXHIBIT A**                                                                          **69**

Société Générale
253, route de Mittelhausbergen, BP60026 - 67012 Strasbourg Cedex, France
Attention: Pole Services Clients.
Téléphone: + 33 3 88 1077 00
Télécopie: + 333 88 1077 56
e-mail : pscstrasbourg.entreprises@socgen.com
Commitment to Tranche A of Credit : 18.200.000
Commitment to Tranche B of Credit : 62.300.000
Commitment to Tranche C of Credit : 7.000.000

Total  Commitment to Tranche A of Credit : 52.000.000 EUR
Total  Commitment to Tranche B of Credit : 178.000.000 EUR
Total  Commitment to Tranche C of Credit : 20.000.000 EUR


ANNEX 2
PARTI
MODELE NOTIFICATION OF WITHDRAWAL OF TRANCHE A OF CREDIT

To: Calyon, Credit Agent (Agency)
ATT: Sophie Robert / Sylvie Charre
9 quai du Président Paul Doumer
92920 Paris la Défense Cedex

Fax: +33 1 41 896073

With copy to  :
ATT : Brigitte Boddaert (Back-Office)
9 quai du Président Paul Doumer
92920 Paris la Défense Cedex

Fax: + 33141 89 11 14

From: Smoby

On [x] September 2005


OPENING OF CREDIT OF 250.000.000 EUR
Contract dated 26th September 2005
We refer to the Contract for Opening of Credit dated 26th September 2005 (the
"Contract"). In application of Article 5 (Modes of Withdrawal) of the Contract, we notify
you by the present Notification of Withdrawal under the terms of the Tranche A of
Credit.

We inform you by the present Notification that we desire to make a Withdrawal in accordance with the Contract with the following characteristics:

Amount of Withdrawal in Euros: 52.000.000 EUR

Withdrawal Date: **[x]** 2005

Interest Period: **[x]** month

The Withdrawal is to be paid to the account n° [at [in favor of [xl under the reference no.]

We confirm the non-occurrence of any event constituting a Case of Advance Payability and declare that all declarations and guarantees made or given under the terms of Article 16 (Declarations and Guarantees) of the Contract are correct at the date of the present Notification of Withdrawal.

We confirm that, in the event that, for any reason, the requested Withdrawal in the present Notification does not take effect, we commit to immediately indemnifying the Banks, the Credit Agent and Guarantee Agent, against any fees or losses, including, notably, the Costs of Refinancing relative to the funds reserved by the Banks following provision of the present Notification of Withdrawal, that the non-occurence of Withdrawal will entail. The expressions defined in the Contract are used in the same sense in the present Notification.

(signature of a person able to sign for the Company)


ANNEX 2
PART 2
MODELE NOTIFICATION OF WITHDRAWAL OF TRANCHE B OF CREDIT

To : Calyon, Credit Agent (Agency)
ATT: Sophie Robert / Sylvie Charre
9 quai du Président Paul Doumer
92920 Paris la Défense Cedex

Fax: + 33 1 41 896073
With copy to: ATT : Brigitte Boddaert (Back-Office)
9 quai du Président Paul Doumer
92920 Paris la Défense Cedex

Fax: + 331418911 14

From:

On [x]

OPENING OF CREDIT OF 250.000.000 EUR
Contract dated 26th September 2005
We refer to the Contract for Opening of Credit dated 26th September 2005 (the "Contract"). In application of Article 5 (Modes of Withdrawal) of the Contract, we notify you of the present Notification of Withdrawal under the terms of the Tranche B of Credit.

**EXHIBIT A**                                                                 **71**

We inform you by the present Notification that we desire to make a Withdrawal in accordance with the Contract having the folowing characteristics:
Amount of Withdrawal in Euros:
Currency of Withdrawal: [Euros / Dollars]
Amount of Withdrawal in the currency of Withdrawal: [EUR/ USD)
Withdrawal Date : [x]
Interest Period: [x] month
The Withdrawal is to be paid into the account no. [x] at [x] in favor of [x] under the refernce [x].
We confirm the non-occurence of any event constituting a Case of Advance Payability and declare all declarations and guarantees made or given under the terms of Article 16 (Declarations and Guarantees) of Contract are correct on the date of the present Notification of Withdrawal.
We confirm that, in the event that, for any reason, the Withdrawal requested in the present Notification does not take effect, we commit to immediately indemnify the Banks, the Credit Agent and Guarantee Agent, against all fees or losses, including, notably, the Costs de Refinancing relative to the funds reserved by the Banks following provision of the present Notification of Withdrawal, that the non-occurence of Withdrawal will entail,
The expressions defined in the Contract are used in the same sense in the present Notification.

(signature of a person able to sign for the Borrower)

ANNEX 2
PART 3
MODELE NOTIFICATION OF WITHDRAWAL OF TRANCHE C OF CREDIT

To : Calyon, Credit Agent (Agency)
ATT: Sophie Robert / Sylvie Charre
9 quai du Président Paul Doumer
92920 Paris là Défense Cedex

Fax: + 33 1 41 896073

With copy to:
ATT : Brigitte Boddaert (Back-Office)
9 quai du Président Paul Doumer
92920 Paris la Défense Cedex

Fax: +33 1 41 89 Il 14

From: Smoby

On [x]

**EXHIBIT A**                                                    72

OPENING OF CREDIT OF 250.000.000 EUR
Contract dated 26th September 2005
We refer to the Contract for Opening of Credit dated 26th September 2005 (the
"Contract"). In application of Article 5 (Modes of Withdrawal) of the Contract, we notify
by the present Notification of Withdrawal under the terms of the Tranche C of Credit. We
inform you by the present Notification that we desire to make a Withdrawal in
accordance with the Contract having the followinf characteristics:
Amount of Withdrawal in Euros: (x] EUR
Withdrawal Date : [x]
Interest Period: [x) month
The Withdrawal is to be paid to account n° [x) at [x] in favor of (x] under the reference
[x].
We confirm the non-occurence of any event constituting a Case of Advance Payability
and declare that all the declarations and guarantees made or given under the terms of
Article 16 (Declarations and Guarantees) pf the Contract are correct on the date of the
present Notification of Withdrawal.
We confirm that, in the event that, for any reason, the Withdrawal requested in the
present Notification does not take effect, we commit to immediately indemnify the
Banks, Credit Agent and Guarantee Agent, against all fees or losses, including, notably,
the Costs of Refinancing relative to the funds reserved by the Banks following provision
of the present Notification of Withdrawal, that the non-occurence of Withdrawal will
entail.
The expressions defined in the Contract are used are used in the same sense in the
present Notification.

(signature of a person able to sign for the Company)

ANNEX 3
MODELE NOTIFICATION OF PERIOD OF INTEREST

To: Calyon, Credit Agent (Agency)
ATT : Sophie Robert / Sylvie Charre
9 quai du Président Paul Doumer
92920 Paris la Défense Cedex

Fax: + 33 1 41 896073

With copy to :
ATT : Brigitte Boddaert (Back-Office)
9 quai du Président Paul Doumer
92920 Paris la Défense Cedex

Fax: + 33 1 41 8911 14

From: Smoby
On :

**EXHIBIT A**                                                73

OPENING OF CREDIT OF 250.000.000 EUR
Contract dated 26th September 2005
We refer to the Contract for Credit dated 26th September 2005 (the "Contract"). In application of Article 10.4 (Notification of Interest Period), we address to you the present Notification of Interest Period.
We refer to the Notification of Withdrawal [of the Tranche A of Credit] [of the Tranche C of Credit) which the characteristics are the following [x]
We inform you by the present that the following Interest Period for Withdrawal made under the terms of the Notification of Withdrawal referred to above will begin on [x) and will last for a duration of [x] months.
The expressions defined in the Contract are used in the same sense in the present Notification of Interest Period.

Signature of a person able to sign for the Borrower


ANNEX 4
MODEL NOTIFICATION OF TRANSFER

To: Calyon, Credit Agent (Agency)
ATT: Sophie Robert/ Sylvie Charre
9 quai du Président Paul Doumer
92920 Paris la Défense Cedex

Fax: + 33 1 41 896073
From: Transferor Bank et Transferee Bank


OPENING OF CREDIT OF 250.000.000 EUR
Contract dated 26th September 2005

Sirs,
The undersigned Bank (the "Transferor Bank") is committed to transfer to [x] (the "Transferee Bank ") on [x) (hereinafter "Effective Date") its rights and obligations up to an Amount in Euros of [x] (x)) and the Transferee Bank commits to acquire them.
The Transferee Bank requests the Credit Agent to note from the Effective Date, it will take on the rights and obligations of [x) (i) up to an Amount in Euros of [x]) under the terms of Tranche A of Credit, (ii) [x) up to an Amount in Euros of [x]) under the terms of Tranche B of Credit and (iii) [x] up to an amount in Euros of [x]) under the terms of the Tranche C of Credit. It confirms that it is in possession of an example or a certified copy of the Contract, Guarantee Documents and the Contract of Autonomous Guarantee on First Demand, recognizes that it will be bound by the "terms and conditions of the Contract from this date and consequently it will execute the obligations running from it, and that it will benefit from the des resulting guarantees in the Guarantee Documents and the Contract of Autonomous Guarantee on First Demande under reserve of the

**EXHIBIT A**                                                                 **74**

accomplishment of formalities provided for in Article 27.7 of the Contract. The contact information for the Transferee Bank for the Contract are the following:
Name of the Transferee Bank: [x]
Agency: [x]
Attention: [x]
Telephone: [x]
Fax: [x]
Email: [x]
The regulations relative to the Withdrawals should be addressed to the Transferee Bank to account no [x] at Bank [x] sunder reference],
The expressions defined in the Contract are used in the same sense in the present Act of Transfer.
Transferor Bank
Transferee Bank


ANNEX
MODEL LETTER OF ADHESION

To: Calyon, Credit Agent (Agency)
ATT : Sophie Robert / Sylvie Charre
9 quai du Président Paul Doumer
92920 Paris la Défense Cedex
Fax: + 33141 896073
From: Smoby and *[Subsidiary]*

OPENING OF CREDIT OF 250.000.000 EUR
Contract dated 26th September 2005

Sirs,
We refer to the Contract for Credit dated 26th September 2005 (the "Contract").
The present document constitutes a Letter of Adhesion.
The terms defined in the Contract will have, except stipulation to the contrary, the same sens in the present Letter of Adhesion.
*[Subsidiary]* accepts to become Additional Borrower and to be bound by the the terms of the Contract as an Additional Borrower in accordance with the stipulations in Article 26.2 (Additional Borrowers) to the Contract.
The administrative information of the *[Subsidiary]* id the following :
Address:
Fax:
Attention :
The present Letter of Adhesion is governed by French law.
Additional Borrower
Company

**EXHIBIT A**                                                                 75

ANNEX 6
MODEL LETTER OF WITHDRAWAL
To: Calyon, Credit Agent (Agency)
ATT : Sophie Robert / Sylvie Charre
9 quai du Président Paul Doumer
92920 Paris la Défense Cedex

Fax: + 33 141 896073

From: Smoby and *[Subsidiary]*

OPENING OF CREDIT OF 250.000.000 EUR
Contract dated 26th September 2005
Sirs,
We refer to the Contract for Credit dated 26th September 2005 (the "Contract").
The present document constitutes a Letter of Withdrawal.
The terms defined in the Contract have, except stipulation to the contrary, the same sense in the  presente Letter of Withdrawal.
In accordance with the stipulations in Article 26.3 (Withdrawal by a Borrower), we request the *[Borrower who withdraws]* be released of any obligation as a Borrower under the terms of the Financing Documents.
We confirm that:
(i) no Case of Advance Payability is in process or susceptible of occuring due to acceptance of the Letter of Withdrawal; and
(ii) *[Borrower who withdraws]* no longer has an existing or future obligation under the terms of the Financing Documents.
The present Letter of Withdrawal is governed by French law.
*[Borrower who withdraws]*
Company

ANNEX 7
MODEL CERTIFICATE OF RESPECT OF FINANCIAL RATIOS
*[by fax and simple letter with receipt or Notification of receipt]*

To: Calyon, Credit Agent (Agencey
ATT : Sophie Robert / Sylvie Charre
9 quai du Président Paul Doumer
92920 Paris la Défeuse Cedex

Fax: + 33 1 41 89 60 73

From: Smoby
On [xl

**EXHIBIT A**                                                                 76

OPENING OF CREDIT OF 250.000.000 EUR
Contract dated 26th September 2005
We trefer to the Contract for Opening of Credit dated 26th September 2005 (the "Contract") and in particular Article 18 (Financial Commitments) in the Contract.
The expressions defined in the Contract are used in the same sense in the present certificate.
We confirm to you that the Group respects the Financial Ratios provided for in Article 18 of the Contract and that, on the date, [x] :
(i) the Financial Ratio no.1 is [x] ;
(ii) Ratio no.2 is [x] ;
The Financial Ratios have been calculated on the basis of Annual Consolidated Accounts.
Made at [xl, on [xl,
In [x] original copies,
Administrative and Financial Director of the Group
[xl
*Stamp of the auditor*

ANNEX 8
MODEL CERTIFICATE OF LENDING BANKS FOR EXISTING BANKING EXAMINATIONS
To: [x]
From: [xl
Date: (x]
Sirs,
We refer to the Contract for Credit of [x] EUR dated (x] granted to *(name of the Borrower concerned]* by [x] as [Bank] [agent and certain financial establishments financiers as lenders].
We confirm by the present that we have received a written notification from *(name of the Borrower concerned]* dated [x] and relative to the intention of *[name of Borrower concerned]* to (i) void the total commitments of the lenders under the terms of the aforementioned Contract of Credit (ii) reimburse [in advance] the Withdrawals in process. We certify by the present that, immediately after having received funds from *[name of Borrower concerned]* relative to notification of advance reimbursement [advance] aforementioned, we will attribute the said funds to reimbursement [advance] of the aforementioned Contract of Credit.
By: (x]

ANNEX 9
CALCULATION OF MANDATORY COSTS
1. General Provisions
The Mandatory Costs and the average pondérée of the rates of Mandatory Costs for each Bank calculated by the Credit Agent as indicated below on the first day of each Interest Period. The Credit Agent will distribute each amount of the Mandatory Cost between the Banks on the basis of rates of mandatory costs calculated for each Bank.
2. For a Bank lending to a Credit Agency situated in the United Kingdom

**EXHIBIT A**                                                                        77

A. The rate of Mandatory Costs applicable to each Bank having a Credit Agency in the United Kingdom is calculated according to the following formula:

For a Loan in Pounds Sterling:

AB +Cm-Dl + E x 0.01 per cent per year

lOO-CA +C)

For a Loan other than in Pounds Sterling:

ExO.Ol o,/0 per year 300

on the understanding that the day the formula is applied:

(a) is the percentage of eligible obligations *(eligible liabilities)* (is added to any minimum required) of the Bank that the Bank of England  imposes on the Bank to hold on a non-renumerated account in accordance with its regulation on ratios of liquidity;

(b) is LIBOR applicable for the Interest Period;

(c) is the percentage of eligible obligations *(eligible liabilities)* of the Bank that the Bank of England imposes on the Bank to place on a special deposit account;

(d) anual interest rate Authorized by the Bank of England on a special deposit account *(special deposit);* and

(e) is calculated by the Credit Agent as being the average of rates of commission provided by the Reference Banks to the Credit Agent under the terms of  Paragraphe (d) expressed in books for each 1 million pounds sterling.

B. For the needs of the present Paragraph 2 :

(i) "eligible obligations" *(eligible liabilities)* and "special deposit account "*(special deposit)* have the meaning attributed to them by the Bank of England at the time of application of the formula;

(ii) "commission rules" *(fee rules)* designate the rules in force relative to the periodical commission in the Book of Regulation and Control of the FSA *(Supervision Manual of the FSA Handbook) ;*

 (iii) "commission basis" *(tarif base)* has the meaning attributed to this term in the " commission rules".

C. (i) In the calculation of the formula, A, B, C et D are treated as numbers and not percentages, for example if A = 0,5% and B = 15%, AB is calculated as 0,5 x 0,15

A negative result obtained by subtracting B from D will be treated as having a value of zero.

(ii) The rate calculated in application of the formula is rounded up to the fourth highest decimal, if necessary.

D. (i) Each Reference Bank will provide the Credit Agent with the commission rate payable to the *Financial Service Authority* under the terms of the commission rules (calculated by this Reference Bank as being the average of commission rates applicable to this Reference by integrating to this end all provisions applicable and excluding all minimum commission prescribed by the commission rules) expressed in pounds for each 1 million pounds sterling as basis of the commission applicable to this Reference Bank.

(ii) Each Reference Bank must promptly inform the Credit Agent of any change in the commission rate.

E. (i) Each Bank and each Reference Bank will provide the Credit Agent all information the Credit Agent may claim in order to calculate the rate of Mandatory Costs

**EXHIBIT A**                                                    78

for each Bank or Reference Bank. The Credit Agent can presume that all information provided to ti qui lui is correct in every regard.

(ii) If a Bank or Reference Bank cannot transmit this information to the Credit Agent, the Credit Agent can presume that the obligations of the Bank or the Reference Bank concerning ratio of liquidity, deposit obligations and "commission rules" are the same as those of an equivalent Bank situated in the country the Bank is registered in and having a Credit Agency situated in the United Kingdom.

(iii) The Credit Agent will incure no responsability toward anyone if its calculation overcompensates or under-compensates any of the Banks.

3. For a Bank lending from a Credit Agency sitiated in the territory of a Participating Member State

A.The rates of Mandatory Costs applicable to a Bank lending from a Credit Agency situated in the territory of a Participating Member State is the rate of annual percentage notified by this Bank to the Credit Agent as being the cost it pays to respect rules on minimum reserves imposed by the European Central Bank.

B. If a Bank is incapable of providing the rate mentioned in Paragraphe (a) above, the Credit Agent can presume that this Bank is not paying any such cost.

4. Modifications

The Credit Agent can, after consultation with the Borrower and the Banks, notify all the parties that an amendement to this Annex is necessary to reflect:

(a) all changes in the regulation in force; or

(b) any instructions imposed by the Bank of England; the *Financial Services Authority* or the European Central Bank (or, as the case may be, one of their successors).

Except for manifest error, any notification made by the Credit Agent will be mandatory for all parties.


ANNEX 10
MODEL CONTRACT FOR TRANSFER OF PROFESSIONAL ACCOUNTS
RECEIVABLE

COPIE CONFORME

# Herbert Smith

---

**En date du 26 septembre 2005**

---

**SMOBY**
Société

et

**CALYON**
**SOCIETE GENERALE**
Arrangeurs Mandatés

et

**CALYON**
Agent du Crédit et Agent des Sûretés

et

**LES BANQUES ET LES ÉTABLISSEMENTS DE CRÉDIT**
Banques

---

**OUVERTURE DE CRÉDIT DE**
**EUR 250.000.000**

---

Herbert Smith LLP

COPIE CONFORME

## SOMMAIRE

1. DÉFINITIONS ET INTERPRÉTATION ....................................................................... 5
2. LE CRÉDIT ................................................................................................................ 16
3. CONDITIONS PRÉALABLES OU CONCOMITANTES ......................................... 17
4. CONDITIONS D'UTILISATION ............................................................................... 19
5. MODALITÉS DE TIRAGE ........................................................................................ 19
6. REMBOURSEMENT .................................................................................................. 20
7. REMBOURSEMENT ANTICIPE OBLIGATOIRE .................................................. 21
8. REMBOURSEMENT ANTICIPE VOLONTAIRE .................................................... 21
9. RENONCIATION ANTICIPÉE .................................................................................. 22
10. INTÉRÊTS .................................................................................................................. 22
11. COMMISSIONS ET FRAIS ....................................................................................... 24
12. ILLÉGALITÉ .............................................................................................................. 26
13. SURVENANCE DE CIRCONSTANCES NOUVELLES .......................................... 26
14. PERTURBATIONS DU MARCHÉ ............................................................................ 28
15. PAIEMENTS ............................................................................................................... 29
16. DÉCLARATIONS ET GARANTIES .......................................................................... 31
17. ENGAGEMENTS D'INFORMATION ....................................................................... 33
18. ENGAGEMENTS FINANCIERS ............................................................................... 34
19. AUTRES ENGAGEMENTS ....................................................................................... 34
20. EXIGIBILITE ANTICIPÉE ........................................................................................ 36
21. INTÉRÊTS DE RETARD ........................................................................................... 38
22. DOCUMENTS DE SURETES .................................................................................... 38
23. AGENT DU CRÉDIT ET AGENT DES SURETES .................................................. 39
24. PÉRÉQUATION DES PAIEMENTS .......................................................................... 43
25. AVENANTS ................................................................................................................ 43
26. CHANGEMENTS D'EMPRUNTEURS ..................................................................... 45
27. CESSION PAR LES BANQUES ................................................................................ 46
28. NOTIFICATIONS ....................................................................................................... 47
29. NON-RENONCIATION .............................................................................................. 49
30. INTERPRÉTATION ET AUTONOMIE DES STIPULATIONS ............................... 49
31. DROIT APPLICABLE ET COMPÉTENCE .............................................................. 49
ANNEXE 1 PARTIE 1 LISTE DES EMPRUNTEURS INITIAUX AUTRES QUE LA SOCIETE 50
ANNEXE 1 PARTIE 2 LISTE DES BANQUES ............................................................. 51
ANNEXE 2 PARTIE 1 MODELE D'AVIS DE TIRAGE DE LA TRANCHE A DU CREDIT ........ 53
ANNEXE 2 PARTIE 2 MODELE D'AVIS DE TIRAGE DE LA TRANCHE B DU CREDIT ........ 55

**EXHIBIT B**

ANNEXE 2 PARTIE 3 MODELE D'AVIS DE TIRAGE DE LA TRANCHE C DU CREDIT........ 57

ANNEXE 3 MODELE DE NOTIFICATION DE PERIODE D'INTERET ........................................ 59

ANNEXE 4 MODELE DE NOTIFICATION DE CESSION ............................................................. 60

ANNEXE 5 MODELE DE LETTRE D'ADHESION............................................................................ 62

ANNEXE 6 MODELE DE LETTRE DE RETRAIT ............................................................................ 63

ANNEXE 7 MODELE D'ATTESTATION DE RESPECT DES RATIOS FINANCIERS ............... 64

ANNEXE 8 MODELE D'ATTESTATION DES BANQUES PRETEUSES AU TITRE DES CONCOURS BANCAIRES EXISTANTS ............................................................................................. 65

ANNEXE 9 CALCUL DES COÛTS OBLIGATOIRES ...................................................................... 66

ANNEXE 10 MODELE DE CONTRAT DE CESSION DE CREANCES PROFESSIONNELLES 69

ANNEXE 11 LISTE DES SURETES EXISTANTES............................................................................ 89

ANNEXE 12 LISTE DES LITIGES EXISTANTS................................................................................ 90

COPIE CONFORME

## Ouverture de Crédit de EUR 250.000.000

ENTRE :

**SMOBY**, société anonyme à directoire et conseil de surveillance au capital social de EUR 7.306.672, dont le siège social est sis Quartier Bourg Dessus, 39170 Lavans Les St Claude, France, immatriculée au Registre du Commerce et des Sociétés de Lons-Le-Saunier sous le numéro 646 050 351, représentée par M. Jean-Christophe Breuil, dûment habilité aux fins des présentes, ci-après dénommée la "**Société**",

de première part,

Les Filiales de la Société énumérées en Partie 1 de l'Annexe 1 en qualité d'emprunteurs initiaux,

de deuxième part,

**CALYON**, société anonyme au capital social de EUR 3.119.771.484 dont le siège social est sis 9, quai Paul Doumer, 92920 Paris La Défense Cedex, France, immatriculée au Registre du Commerce et des Sociétés de Nanterre sous le numéro 304 187 701,

$576.780.702,70$

**SOCIETE GENERALE**, société anonyme au capital social de EUR ~~550.781.598,75~~, dont le siège social est sis 29, boulevard Haussmann, 75009 Paris, France, immatriculée au Registre du Commerce et des Sociétés de Paris sous le numéro 552 120 222,

Calyon et Société Générale ci-après dénommées les "**Arrangeurs Mandatés**",

de troisième part,

**LES BANQUES ET ETABLISSEMENTS FINANCIERS** désignés en Partie 2 de l'Annexe 1 (définis ci-après individuellement comme une "**Banque**" - en ce compris tout successeur, ayant-droit ou cessionnaire aux termes de l'Article 27 (Cession par les Banques) du présent Contrat - et collectivement les "**Banques**"),

de quatrième part,

**ET**

**CALYON**, société anonyme au capital social de EUR 3.119.771.484 dont le siège social est sis 9, quai Paul Doumer, 92920 Paris La Défense Cedex, France, immatriculée au Registre du Commerce et des Sociétés de Nanterre sous le numéro 304 187 701, ci-après dénommée l'"**Agent du Crédit**" et l'"**Agent des Sûretés**", en ce compris tout successeur de l'Agent du Crédit et de l'Agent des Sûretés aux termes de l'Article 23.9 (Succession de l'Agent du Crédit ou de l'Agent des Sûretés) du présent Contrat,

de cinquième part.

COPIE CONFORME

**APRES AVOIR RAPPELE QUE :**

Les Banques sont disposées à mettre à la disposition des Emprunteurs, un Crédit d'un montant maximum en principal de EUR 250.000.000 (deux cent cinquante millions d'Euros) selon les termes et conditions du présent Contrat.

**IL A ETE CONVENU CE QUI SUIT :**

**1.      DEFINITIONS ET INTERPRETATION**

**1.1      Définitions**

Pour l'application du présent Contrat, sauf stipulation contraire, les mots et expressions ci-dessous auront la signification suivante :

**"Acquisition"** désigne toute acquisition d'actif immobilisé, immobilier, corporel ou incorporel par un Emprunteur.

**"Agence de Crédit"** désigne pour chaque Banque l'agence (ou les agences) auprès de laquelle (ou desquelles) sa participation à tout Tirage est comptabilisée aux fins du Contrat et dont les coordonnées à la Date de Signature figurent en Partie 2 de l'Annexe 1, étant entendu que l'Agent du Crédit et chaque Banque se réservent la possibilité de modifier à tout moment une telle domiciliation sous réserve que cette nouvelle domiciliation se situe dans un Etat de l'Union Européenne telle que celle-ci est composée au 1er mai 2004 et ayant conclu avec la France une convention fiscale internationale ayant pour objet d'éviter une double imposition et permettant d'effectuer des paiements au titre du Crédit sans retenue à la source, impôt et taxe ou déduction de toute nature.

**"Avis de Tirage"** désigne l'Avis de Tirage de la Tranche A du Crédit, les Avis de Tirage de la Tranche B du Crédit et les Avis de Tirage de la Tranche C du Crédit .

**"Avis de Tirage de la Tranche A du Crédit"** désigne l'avis conforme au modèle figurant en Partie 1 de l'Annexe 2 relatif à la demande de Tirage de la Tranche A du Crédit.

**"Avis de Tirage de la Tranche B du Crédit"** désigne un avis conforme au modèle figurant en Partie 2 de l'Annexe 2 relatif à une demande de Tirage au titre de la Tranche B du Crédit.

**"Avis de Tirage de la Tranche C du Crédit"** désigne un avis conforme au modèle figurant en Partie 3 de l'Annexe 2 relatif à une demande de Tirage au titre de la Tranche C du Crédit.

**"Banques EURIBOR de Référence"** désigne l'agence principale à Paris des banques suivantes : Calyon et Société Générale ou de tout autre établissement de crédit désigné d'un commun accord entre l'Emprunteur et la Majorité des Banques dans le cas où l'une des Banques EURIBOR de Référence ne pourrait plus ou n'accepterait plus d'agir en tant que telle.

**"Banques LIBOR de Référence"** désigne l'agence principale à Londres des banques suivantes : Calyon et Société Générale ou de tout autre établissement de crédit désigné d'un commun accord entre l'Emprunteur et la Majorité des Banques dans le cas où l'une des Banques LIBOR de Référence ne pourrait plus ou n'accepterait plus d'agir en tant que telle.

**"Cas d'Exigibilité Anticipée"** désigne tout événement prévu à l'Article 20 (Exigibilité Anticipée).

COPIE CONFORME

"**Cas d'Exigibilité Anticipée Potentiel**" désigne tout événement susceptible de constituer un Cas d'Exigibilité Anticipée dès réception d'une notification à cet effet ou après l'écoulement d'un certain délai ou bien à la réalisation d'une condition conformément à l'Article 20.1 (Cas d'Exigibilité Anticipée).

"**Cessions Autorisées**" désigne toute vente, location, transfert ou autres dispositions d'actifs à des tiers :

(i)     réalisées intra-Groupe ;

(ii)    réalisées dans le cadre normal des activités du Groupe ;

(iii)   totalement amorties au bilan ;

(iv)    réalisées avec l'accord préalable de la Majorité des Banques ; ou

(v)     réalisées dans la limite de (i) 5% (cinq pour cent) du total des actifs immobilisés corporels, incorporels ou financiers nets de provisions et amortissements consolidés du Groupe par exercice social, et (ii) 20% (vingt pour cent) du total des actifs immobilisés corporels, incorporels ou financiers nets de provisions et amortissements consolidés du Groupe sur la totalité de la durée du Crédit.

"**Changement de Réglementation**" désigne :

(i)     l'entrée en vigueur, après la Date de Signature, d'une disposition législative ou réglementaire, d'une nouvelle directive ou recommandation ;

(ii)    une modification apportée, après la Date de Signature, à toute disposition législative ou réglementaire, ou à toute directive ou recommandation de portée générale ou dans l'interprétation qui en est faite par toute autorité compétente ; et

(iii)   toute recommandation ou instruction émanant, après la Date de Signature d'une banque centrale (y compris la Banque Centrale Européenne) ou d'une autorité fiscale, monétaire ou autre autorité compétente ou de toute association ou organisation professionnelle dont une Banque est membre, et notamment toute recommandation ou instruction se rapportant à la constitution de réserves ou dépôts obligatoires, au maintien d'un niveau minimum de fonds propres, au respect de ratios de solvabilité ou relative aux modalités selon lesquelles une Banque affecte ses fonds propres à ses engagements, ainsi que tout changement de l'interprétation de telles recommandations ou instructions.

"**Contrat**" désigne le présent contrat, ses annexes et tout avenant ultérieur à ceux-ci ainsi que la lettre séparée visée à l'Article 10.7 (Taux Effectif Global).

"**Contrats de Cessions de Créances Professionnelles**" désigne les contrats de cessions de créances professionnelles conclus le 26 septembre 2005 entre chaque Emprunteur Initial en qualité de cédant, l'Agent des Sûretés et les Banques en qualité de cessionnaires ainsi que les contrats de cessions de créances professionnelles à conclure entre les Emprunteurs Additionnels en qualité de cédants, l'Agent des Sûretés et les Banques en qualité de cessionnaires dont un modèle figure en Annexe 10.

"**Contrat de Garantie Autonome à Première Demande**" désigne le contrat de garantie autonome à première demande conclue le 26 septembre 2005 entre la Société en qualité de garant et les Banques en qualité de bénéficiaires.

**EXHIBIT B**

COPIE CONFORME

"**Contrat de Gage de Compte d'Instruments Financiers Portant sur les Actions de Majorette Solido**" désigne (i) le contrat de nantissement de compte d'instruments financiers conclu le 26 septembre 2005 entre la Société en qualité de constituant, l'Agent des Sûretés, les Banques en qualité de bénéficiaires, et Calyon en qualité de teneur du compte bancaire nanti, et portant sur le compte d'instruments financiers sur lequel figurent les titres de Majorette Solido détenus par la Société, (ii) la déclaration de gage de compte d'instruments financiers signée par la Société en qualité de constituant, (iii) l'attestation de gage de compte d'instruments financiers signée Majorette Solido en qualité de teneur de compte, et (iv) l'attestation de gage du compte spécial d'instruments financiers signée par Calyon en qualité de teneur du compte bancaire nanti.

"**Contrat de Gage de Compte d'Instruments Financiers Portant sur les Actions de J.L.B. Développement**" désigne (i) le contrat de nantissement de compte d'instruments financiers conclu le 26 septembre 2005 entre la Société en qualité de constituant, l'Agent des Sûretés les Banques en qualité de bénéficiaires et Calyon en qualité de teneur du compte bancaire nanti, et portant sur le compte d'instruments financiers sur lequel figurent les titres de J.L.B. Développement détenus par la Société, (ii) la déclaration de gage de compte d'instruments financiers signée par la Société en qualité de constituant, (iii) l'attestation de gage de compte d'instruments financiers signée par J.L.B. Développement en qualité de teneur de compte, et (iv) l'attestation de gage du compte spécial d'instruments financiers signée par Calyon en qualité de teneur du compte bancaire nanti.

"**Contrat de Gage de Compte d'Instruments Financiers Portant sur les Actions de Groupe Berchet**" désigne (i) le contrat de nantissement de compte d'instruments financiers conclu le 26 septembre 2005 entre la Société en qualité de constituant, l'Agent des Sûretés, les Banques en qualité de bénéficiaires, et Calyon en qualité de teneur du compte bancaire nanti, et portant sur le compte d'instruments financiers sur lequel figurent les titres de Groupe Berchet détenus par la Société, (ii) la déclaration de gage de compte d'instruments financiers signée par la Société en qualité de constituant, (iii) l'attestation de gage de compte d'instruments financiers signée par Groupe Berchet en qualité de teneur de compte, et (iv) l'attestation de gage du compte spécial d'instruments financiers signée par Calyon en qualité de teneur du compte bancaire nanti.

"**Contrat de Nantissement de la Marque Smoby**" désigne le contrat de nantissement de la marque SMOBY conclu le 26 septembre 2005 entre la Société en qualité de constituant, l'Agent des Sûretés et les Banques en qualité de bénéficiaires.

"**Contre-valeur**" désigne, en ce qui concerne tout Tirage devant être effectué en Dollar au titre de la Tranche B du Crédit ou toute somme libellée en Dollar à une date donnée, le montant déterminé par l'Agent du Crédit (sur la base de la moyenne du cours d'échange de référence de l'Euro contre le Dollar, fixé par la Banque Centrale Européenne à 14h00 (quatorze heures), le troisième Jour Ouvré précédant) et communiqué à la Société et à l'Emprunteur concerné, correspondant à la contre-valeur (arrondie à la dix millième unité inférieure) en Euro du montant en Dollar du Tirage considéré tel qu'indiqué dans l'Avis de Tirage de la Tranche B du Crédit correspondant ou de la somme considérée.

"**Coûts de Refinancement**" désigne la différence positive, le cas échéant, entre :

(i)     le montant des intérêts qu'une Banque aurait dû recevoir entre la date de paiement anticipé effectif d'une somme et la date à laquelle cette somme aurait dû être payée, et

(ii)    le montant des intérêts que ladite Banque pourrait percevoir en déposant la même somme auprès d'une banque de premier rang sur le marché interbancaire européen pendant la période

COPIE CONFORME

courant entre sa date de paiement effectif et la date à laquelle cette somme aurait dû être payée.

**"Coûts Obligatoires"** désigne tous les coûts futurs imposés aux Banques, dans le cadre de leur financement du Crédit, par la Banque Centrale Européenne ou la *Financial Services Authority*, tels que communiqués par les Banques concernées à la Société dans les 8 (huit) jours de sa décision de facturer ces Coûts Obligatoires à un Emprunteur, et calculés conformément aux stipulations de l'Annexe 9 du présent Contrat.

**"Crédit"** désigne la Tranche A du Crédit, la Tranche B du Crédit et la Tranche C du Crédit.

**"Crédit Relais"** désigne le crédit relais de EUR 10.000.000 (dix millions d'Euros) consenti à la Société le 30 juin 2005 par Calyon et Société Générale pour financer l'apport en compte courant fait à Groupe Berchet, ledit compte courant devant être incorporé au capital avant le 31 décembre 2006 au plus tard, à concurrence de la somme minimale de EUR 10.000.000 (dix millions d'Euros).

**"Date d'Echéance Finale de la Tranche A du Crédit"** désigne la 7ème (septième) date anniversaire de la Date de Signature.

**"Date d'Echéance Finale de la Tranche B du Crédit"** désigne la 5ème (cinquième) date anniversaire de la Date de Signature.

**"Date d'Echéance Finale de la Tranche C du Crédit"** désigne la 7ème (septième) date anniversaire de la Date de Signature.

**"Date de Paiement d'Intérêt"** désigne le dernier jour d'une Période d'Intérêt, sous réserve des stipulations de l'Article 15.7 (Paiements effectués un Jour Ouvré) du présent Contrat.

**"Date de Signature"** désigne le jour de signature du Contrat.

**"Date de Tirage"** désigne le jour de mise à disposition des fonds au titre d'un Tirage tel que mentionné dans l'Avis de Tirage correspondant.

**"Derniers Comptes Annuels Consolidés"** désigne à tout moment les comptes annuels (bilan et compte de résultat) consolidés de la Société, relatifs au dernier exercice clos, tels que certifiés par ses commissaires aux comptes, et établis conformément aux principes comptables utilisés pour l'établissement des comptes de l'exercice précédent, sous réserve des stipulations de l'Article 19.1.1 du Contrat.

**"Derniers Comptes Annuels Sociaux"** désigne à tout moment les comptes annuels (bilan et compte de résultat) sociaux d'un Emprunteur, relatifs au dernier exercice clos dudit Emprunteur, tels que certifiés par ses commissaires aux comptes, et établis conformément aux principes comptables utilisés pour l'établissement des comptes de l'exercice précédent, sous réserve des stipulations de l'Article 19.1.1 du Contrat.

**"Derniers Comptes Semestriels Consolidés"** désigne à tout moment les comptes semestriels (bilan et compte de résultat) consolidés de la Société, relatifs au premier semestre de l'exercice en cours et établis conformément aux principes comptables utilisés pour l'établissement des comptes de l'exercice précédent, sous réserve des stipulations de l'Article 19.1.1 du Contrat.

**"Derniers Comptes Semestriels Sociaux"** désigne à tout moment les comptes semestriels (bilan et compte de résultat) sociaux des Emprunteurs, relatifs au premier semestre de l'exercice en cours et

COPIE CONFORME

établis conformément aux principes comptables utilisés pour l'établissement des comptes de l'exercice précédent, sous réserve des stipulations de l'Article 19.1.1 du Contrat.

**"Dette Financière"** désigne toute obligation de paiement (dont l'inscription au bilan ou à l'annexe du bilan est exigée par les normes comptables en vigueur) se rapportant :

(i)     à toute dette d'emprunt, de quelque forme que ce soit, y compris toute dette obligataire, convertible ou non ;

(ii)    à tous instruments financiers (à l'exception des actions) au sens de l'article L. 211-1 du Code Monétaire et Financier, de droit français ou étranger, y compris à toute dette au titre d'un contrat d'échange de devises ou de taux ou d'un autre contrat de couverture ;

(iii)   à toute dette (existante ou potentielle) au titre d'une garantie de quelque forme que ce soit ;

(iv)    à tout contrat de location financière ou de crédit-bail ;

(v)     à toute dette au titre de bons de caisse, de billets à ordre ou de lettres de change ;

(vi)    à toute obligation de paiement différé contractée à l'occasion de l'acquisition d'un actif quelconque dans la mesure où le délai de paiement consenti constitue le moyen de financement de cette acquisition.

**"Disponibilités"** désigne, sur la base des Derniers Comptes Annuels Consolidés, la somme entre (i) la position créditrice des comptes courants bancaires de la Société et de ses Filiales, et (ii) les Valeurs Mobilières de Placement.

**"Documents de Financement"** désigne le présent Contrat, les Documents de Sûretés, le Contrat de Garantie Autonome à Première Demande, les Lettres de Commissions, les Avis de Tirages, toute Lettre d'Adhésion et toute Lettre de Retrait.

**"Documents de Sûretés"** désigne :

(i)     le Contrat de Gage de Compte d'Instruments Financiers Portant sur les Actions de Groupe Berchet ;

(ii)    le Contrat de Gage de Compte d'Instruments Financiers Portant sur les Actions de J.L.B. Développement ;

(iii)   le Contrat de Gage de Compte d'Instruments Financiers Portant sur les Actions de Majorette Solido ;

(iv)    le Contrat de Nantissement de la Marque Smoby ;

(v)     les Contrats de Cessions de Créances Professionnelles ;

(vi)    tout contrat de gage portant sur des Valeurs Mobilières de Placement détenues par la Société et conclu à la demande de la Majorité des Banques conformément à l'Article 19.2.1 ci-dessous ; et

(vii)   tout contrat constitutif de Sûreté conclu conformément à l'Article 19.2.2 ci-dessous.

**"Dollar"** ou **"USD"** désigne la monnaie ayant cours légal aux Etats-Unis d'Amérique.

**"Effet Défavorable Significatif"** désigne tout événement pouvant avoir un effet défavorable significatif (i) sur la situation financière ou l'activité ou les perspectives d'un Emprunteur ou la

COPIE CONFORME

situation financière consolidée ou l'activité ou les perspectives du Groupe, et (ii) sur la capacité d'un Emprunteur à faire face à ses obligations au titre du Contrat.

"**Emprunteur**" désigne un Emprunteur Initial ou un Emprunteur Additionnel, jusqu'au moment où il cesse d'être un Emprunteur conformément aux stipulations de l'Article 26.3 (Retrait d'un Emprunteur).

"**Emprunteur Additionnel**" désigne une société devenue Emprunteur Additionnel conformément aux stipulations de l'Article 26.2 (Emprunteurs Additionnels).

"**Emprunteur Initial**" désigne (i) la Société au titre de la Tranche A du Crédit et de la Tranche C du Crédit, et (ii) la Société et les Filiales énumérées en Partie 1 de l'Annexe 1 au titre de la Tranche B du Crédit.

"**Encours**" désigne, à une date donnée, le montant déterminé par l'Agent du Crédit égal à la somme (i) du total des Montants en Euro des Tirages effectués et non remboursés à cette date et (ii) du total des Montants en Euro de tous les Tirages demandés et non encore mis à la disposition des Emprunteurs à cette date (étant entendu que si un Tirage intervenait le même jour que le remboursement d'un autre Tirage, seule serait prise en compte la partie du Montant en Euro du nouveau Tirage excédant le Montant en Euro du Tirage venant ainsi à échéance).

"**Endettement Financier**" désigne, sur la base des Derniers Comptes Annuels Consolidés, l'ensemble des emprunts et dettes bancaires et financières y compris les encours de crédit-bail et de location financière, les crédits-vendeurs, les opérations d'affacturage, de titrisation ou toute autre opération similaire portant sur des créances commerciales réintégrés au bilan selon les normes internationales dites "IFRS" (*International Financial Reporting Standards*).

"**Endettement Financier Net**" désigne, sur la base des Derniers Comptes Annuels Consolidés, l'Endettement Financier diminué des Disponibilités.

"**Engagement**" désigne, pour une Banque donnée et sous réserve des stipulations du Contrat, la somme de l'Engagement de la Tranche A du Crédit, de l'Engagement de la Tranche B du Crédit et de l'Engagement de la Tranche C du Crédit. Le montant initial de l'engagement de chaque Banque figure en regard de son nom en Partie 2 de l'Annexe 1.

"**Engagement de la Tranche A du Crédit**" désigne, pour une Banque donnée et sous réserve des stipulations du présent Contrat, le montant (éventuellement modifié en vertu des stipulations du Contrat et notamment de l'Article 9 (Renonciation anticipée) ou de l'Article 13 (Survenance de circonstances nouvelles)) que ladite Banque s'engage à mettre à la disposition de la Société au titre de la Tranche A du Crédit conformément à l'Article 2.1.

"**Engagement de la Tranche B du Crédit**" désigne, pour une Banque donnée et sous réserve des stipulations du présent Contrat, le montant (éventuellement modifié en vertu des stipulations du Contrat et notamment de l'Article 9 (Renonciation anticipée) ou de l'Article 13 (Survenance de circonstances nouvelles)) que ladite Banque s'engage à mettre à la disposition des Emprunteurs au titre de la Tranche B du Crédit conformément à l'Article 2.1.

"**Engagement de la Tranche C du Crédit**" désigne, pour une Banque donnée et sous réserve des stipulations du présent Contrat, le montant (éventuellement modifié en vertu des stipulations du Contrat et notamment de l'Article 9 (Renonciation anticipée) ou de l'Article 13 (Survenance de

COPIE CONFORME

circonstances nouvelles)) que ladite Banque s'engage à mettre à la disposition de la Société au titre de la Tranche C du Crédit conformément à l'Article 2.1.

"**Engagement Total**" désigne à tout moment, la somme de l'Engagement Total de la Tranche A du Crédit, de l'Engagement Total de la Tranche B du Crédit et de l'Engagement Total de la Tranche C du Crédit.

"**Engagement Total de la Tranche A du Crédit**" désigne à tout moment, la somme des Engagements de la Tranche A du Crédit dont le montant est, à la Date de Signature, de EUR 52.000.000 (cinquante deux millions d'Euros).

"**Engagement Total de la Tranche B du Crédit**" désigne à tout moment, la somme des Engagements de la Tranche B du Crédit dont le montant correspond, à la Date de Signature, au Montant Maximum Autorisé.

"**Engagement Total de la Tranche C du Crédit**" désigne à tout moment, la somme des Engagements de la Tranche C du Crédit dont le montant est, à la Date de Signature, de EUR 20.000.000 (vingt millions d'Euros).

"**EONIA**" désigne, pour un jour considéré, l'*European Overnight Index Average*, le taux interbancaire au jour le jour des dépôts en Euro et publié à la page 247 du Telerate (ou sur telle autre page ou service qui pourrait lui être substitué) le lendemain.

En cas d'indisponibilité de taux ainsi diffusé, l'EONIA sera déterminé sur la base des taux au jour le jour offerts sur le marché interbancaire par les banques de premier rang aux Banques EURIBOR de Référence.

L'Agent du Crédit calculera la moyenne arithmétique (arrondie, s'il y a lieu, au seizième de pour cent (1/16%) supérieur) des taux communiqués par chacune des Banques EURIBOR de Référence dans les meilleurs délais et le résultat de ce calcul donnera l'EONIA applicable au paiement considéré.

"**EURIBOR**" désigne le taux interbancaire diffusé sur la page 248 du Telerate (ou sur telle autre page ou service qui pourrait lui être substitué) aux environs de 11h00 (heure de Paris) le deuxième Jour Ouvré qui précède le premier jour de la Période d'Intérêt considérée, auquel des dépôts en Euro sont offerts pour une durée équivalente à ladite Période d'Intérêt.

En cas d'indisponibilité du taux ainsi diffusé, l'EURIBOR sera déterminé sur la base des taux annuels auxquels des dépôts en Euro pour le même montant que celui du Tirage concerné, sont offerts pour une durée équivalente à la Période d'Intérêt considérée sur le marché interbancaire par les banques de premier rang aux Banques EURIBOR de Référence.

Chaque Banque EURIBOR de Référence devra indiquer, par télécopie, ce taux à la demande de l'Agent du Crédit. Le taux indiqué sera le taux relevé aux environs de 11h00 (heure de Paris) le deuxième Jour Ouvré qui précède le premier jour de la Période d'Intérêt considérée.

L'Agent du Crédit calculera la moyenne arithmétique (arrondie s'il y a lieu, au seizième de pour cent (1/16%) supérieur) des taux communiqués par chacune des Banques EURIBOR de Référence dans les meilleurs délais et le résultat de ce calcul donnera l'EURIBOR applicable à la Période d'Intérêt considérée.

"**Euro**" ou "**EUR**" désigne la devise créée par les dispositions du Traité de l'Union Européenne ayant pris effet le 1er janvier 1999 et ayant cours légal en France.

COPIE CONFORME

**"Excédent Brut d'Exploitation"** désigne, sur la base des Derniers Comptes Annuels Consolidés, le montant égal à la somme du résultat d'exploitation, des dotations aux amortissements nettes de reprises, et des dotations nettes aux provisions pour dépréciation d'actif, tels que ces postes figurent dans les Derniers Comptes Annuels Consolidés du Groupe, et établis conformément aux normes internationales dites "IFRS" (*International Financial Reporting Standards*).

**"Famille Breuil"** désigne (i) Mme Dany Breuil née Boussant demeurant Moulin de Marignat, 39360 Chassal, (ii) M. Jean Christophe Breuil demeurant 8, rue du Curé Marquis, 39170 St Lupicin et (iii) Mlle Karine Breuil demeurant Moulin de Marignat, 39360 Chassal.

**"Famille Moquin"** désigne (i) M. Roger Moquin demeurant à Bourg Dessus, 39170 Lavans Les St Claude, (ii) Mme Danielle Moquin née Clerc demeurant à Bourg Dessus, 39170 Lavans Les St Claude, (iii) Mme Anne Marie Roy née Moquin demeurant à Vescles (39240), (iv) Mme Chantal Lafuitte née Moquin demeurant à Chemin de Fontanette Lavans, 39170 Lavans Les St Claude, (v) M. Pierre Moquin demeurant rue F. Bourdeaux, 39170 Lavans Les St Claude et (vi) M. Jean Paul Moquin demeurant rue de la Fortune, 39170 Lavans Les St Claude.

**"Filiale"** désigne toute société dont plus de 50% (cinquante pour cent) du capital ou des droits de vote sont directement ou indirectement détenus par la Société et entrant dans le périmètre de consolidation de la Société sur la base des Derniers Comptes Annuels Consolidés, à l'exclusion de MOB et de Giochi Preziosi France.

**"Filiale Principale"** désigne toute Filiale dont le résultat d'exploitation ou le total des actifs au bilan ou le chiffre d'affaires est supérieur à 5% respectivement du résultat d'exploitation consolidé ou des actifs au bilan consolidés ou du chiffre d'affaires consolidé tels que calculés sur la base des Derniers Comptes Annuels Consolidés.

**"Fonds Propres"** désigne, sur la base des Derniers Comptes Annuels Consolidés, le montant des capitaux propres consolidés du Groupe établis conformément aux normes internationales dites "IFRS" (*International Financial Reporting Standards*).

**"Giochi Preziosi France"** désigne la société Giochi Preziosi France, société par actions simplifiée au capital social de EUR 100.000 dont le siège social est sis rue Blaise Pascal 39000 Lons-Le-Saunier, France, immatriculée au Registre du Commerce et des Sociétés de Lons-Le-Saunier sous le numéro 437 491 566.

**"Groupe"** désigne la Société et ses Filiales.

**"Groupe Berchet"** désigne la société Groupe Berchet, société anonyme au capital social de EUR 39.500.000 dont le siège social est sis 31, Cours de Verdun 01100 Oyonnax, France, immatriculée au Registre du Commerce et des Sociétés de Bourg-En-Bresse sous le numéro 400 432 381.

**"J.L.B. Développement"** désigne la société J.L.B. Développement, société par actions simplifiée au capital social de EUR 1.750.000 dont le siège social est sis 31, Cours de Verdun 01100 Oyonnax, France, immatriculée au Registre du Commerce et des Sociétés de Bourg-En-Bresse sous le numéro 351 020 474.

**"Jour Ouvré"** désigne tout jour entier (à l'exception du samedi et du dimanche) où le marché interbancaire international fonctionne et où les établissements de crédit sont ouverts à Paris et Londres.

**"Lettre d'Adhésion"** désigne un document substantiellement en la forme du modèle figurant en Annexe 5.

"**Lettres de Commissions**" désigne les lettres déterminant les commissions prévues aux Article 11.1.1 (Commission de l'Agent du Crédit et de l'Agent des Sûretés) et 11.1.2 (Commission d'arrangement et de participation).

"**LIBOR**" désigne pour le Dollar et une Période d'Intérêt donnée, le taux diffusé sur la page 3570 de l'écran Telerate (ou telle autre page ou service qui pourrait lui être substitué) aux environs de 11h00 (heure de Londres), le deuxième Jour Ouvré précédant le jour prévu pour un Tirage au titre de la Tranche B du Crédit, auquel des dépôts en Dollar sont offerts pour une durée équivalente à ladite Période d'Intérêt.

En cas d'indisponibilité du taux ainsi diffusé, le LIBOR sera déterminé sur la base des taux auxquels des dépôts en Dollar d'un montant comparable à celui du Tirage concerné, sont offerts pour une durée équivalente à la Période d'Intérêt concernée sur le marché interbancaire de Londres par des banques de premier rang aux Banques LIBOR de Référence.

Chaque Banque LIBOR de Référence devra indiquer, par télécopie, ce taux à la demande de l'Agent du Crédit. Le taux indiqué sera le taux relevé aux environs de 11h00 (heure de Londres), 2 (deux) Jours Ouvrés avant le jour prévu pour le Tirage concerné.

L'Agent du Crédit calculera la moyenne arithmétique (arrondie, s'il y a lieu, au seizième de pour cent (1/16%) supérieur) des taux communiqués par les Banques LIBOR de Référence dans les meilleurs délais et le résultat de ce calcul donnera le LIBOR applicable au Tirage considéré.

"**LIBOR au Jour le Jour**" désigne, pour le Dollar, le taux établi par l'Agent du Crédit comme étant égal à la moyenne arithmétique (arrondie s'il y a lieu au seizième de pour cent (1/16%) supérieur) des taux annuels indiqués à l'Agent du Crédit par les Banques LIBOR de Référence comme étant les taux auxquels des dépôts en Dollar, d'un montant comparable au montant concerné leur sont offerts sur le marché interbancaire de Londres, pour le Jour Ouvré pour lequel le taux doit être fixé, pour une période commençant ce Jour Ouvré et se terminant le Jour Ouvré suivant.

"**Majorette Solido**" désigne la société Majorette Solido, société anonyme au capital social de EUR 9.411.380 dont le siège social est sis 110, rue du Companet 69143 Rillieux La Pape, France, immatriculée au Registre du Commerce et des Sociétés de Lyon sous le numéro 391 579 836.

"**Majorité des Banques**" désigne :

(i)     en l'absence de Tirage, une ou plusieurs Banques dont l'Engagement représente plus de 66 ⅔% de l'Engagement Total ; ou

(ii)    dans le cas où les Tirages seraient en cours, une ou plusieurs Banques dont le montant cumulé des participations dans les Tirages, représente plus de 66 ⅔% de l'Encours.

"**Marge**" correspond à la Date de Signature à :

(i)     0,85 % (zéro virgule quatre vingt cinq pour cent) l'an en ce qui concerne la Tranche A du Crédit et la Tranche C du Crédit ;

(ii)    0,60 % (zéro virgule soixante pour cent) l'an en ce qui concerne la Tranche B du Crédit ;

sous réserve des stipulations de l'Article 10.2 (Ajustement de la Marge) du présent Contrat.

"**MOB**" désigne la société MOB, société par actions simplifiée au capital social de EUR 3.063.840 dont le siège social est sis 39170 Lavans Les St Claude, France, immatriculée au Registre du Commerce et des Sociétés de Lons-Le-Saunier sous le numéro 403 243 066.

COPIE CONFORME

"**Montant en Euro**" désigne, en ce qui concerne toute somme libellée en Euro, ladite somme et, en ce qui concerne toute somme libellée en Dollar, le montant en Euro dont ladite somme est la Contre-valeur.

"**Montant Maximum Autorisé**" désigne le montant maximum mis à disposition des Emprunteurs par les Banques au titre de la Tranche B du Crédit, ajusté mensuellement tel qu'indiqué dans le tableau suivant :

| Mois | Montant Maximum Autorisé | Mois | Montant Maximum Autorisé |
|---|---|---|---|
| Janvier | EUR 140.000.000 | Juillet | EUR 160.000.000 |
| Février | EUR 135.000.000 | Août | EUR 165.000.000 |
| Mars | EUR 130.000.000 | Septembre | EUR 170.000.000 |
| Avril | EUR 135.000.000 | Octobre | EUR 178.000.000 |
| Mai | EUR 140.000.000 | Novembre | EUR 178.000.000 |
| Juin | EUR 150.000.000 | Décembre | EUR 178.000.000 |

Les montants indiqués dans le tableau ci-dessus pourront être modifiés à la demande de la Société et avec l'accord des Banques au mois de juin de chaque année afin de les adapter au plan de trésorerie prévisionnelle du Groupe.

"**Notification de Période d'Intérêt**" désigne la notification substantiellement en la forme du modèle figurant en Annexe 3 du présent Contrat et relatif à la notification par la Société à l'Agent du Crédit de la durée des Périodes d'Intérêt successives applicables au Tirage unique effectué au titre de la Tranche A du Crédit ou aux Tirages effectués au titre de la Tranche C du Crédit.

"**Période d'Intérêt**" désigne, pour tout Tirage, la période de 1 (un), 2 (deux), 3 (trois) ou 6 (six) mois (ou toute autre période convenue entre l'Emprunteur concerné et l'ensemble des Banques) indiquée dans l'Avis de Tirage correspondant ou une Notification de Période d'Intérêt.

"**Programme de Titrisation**" désigne le programme de titrisation mis en place par Groupe Berchet le 30 novembre 2004.

"**Ratio Financier n°1**" désigne le résultat du rapport de l'Endettement Financier Net sur l'Excédent Brut d'Exploitation, calculé sur la base des Derniers Comptes Annuels Consolidés.

"**Ratio Financier n°2**" désigne le résultat du rapport de l'Endettement Financier Net sur les Fonds Propres, calculé sur la base des Derniers Comptes Annuels Consolidés.

"**Sûreté**" désigne toute sûreté réelle ou personnelle, à savoir tout nantissement, gage, privilège, servitude, hypothèque, caution, aval, garantie, ou tout autre droit ayant pour objet de grever un ou des biens présents ou à venir sur le patrimoine d'un Emprunteur et ayant pour but de garantir l'exécution de toute obligation contractée par un Emprunteur (ou par tout tiers dont ledit Emprunteur garantirait l'exécution des obligations) ou ayant pour but le transfert de propriété à titre de garantie de tout bien

COPIE CONFORME

présent ou à venir appartenant à un Emprunteur en vue de garantir l'exécution de toute obligation contractée par ledit Emprunteur ou un tiers.

**"Sûretés Autorisées"** désigne toute Sûreté créée ou consentie par un Emprunteur :

(i)      dans le cadre normal de son activité ;

(ii)      dans le cadre de contentieux fiscaux ou sociaux ;

(iii)      avec l'accord préalable écrit de la Majorité des Banques ;

(iv)      en garantie de dettes n'excédant pas un montant cumulé de EUR 30.000.000.

**"Taux de Référence"** désigne :

(i)      dans le cas d'une Période d'Intérêt, pour ce qui concerne toute somme libellée en :

- Euro, l'EURIBOR ;

- Dollar, le LIBOR ;

(ii)      dans le cas de toute somme due autrement qu'au titre d'une Période d'Intérêt pour ce qui concerne toute somme libellée en :

- Euro, l'EONIA ;

- Dollar, le LIBOR au Jour le Jour.

**"Tirages"** désigne les utilisations par les Emprunteurs du Crédit ou, selon le contexte, le montant non remboursé des Tirages effectués par les Emprunteurs.

**"Tranche A du Crédit"** désigne le crédit non-réutilisable de EUR 52.000.000 (cinquante deux millions d'Euros) consenti par les Banques à la Société selon les termes et conditions du présent Contrat.

**"Tranche B du Crédit"** désigne le crédit réutilisable d'un montant égal au Montant Maximum Autorisé consenti par les Banques aux Emprunteurs selon les termes et conditions du présent Contrat.

**"Tranche C du Crédit"** désigne le crédit non-réutilisable de EUR 20.000.000 (vingt millions d'Euros) consenti par les Banques à la Société selon les termes et conditions du présent Contrat.

**"Valeurs Mobilières de Placement"** désigne les valeurs mobilières détenues par la Société, autres que les valeurs mobilières détenues dans l'une quelconque des sociétés du Groupe, à titre d'investissement ou de placement n'ayant pas pour objectif d'exercer une influence particulière sur les sociétés émettrices des titres.

1.2      **Interprétation**

Dans le présent Contrat, sauf indication contraire,

         1.2.1      "actifs" s'entend des biens, revenus et droits de toute nature, présents ou futurs ;

COPIE CONFORME

1.2.2    toute référence à l'"Agent du Crédit", l'"Agent des Sûretés", l'"Arrangeur Mandaté", une "Banque", une "partie" inclut ses successeurs, cessionnaires et ayant-droits ;

1.2.3    "autorisation" s'entend de toute autorisation, consentement, approbation, résolution, licence, exemption ou enregistrement ;

1.2.4    "fusion" s'entend d'une fusion réalisée en application des articles L. 236-1 à L. 236-24 du Code de commerce ;

1.2.5    "mois" s'entend de toute période commençant un jour donné dans un mois calendaire et finissant le jour numériquement correspondant du mois suivant ;

1.2.6    toute référence à une disposition légale s'entend de cette disposition telle qu'éventuellement amendée ;

1.2.7    sauf stipulation contraire, les références horaires sont des références aux heures françaises et les références aux Articles et Annexes renvoient au présent Contrat.

## 2.    LE CREDIT

### 2.1    Crédit

Sous réserve des stipulations du Contrat, les Banques consentent :

2.1.1    à la Société, à compter de la Date de Signature et jusqu'à la Date d'Echéance Finale de la Tranche A du Crédit, un crédit non-réutilisable d'un montant égal à l'Engagement Total de la Tranche A du Crédit ;

2.1.2    aux Emprunteurs, à compter de la Date de Signature et jusqu'à la Date d'Echéance Finale de la Tranche B du Crédit, un crédit réutilisable d'un montant égal à l'Engagement Total de la Tranche B du Crédit ; et

2.1.3    à la Société, à compter de la Date de Signature et jusqu'à la Date d'Echéance Finale de la Tranche C du Crédit, un crédit non-réutilisable d'un montant égal à l'Engagement Total de la Tranche C du Crédit.

### 2.2    Objet du Crédit

La Tranche A du Crédit est destinée au refinancement de la dette existante à moyen et long terme du Groupe, y compris le Crédit Relais mais à l'exclusion de la dette à moyen terme de EUR 20.000.000 de Groupe Berchet ayant fait l'objet d'un protocole avec les banques et l'Etat français et telle que visée dans le tableau des flux visé à l'Article 3.1.12 (Remise de documents).

La Tranche B du Crédit est destinée au refinancement de la dette existante à court terme des Emprunteurs y compris l'encours existant au titre du Programme de Titrisation.

La Tranche C du Crédit est destinée au financement d'Acquisitions futures.

Ni l'Agent du Crédit ni les Banques n'auront à vérifier que les fonds empruntés par les Emprunteurs au titre du Contrat seront affectés conformément au présent Article 2.2 (Objet du Crédit).

COPIE CONFORME

### 2.3 Participation des Banques

Conformément aux termes du Contrat et sous réserve du respect des conditions qui y sont stipulées, chaque Banque s'engage individuellement à participer, par l'intermédiaire de son Agence de Crédit, à tout Tirage pour un montant calculé au prorata de sa tranche du Crédit correspondante. La défaillance d'une ou de plusieurs Banques dans l'exécution de ses obligations ne libérera en aucun cas les autres Banques, ou les Emprunteurs (pour ce qui concerne leurs obligations vis-à-vis des autres Banques) de leurs propres obligations.

### 2.4 Droits et obligations des Banques

2.4.1 Les droits et obligations de chacune des Banques sont distincts, conjoints et divisibles et il n'existe aucune solidarité, active ou passive entre les Banques. En conséquence, aucune des Banques ne sera responsable des obligations d'une quelconque autre Banque. Le manquement par une Banque à tout ou partie de ses obligations au titre du Contrat ne pourra pas avoir pour effet d'exonérer les Emprunteurs ou les Banques non défaillantes de leurs propres obligations respectives envers les Banques non défaillantes ou envers les Emprunteurs, selon le cas.

2.4.2 Les sommes dues aux Banques impayées à quelque moment que ce soit constituent des dettes séparées et indépendantes.

2.4.3 Sous réserve des stipulations du Contrat relatives aux décisions ou actions qui ne peuvent être prises ou engagées que par la Majorité des Banques ou l'unanimité des Banques, chaque Banque a le droit de protéger et de mettre en œuvre ses droits résultant du Contrat, sous réserve d'en informer au préalable l'Agent du Crédit qui en informera les autres Banques, et, pour protéger ou mettre en œuvre ses droits au titre du Contrat, il n'est pas nécessaire pour une Banque de se joindre en tant que partie à l'instance entamée par l'Agent du Crédit ou toute autre Banque.

## 3. CONDITIONS PRÉALABLES OU CONCOMITANTES

### 3.1 Remise de documents

Le premier Avis de Tirage ne pourra être présenté à l'Agent du Crédit avant la remise par la Société à l'Agent du Crédit des documents suivants, jugés satisfaisants tant sur le fond que sur la forme par l'Agent du Crédit :

3.1.1 une copie certifiée conforme et à jour des statuts de chaque Emprunteur Initial ;

3.1.2 un extrait K-bis de chaque Emprunteur Initial daté de moins d'un mois avant la Date de Tirage mentionnée dans le premier Avis de Tirage ;

3.1.3 un certificat de non faillite de chaque Emprunteur Initial daté de moins d'un mois avant la Date de Tirage mentionnée dans le premier Avis de Tirage ;

3.1.4 un état des inscriptions des privilèges et nantissements de chaque Emprunteur Initial daté de moins d'un mois avant la Date de Tirage mentionnée dans le premier Avis de Tirage ;

COPIE CONFORME

3.1.5 une copie certifiée conforme par le représentant légal de chacun des Emprunteurs Initiaux du procès-verbal des décisions de ses organes compétents approuvant la négociation, la conclusion, la signature et l'exécution des Documents de Financement auxquels il est partie ;

3.1.6 une copie originale des pouvoirs des signataires des Documents de Financement ou de tout document devant être remis par les Emprunteurs Initiaux conformément aux Documents de Financement ;

3.1.7 un document signé par le représentant légal de chaque Emprunteur Initial contenant les noms et spécimens de signature des signataires autorisés à signer les Documents de Financement et à effectuer les Tirages au nom et pour le compte de l'Emprunteur Initial concerné ;

3.1.8 une copie des Derniers Comptes Annuels Sociaux de chaque Emprunteur Initial et des Derniers Comptes Annuels Consolidés ;

3.1.9 un ou plusieurs documents, substantiellement en la forme du modèle figurant en Annexe 8, attestant que l'ensemble des concours bancaires actuellement mis à la disposition des Emprunteurs Initiaux ,et notamment le Crédit Relais, à l'exception (i) du Crédit et (ii) de la dette à moyen terme de EUR 20.000.000 de Groupe Berchet ayant fait l'objet d'un protocole avec les banques et l'Etat français seront remboursés et/ou annulés en totalité, y compris par anticipation ;

3.1.10 tout document attestant de l'obtention de la mainlevée (i) sur l'ensemble des gages-espèces existants à hauteur de EUR 15.000.000 (quinze millions d'Euros) à l'exclusion des gages-espèces garantissant les cautions sur le Chili, le Mexique et l'Argentine et (ii) sur tout gage de compte d'instruments financiers existant préalablement à la Date de Signature et portant sur les actions émises respectivement par Groupe Berchet, J.L.B. Développement et Majorette Solido ;

3.1.11 une copie du business plan du Groupe incluant les projections financières du Groupe sur 3 (trois) ans ;

3.1.12 un tableau des flux ;

3.1.13 une copie de l'autorisation de la DGCCRF ou de toute autre autorité compétente relative à l'acquisition de Groupe Berchet ;

3.1.14 tout document attestant de l'arrêt du Programme de Titrisation après épuisement des créances cédées antérieurement à la date de remise du premier Avis de Tirage ;

3.1.15 tout document attestant du paiement par les Emprunteurs Initiaux des frais et commissions dus conformément à l'Article 11 (Commissions et frais) ;

3.1.16 les Documents de Sûretés et le Contrat de Garantie Autonome à Première Demande auxquels les Emprunteurs Initiaux sont parties dûment signés ;

3.1.17 un avis juridique du conseil des Emprunteurs ; et

3.1.18 un avis juridique du cabinet Herbert Smith LLP, conseil des Banques.

**EXHIBIT B**

COPIE CONFORME

### 3.2   Information par l'Agent du Crédit

L'Agent du Crédit informera sans délai l'ensemble des Banques de la bonne réception de l'ensemble de ces documents.

### 4.   CONDITIONS D'UTILISATION

4.1   Tout Tirage effectué au titre de la Tranche A du Crédit ou de la Tranche C du Crédit sera effectué en Euro et tout Tirage effectué au titre de la Tranche B du Crédit sera effectué soit en Euro soit en Dollar.

4.2   Les obligations des Banques afférentes aux Tirages sont subordonnées au respect des conditions stipulées au Contrat et notamment :

    4.2.1   qu'il n'y ait aucun Cas d'Exigibilité Anticipée ou Cas d'Exigibilité Anticipée Potentiel ;

    4.2.2   que les déclarations faites et les garanties données à l'Article 16.1 (Déclarations et garanties) soient exactes ;

    4.2.3   que l'Encours n'excède à aucun moment le montant de l'Engagement Total ;

    4.2.4   que le montant total des Tirages en cours au titre de la Tranche B du Crédit n'excède à aucun moment le Montant Maximum Autorisé ;

    4.2.5   le cas échéant et conformément aux stipulations de l'Article 19.2 du Contrat, que la Société ait donné en gage au profit des Banques, toute Valeur Mobilière de Placement détenue par la Société, ainsi que tout titre de capital et tout actif acquis par la Société au titre d'une utilisation de la Tranche C du Crédit ;

    4.2.6   que les Emprunteurs aient payé tous frais et commissions exigibles conformément à l'Article 11 (Commissions et Frais).

### 5.   MODALITÉS DE TIRAGE

Les modalités applicables aux Tirages seront les suivantes, étant précisé que tout Tirage effectué au titre de la Tranche B du Crédit est renouvelable à la demande de l'Emprunteur concerné :

5.1   l'Emprunteur fera parvenir à l'Agent du Crédit un Avis de Tirage au plus tard à dix heures (10h00), 3 (trois) Jours Ouvrés avant la Date de Tirage ;

5.2   au plus tard à neuf heures (9h00) le Jour Ouvré suivant la date de réception de l'Avis de Tirage, l'Agent du Crédit communiquera aux Banques la teneur de l'Avis de Tirage ;

5.3   la Date de Tirage sera un Jour Ouvré ;

5.4   les Avis de Tirages engageront irrévocablement l'Emprunteur qui sera tenu d'effectuer les Tirages conformément aux conditions du Contrat ;

5.5   chacune des Banques mettra à la disposition de l'Emprunteur, à la Date de Tirage, conformément à l'Article 15 (Paiements), le montant de sa participation au Tirage calculée au pro rata de son Engagement dans la tranche du Crédit considérée ;

5.6   en cas d'indisponibilité de l'Euro ou du Dollar (en ce qui concerne un Tirage au titre de la Tranche B du Crédit) pour la Banque à l'occasion de tout Tirage, les stipulations de l'Article 14.2 (Indisponibilité pour une Banque de l'Euro ou du Dollar) s'appliqueront ;

COPIE CONFORME

5.7   le Tirage unique au titre de la Tranche A du Crédit devra être effectué avant le 31 octobre 2005 ;

5.8   en cas de renouvellement de Tirage effectué au titre de la Tranche B du Crédit, l'Emprunteur concerné fera parvenir à l'Agent du Crédit un Avis de Tirage de la Tranche B du Crédit au plus tard à dix heures (10h00), 3 (trois) Jours Ouvrés avant la date de renouvellement du Tirage considéré, étant entendu qu'aucun Tirage au titre de la Tranche B du Crédit ne pourra être effectué après la date correspondant à un mois avant la Date d'Echéance Finale de la Tranche B du Crédit ;

5.9   tout Tirage effectué au titre de la Tranche C du Crédit devra avoir une Date de Tirage comprise entre la Date de Signature et la 2$^{ème}$ (deuxième) date anniversaire de la Date de Signature ; et

5.10  chaque demande de Tirage effectuée au titre de la Tranche C du Crédit devra être faite pour un montant minimum de EUR 1.500.000 (un million cinq cent mille Euros) à l'exception du Tirage qui, s'il était effectué, permettrait l'utilisation de l'Engagement Total de la Tranche C du Crédit.

## 6.   REMBOURSEMENT

### 6.1   Remboursement au titre de la Tranche A du Crédit

Le montant du Tirage unique effectué au titre de la Tranche A du Crédit sera amorti annuellement à hauteur de :

6.1.1   EUR 7.428.571 (sept millions quatre cent vingt huit mille cinq cent soixante et onze Euros) à compter de la 1$^{ère}$ (première) date anniversaire de sa Date de Tirage jusqu'à la 6$^{e}$ (sixième) date anniversaire de sa Date de Tirage, et

6.1.2   EUR 7.428.574 (sept millions quatre cent vingt huit mille cinq cent soixante quatorze Euros) à la Date d'Echéance Finale de la Tranche A du Crédit.

A la Date d'Echéance Finale de la Tranche A du Crédit, toutes sommes en principal, intérêts et accessoires dues au titre du Tirage effectué au titre de la Tranche A du Crédit devront être remboursées ou payées par la Société.

### 6.2   Remboursement au titre de la Tranche B du Crédit

Chaque Emprunteur ayant effectué un Tirage au titre de la Tranche B du Crédit remboursera l'intégralité dudit Tirage le dernier jour de la Période d'Intérêt applicable au Tirage, étant entendu que les montants ainsi remboursés pourront, sous réserve des stipulations du Contrat, faire l'objet de nouveaux Tirages jusqu'à la Date d'Echéance Finale de la Tranche B du Crédit

A la Date d'Echéance Finale de la Tranche B du Crédit, toutes sommes en principal, intérêts et accessoires dues au titre de l'ensemble des Tirages en cours effectués au titre de la Tranche B du Crédit devront être remboursées ou payées par les Emprunteurs concernés.

Le remboursement d'un Tirage, ou d'une partie de celui-ci, sera effectué au moment de son remboursement dans la devise pour laquelle ledit Tirage a été effectué.

COPIE CONFORME

**6.3     Remboursement au titre de la Tranche C du Crédit**

Chaque Tirage effectué au titre de la Tranche C du Crédit sera amorti en 5 (cinq) annuités égales à compter de la 3$^{ème}$ (troisième) date anniversaire de la Signature du Contrat.

A la Date d'Echéance Finale de la Tranche C du Crédit, toutes sommes en principal, intérêts et accessoires dues au titre de l'ensemble des Tirages en cours effectués au titre de la Tranche C du Crédit devront être remboursées ou payées par la Société.

**7.     REMBOURSEMENT ANTICIPE OBLIGATOIRE**

7.1     Dans l'hypothèse où :

> 7.1.1     la Famille Breuil et la Famille Moquin viendraient à cesser de détenir conjointement, directement ou indirectement, plus de 40% du capital ou plus de 50% des droits de vote de la Société et des Filiales ; ou
>
> 7.1.2     toute entité, agissant seule ou de concert avec d'autres entités acquerrait le contrôle de la Société ;

la Société en informera l'Agent du Crédit dès qu'elle en aura connaissance.

Sur demande de la Majorité des Banques, l'Agent du Crédit devra notifier par un préavis d'au moins 15 (quinze) jours l'annulation de l'Engagement Total et l'exigibilité immédiate des Tirages en cours et de tous intérêts et autres montants dus au titre des Documents de Financement. L'Engagement Total sera alors annulé et tous ces montants deviendront immédiatement exigibles.

7.2     Pour les besoins du paragraphe 7.1 ci-dessus,

> 7.2.1     le terme "contrôle" a la signification qui lui est donnée à l'article L. 233-3 du Code de commerce ; et
>
> 7.2.2     le terme "agissant de concert" a la signification qui lui est donnée à l'article L. 233-10 du Code de commerce.

**8.     REMBOURSEMENT ANTICIPE VOLONTAIRE**

**8.1     Conditions**

Les Emprunteurs auront la faculté de rembourser par anticipation tout ou partie des Tirages sous réserve :

> 8.1.1     d'en avoir informé l'Agent du Crédit, au moins 5 (cinq) Jours Ouvrés avant la date prévue pour le remboursement anticipé ; et
>
> 8.1.2     que la partie remboursée du Tirage soit d'un montant minimum de EUR 5.000.000 (cinq millions d'Euros) et, au-delà de cette somme, d'un multiple entier de EUR 5.000.000 (cinq millions d'Euros), à l'exception de tout montant au titre d'un remboursement anticipé permettant le remboursement de l'Engagement Total de la Tranche A du Crédit, de l'Engagement Total de la Tranche B du Crédit ou de l'Engagement Total de la Tranche C du Crédit selon le cas.

COPIE CONFORME

8.2     **Réutilisation des fonds remboursés**

8.2.1     Tout montant remboursé conformément au présent Article 8 (Remboursement anticipé volontaire) au titre de la Tranche A du Crédit et de la Tranche C du Crédit ne sera plus disponible, l'Engagement Total de la Tranche A du Crédit ou l'Engagement Total de la Tranche C du Crédit, selon le cas, étant réduit en conséquence.

8.2.2     Tout montant remboursé conformément au présent Article 8 (Remboursement anticipé volontaire) au titre de la Tranche B du Crédit pourra, sous réserve des stipulations du Contrat, faire l'objet de nouveaux Tirages.

8.2.3     Tout montant en principal remboursé conformément au présent Article 8 (Remboursement anticipé volontaire) sera accompagné des intérêts échus et tous autres frais et accessoires dus au titre du Contrat, y compris des Coûts de Refinancement.

9.     **RENONCIATION ANTICIPÉE**

La Société aura la faculté de renoncer par anticipation et sans pénalité au bénéfice de tout ou partie de la part non utilisée à la date de prise d'effet de ladite renonciation de l'Engagement Total de la Tranche A du Crédit, de l'Engagement Total de la Tranche B du Crédit ou de l'Engagement Total de la Tranche C du Crédit selon le cas, sous réserve d'un préavis écrit de 30 (trente) Jours Ouvrés au moins avant la date de prise d'effet de ladite renonciation adressé à l'Agent du Crédit. Tout montant auquel la Société aura renoncé au titre du présent Article 9 ne sera plus disponible, le Montant Maximal Autorisé étant réduit en conséquence.

10.     **INTERETS**

10.1     **Taux d'intérêt**

Le taux d'intérêt applicable à chaque Période d'Intérêt d'un Tirage sera établi par l'Agent du Crédit, définitivement et sans recours tant des Banques que des Emprunteurs (sauf en cas d'erreur manifeste), et sera égal à la somme entre :

(A)     le Taux de Référence,

(B)     la Marge, et

(C)     le cas échéant, les Coûts Obligatoires.

10.2     **Ajustement de la Marge**

La Marge sera ajustée annuellement en fonction du niveau du Ratio Financier n°1 à compter de la date de réception par l'Agent du Crédit de l'attestation visée à l'Article 17.1.3 et correspondra au taux indiqué en regard du niveau du Ratio Financier n°1 figurant dans le tableau suivant :

**EXHIBIT B**                                                101

COPIE CONFORME

| Niveau du Ratio Financier R1 (R1) | Marge applicable à la tranche A ou à la tranche B du Crédit | Marge applicable à la tranche C du Crédit |
|---|---|---|
| $2,5 \leq R1 < 3,5$ | 0,85 % par an | 0,60 % par an |
| $1,5 \leq R1 < 2,5$ | 0,80 % par an | 0,50 % par an |
| $R1 < 1,5$ | 0,75 % par an | 0,40 % par an |

**10.3   Base de calcul**

Les intérêts relatifs aux Tirages seront calculés par l'Agent du Crédit sur la base du nombre exact de jours écoulés (le premier jour de chaque période étant inclus et le dernier jour exclu) divisé par 360.

**10.4   Notification de Période d'Intérêt**

10.4.1   La Société fera parvenir à l'Agent du Crédit, au plus tard 4 (quatre) Jours Ouvrés avant chaque Date de Paiement d'Intérêts relative au Tirage unique effectué au titre de la Tranche A du Crédit et à chacun des Tirages effectués au titre de la Tranche C du Crédit, une Notification de Période d'Intérêt indiquant la durée choisie pour la Période d'Intérêt suivante. A défaut de remise par la Société à l'Agent du Crédit d'une telle Notification de Période d'Intérêt, la durée de la Période d'Intérêt concernée sera identique à celle de la Période d'Intérêt en cours.

10.4.2   Chaque Période d'Intérêt au titre de la Tranche A du Crédit et au titre de la Tranche C du Crédit commencera le dernier jour de la Période d'Intérêt de la Tranche A du Crédit ou de la Tranche C du Crédit précédente.

10.4.3   Chaque Tirage effectué au titre de la tranche B du Crédit aura une seule Période d'Intérêt qui commencera à la Date de Tirage concernée.

**10.5   Notification du taux**

Aussitôt après avoir établi le taux d'intérêt applicable à une Période d'Intérêt, l'Agent du Crédit en avisera l'Emprunteur concerné, la Société et les Banques. De même, l'Agent du Crédit avisera l'Emprunteur concerné, la Société et les Banques du montant des intérêts correspondants, une fois celui-ci calculé.

**10.6   Paiement**

Les intérêts applicables à une Période d'Intérêt seront payés par l'Emprunteur concerné à l'Agent du Crédit, pour compte commun des Banques, à chaque Date de Paiement d'Intérêt.

Si la Période d'Intérêt est supérieure à 6 (six) mois, les intérêts seront payés le dernier jour de la première période de 6 (six) mois de la Période d'Intérêt puis le dernier jour de ladite période, sous réserve de l'application des stipulations de l'Article 15.7 (Paiements effectués un Jour Ouvré).

COPIE CONFORME

Les intérêts applicables à une Période d'Intérêt relative à un Tirage au titre de la Tranche B du Crédit seront payés par l'Emprunteur concerné dans la devise dans laquelle ledit Tirage était libellé dans l'Avis de Tirage de la Tranche B y afférent.

## 10.7 Taux effectif global

Les Emprunteurs reconnaissent expressément que du fait du particularisme des stipulations du Contrat, notamment de la possibilité offerte aux Emprunteurs de choisir la durée des Périodes d'Intérêt, il n'est pas possible, à la Date de Signature, de déterminer précisément le taux effectif global applicable au Crédit conformément aux dispositions des articles L. 313-1 et L. 313-2 du Code de la Consommation. Toutefois les Emprunteurs déclarent avoir reçu de l'Agent du Crédit des exemples chiffrés, par lettre séparée mais faisant partie intégrante du Contrat, sur la base de différentes hypothèses de Périodes d'Intérêt, faisant ressortir le taux effectif global correspondant.

## 11. COMMISSIONS ET FRAIS

### 11.1 Commissions

#### 11.1.1 Commission de l'Agent du Crédit et de l'Agent des Sûretés

La Société paiera à l'Agent du Crédit et à l'Agent des Sûretés, pour leur compte propre, à la Date de Signature et à chaque date anniversaire de la Date de Signature, une commission déterminée dans une Lettre de Commissions.

#### 11.1.2 Commission d'arrangement et de participation

La Société paiera aux Arrangeurs Mandatés, pour leur compte propre, à la Date de Signature, une commission d'arrangement et de participation déterminée dans une Lettre de Commissions.

#### 11.1.3 Commission de non-utilisation

(A) Commission de non-utilisation au titre de la Tranche A du Crédit

(i) La Société paiera à l'Agent du Crédit, pour le compte des Banques, au prorata de leur Engagement de la Tranche A du Crédit, une commission de non-utilisation égale à 0,25 % (zéro virgule vingt cinq pour cent) par an calculée sur la différence entre l'Engagement Total de la Tranche A du Crédit (après renonciation anticipée le cas échéant) et le montant du Tirage unique effectué au titre de la Tranche A du Crédit.

(ii) La commission de non-utilisation sera payable trimestriellement à terme échu jusqu'à la Date de Tirage afférente au Tirage unique effectué au titre de la Tranche A du Crédit et calculée par l'Agent du Crédit sur la base du nombre de jours exacts écoulés rapportés à une année de 360 jours.

(B) Commission de non-utilisation au titre de la Tranche B du Crédit

(i) La Société paiera à l'Agent du Crédit, pour le compte des Banques, au prorata de leur Engagement de la Tranche B du Crédit, une commission de non-utilisation égale à 0,25 % (zéro virgule vingt cinq

COPIE CONFORME

pour cent) par an calculée sur la différence entre l'Engagement Total de la Tranche B du Crédit (après renonciation anticipée le cas échéant) et le montant des Tirages effectués au titre de la Tranche B du Crédit.

(ii) La commission de non-utilisation sera payable trimestriellement à terme échu jusqu'à la Date d'Echéance Finale de la Tranche B du Crédit et calculée par l'Agent du Crédit sur la base du nombre de jours exacts écoulés rapportés à une année de 360 jours.

(C) Commission de non-utilisation au titre de la Tranche C du Crédit

(i) La Société paiera à l'Agent du Crédit, pour le compte des Banques, au prorata de leur Engagement de la Tranche C du Crédit, une commission de non-utilisation égale à 0,25 % (zéro virgule vingt cinq pour cent) par an calculée sur la différence entre l'Engagement Total de la Tranche C du Crédit (après renonciation anticipée le cas échéant) et le montant des Tirages effectués au titre de la Tranche C du Crédit.

(ii) La commission de non-utilisation sera payable trimestriellement à terme échu jusqu'à la $2^{ème}$ (deuxième) date anniversaire de la Date de Signature et calculée par l'Agent du Crédit sur la base du nombre de jours exacts écoulés rapportés à une année de 360 jours.

11.2 **Frais**

11.2.1 La Société remboursera aux Arrangeurs Mandatés tous les frais (TVA incluse lorsque celle-ci est exigible) encourus par les Arrangeurs Mandatés à l'occasion de la rédaction, la négociation ou la syndication du Crédit.

11.2.2 La Société remboursera à l'Agent du Crédit et à l'Agent des Sûretés l'ensemble des frais (majorés des taxes y afférentes), notamment des frais juridiques, encourus à l'occasion de l'exécution des Documents de Financement sur simple demande de l'Agent du Crédit ou, le cas échéant, de l'Agent des Sûretés, et sur présentation de justificatifs appropriés. La Société indemnisera également, sur présentation de tout justificatif, les Banques, l'Agent du Crédit et l'Agent des Sûretés pour tous frais raisonnables exposés de quelque manière que ce soit en raison de la préservation ou de l'exercice de leurs droits à l'encontre des Emprunteurs découlant des Documents de Financement en cas de non respect par les Emprunteurs de leurs obligations au titre des Documents de Financement (majorés des taxes y afférentes).

11.3 **TVA**

Toutes les commissions et frais dus en vertu du Contrat sont exprimés hors taxes. Si les commissions ou les frais concernés devaient être soumis à la taxe sur la valeur ajoutée, celle-ci serait payée par l'Emprunteur concerné au taux en vigueur et à la même date que les commissions ou les frais qui lui servent de base.

11.4    **Droit de timbre**

La Société supportera tout droit de timbre éventuellement exigible à l'occasion de la signature des Documents de Financement.

## 12.    ILLÉGALITÉ

Au cas où toute nouvelle législation ou réglementation ou toute modification concernant toute réglementation ou l'interprétation qui en est faite par une autorité officielle compétente, rendrait impossible, pour l'une des Banques, l'exécution de ses obligations prévues par le Contrat :

12.1    l'Agent du Crédit, après en avoir été informé par la ou les Banques concernées, en avisera immédiatement l'Emprunteur concerné ;

12.2    chaque Banque concernée, l'Agent du Crédit et l'Emprunteur se consulteront et feront leurs meilleurs efforts pour rechercher de bonne foi une solution qui puisse être acceptée tant par chaque Banque concernée que par l'Emprunteur, sans toutefois que chacune desdites Banques et que l'Agent du Crédit encourent une responsabilité quelconque vis-à-vis de l'Emprunteur si une telle solution n'est pas trouvée, étant entendu que parmi les solutions envisagées chaque Banque concernée étudiera la possibilité de prêter par l'intermédiaire d'une Agence de Crédit située dans une autre juridiction ou de céder ses droits et obligations découlant du Contrat à un autre établissement financier ;

12.3    à défaut de solution acceptable par les parties concernées, l'Emprunteur remboursera (dans toute la mesure permise par la loi) dans les meilleurs délais, et en tout état de cause dans le délai de 30 (trente) jours à compter de l'entrée en vigueur de la réglementation susvisée, l'intégralité des participations aux Tirages des Banques pour lesquelles aucune solution n'a été trouvée et paiera à ces Banques toute somme qui leur serait due au titre du Contrat à la date dudit remboursement, y compris les Coûts de Refinancement.

## 13.    SURVENANCE DE CIRCONSTANCES NOUVELLES

13.1    **Base de l'engagement des Banques**

Les conditions de rémunération des Banques au titre du Contrat ont été fixées en fonction de la réglementation du crédit, fiscale, monétaire et professionnelle qui leur est applicable à la Date de Signature et, de façon plus générale, des données juridiques, fiscales et monétaires en vigueur à la Date de Signature.

13.2    **Augmentation des coûts**

S'il résulte d'un Changement de Réglementation :

13.2.1    qu'une Banque (ou tout établissement financier la contrôlant) n'est pas en mesure d'obtenir la rémunération nette de son capital qu'elle aurait normalement reçue si elle n'avait pas les obligations d'une Banque au titre du Contrat ; ou

13.2.2    qu'une Banque (ou tout établissement financier la contrôlant) encourt un coût (ou, selon le cas, un coût supplémentaire) du fait des obligations d'une Banque au titre du Contrat ; ou

07\471816_9

COPIE CONFORME

13.2.3    qu'une Banque (ou tout établissement financier la contrôlant) encourt un coût (ou, selon le cas, un coût supplémentaire) du fait du financement d'une catégorie d'actifs dont la participation de cette Banque aux Tirages fait partie ; ou

13.2.4    qu'une Banque (ou tout établissement financier la contrôlant) est assujettie à un impôt quelconque (à l'exclusion de l'impôt sur le revenu net de son Agence de Crédit perçu dans l'Etat de situation de son siège central ou de son Agence de Crédit), calculé à raison de la participation de cette Banque aux Tirages ou en fonction des sommes revenant à celle-ci au titre du Contrat ;

les mesures visées à l'Article 13.3 (Mesures) s'appliqueront.

## 13.3    Mesures

En cas de survenance de l'un des événements décrits à l'Article 13.2 (Augmentation des coûts) :

13.3.1    la Banque concernée avisera immédiatement l'Agent du Crédit en indiquant, d'une manière raisonnablement détaillée, le montant de l'augmentation pour la Banque concernée (ou tout établissement financier la contrôlant) du coût de sa participation au Contrat ou de la réduction pour la Banque concernée (ou tout établissement de crédit la contrôlant) de sa rémunération nette ainsi que du montant de l'indemnisation correspondant ;

13.3.2    l'Agent du Crédit transmettra cet avis à l'Emprunteur concerné dans les meilleurs délais ;

13.3.3    la Banque concernée recherchera de bonne foi, pendant une durée maximum de 30 (trente) jours à compter de la date de l'avis visé à l'Article 13.3.1 ci-dessus, une solution raisonnable permettant de minimiser les conséquences négatives de cet événement étant entendu que ces solutions ne devront pas affecter les intérêts de la Banque concernée (ou de tout établissement de crédit la contrôlant) ; parmi ces solutions figurent notamment le transfert de la participation de ladite Banque à une succursale ou à un autre établissement acceptable par les parties ;

13.3.4    à défaut de solution satisfaisante pour la Banque concernée (ou tout établissement de crédit la contrôlant) :

(A)    l'Emprunteur prendra intégralement à sa charge sur présentation de justificatifs le montant de ladite augmentation ou de ladite réduction, le calcul par la Banque concernée de l'indemnisation correspondante devant être justifié ; ou

(B)    l'Emprunteur aura la faculté, sur simple notification à l'Agent du Crédit, qui en avisera la Banque concernée, de rembourser par anticipation à la date indiquée dans ladite notification, l'intégralité de la participation de ladite Banque aux Tirages, sous réserve du paiement par l'Emprunteur à ladite Banque de toutes sommes qui lui seraient dues à quelque titre que ce soit (y compris au titre de l'augmentation ou de la réduction visée à l'Article 13.2 (Augmentation des coûts) ci-dessus) à la date dudit remboursement anticipé

COPIE CONFORME

en vertu du Contrat. En outre, l'Emprunteur remboursera à ladite Banque sur présentation de justificatifs les Coûts de Refinancement.

## 14.   PERTURBATIONS DU MARCHÉ

### 14.1   Indisponibilité du Taux de Référence

Si, à une date de détermination du Taux de Référence :

    14.1.1   l'Agent du Crédit est informé du fait que, pour une Banque ou un groupe de Banques dont la somme des participations dans les Tirages représente plus de 51% du montant des Tirages, l'EURIBOR, le LIBOR, l'EONIA ou le LIBOR au Jour le Jour, selon le cas, ne reflète pas leur coût de financement de leur participation aux Tirages ou d'une somme impayée, ou

    14.1.2   l'Agent du Crédit reçoit une indication de taux de moins de deux Banques EURIBOR de Référence ou de deux Banques LIBOR de Référence, ou

    14.1.3   pour une raison quelconque, l'EURIBOR, le LIBOR, l'EONIA ou le LIBOR au Jour le Jour cesseraient d'être publiés,

l'Agent du Crédit en avisera sans délai les Emprunteurs.

Dans chacun de ces cas, la Période d'Intérêt concernée sera de 30 (trente) jours et l'Agent du Crédit, en consultation avec les Banques et les Emprunteurs, négocieront de bonne foi pour convenir (i) d'un taux d'intérêt de substitution satisfaisant pour les Emprunteurs et pour les Banques ou (ii) de modalités acceptables pour les Banques et pour les Emprunteurs, permettant de continuer à financer le Crédit.

A défaut de détermination d'un taux de substitution ou de modalités acceptables, dans un délai de 30 (trente) jours suivant la notification susvisée, l'Agent du Crédit déterminera un ou des taux d'intérêts applicable(s) à la participation de chaque Banque dans les Tirages et en informera les Emprunteurs ; ledit taux s'appliquant entre les parties à compter du début de ladite Période d'Intérêt de 30 (trente) jours et correspondant au coût de financement de la participation de chaque Banque dans les Tirages pour ladite Période d'Intérêt, tel que justifié par cette Banque. Les Emprunteurs paieront alors à l'Agent du Crédit pour le compte des Banques des intérêts sur le montant de la participation de chacune des Banques aux Tirages au taux ainsi déterminé augmenté de la Marge, lesdits intérêts étant payables le dernier jour de la Période d'Intérêt de 30 (trente) jours susvisée.

Tout accord entre les Emprunteurs et l'Agent du Crédit (après consultation des Banques), dans les 30 (trente) jours suivants la date de la notification susvisée relative au Taux de Référence, s'appliquera, sauf si cela est impossible, à compter du début et pour la durée de la Période d'Intérêt convenue.

### 14.2   Indisponibilité pour une Banque de l'Euro ou du Dollar

Au plus tard à 10h00 (dix heures), à la Date de Tirage, toute Banque constatant qu'elle n'est pas en mesure de prêter en Euro ou en Dollar, en raison de l'indisponibilité de l'Euro ou du Dollar pour la Banque, ou en cas de changements, soit dans les conditions politiques, financières ou économiques, nationales ou internationales, soit dans les cours de change des monnaies, soit dans la réglementation des changes, soit dans la disponibilité sur le marché interbancaire de dépôts en Euro ou en Dollar (la "**Devise Indisponible**"), qui rendraient impossible pour la Banque tout Tirage dans la Devise Indisponible, en fera part à l'Agent du Crédit qui le notifiera immédiatement à l'Emprunteur concerné

**EXHIBIT B**                                    **107**

COPIE CONFORME

et ladite Banque ne sera pas tenue de mettre à la disposition de l'Emprunteur un montant dans la Devise Indisponible.

## 15.    PAIEMENTS

### 15.1    Paiements en faveur d'un Emprunteur

Sous réserve de toute stipulation contraire du Contrat, tout versement en faveur d'un Emprunteur au titre du Contrat sera effectué par les Banques concernées en fonds disponibles le jour même, avant 10h00 (heure de Paris) le jour du paiement, au compte de l'Agent du Crédit chez telle banque de la place financière correspondante que l'Agent du Crédit aura désignée.

L'Agent du Crédit reversera le montant total à l'Emprunteur concerné, valeur jour du paiement selon les instructions de celui-ci et à concurrence des montants reçus des Banques concernées.

### 15.2    Paiements en faveur des Banques

Sous réserve de toute stipulation contraire du Contrat, tout paiement en faveur des Banques devra être effectué par prélèvement par l'Agent du Crédit pour le compte des Banques concernées avant 10h00 (heure de Paris) le jour du paiement, du compte de l'Emprunteur concerné que l'Emprunteur aura désigné (i) à la Date de Signature, ou (ii) en cas de changement de compte postérieurement à la Date de Signature, au plus tard 3 (trois) Jours Ouvrés avant la date de paiement concernée. Tout paiement sera majoré par les Emprunteurs de la taxe sur la valeur ajoutée éventuellement applicable y afférente.

L'Agent du Crédit reversera aux Banques les montants reçus comme stipulés ci-dessus, valeur jour du paiement par les Emprunteurs, selon les instructions de celles-ci, et à concurrence des montants reçus des Emprunteurs.

### 15.3    Paiements libératoires

Tous versements et paiements prévus au Contrat ne seront libératoires que si effectués de façon que les fonds soient disponibles et librement transférables au lieu et à la date fixée pour ledit paiement et valeur jour du paiement.

### 15.4    Impôts

15.4.1    Le paiement de toute somme due par les Emprunteurs en vertu du Contrat sera effectué net de tout impôt (à l'exclusion de l'impôt sur le revenu), retenue ou taxe de quelque nature que ce soit, présent ou futur.

15.4.2    Au cas où un paiement d'intérêts ou tout autre revenu donnerait lieu à une quelconque retenue ou déduction, ou à un quelconque impôt ou prélèvement dans la juridiction d'un Emprunteur, ledit Emprunteur s'engage, dans toute la mesure permise par la législation applicable, à majorer le montant à payer de telle façon qu'après déduction de cette retenue ou de ce prélèvement ou impôt ou de cette déduction, les Banques concernées reçoivent le montant qu'elles auraient reçu en l'absence de cette retenue, de ce prélèvement ou impôt ou de cette déduction. L'Emprunteur remettra à l'Agent du Crédit dans les 30 (trente) jours suivant ce paiement, un justificatif approprié attestant du paiement de la déduction ou retenue en question.

15.4.3    Si ladite législation applicable ne permettait pas une telle majoration, les Banques concernées et l'Emprunteur se consulteront pendant une période de 30

COPIE CONFORME

(trente) jours et rechercheront de bonne foi une solution qui puisse être acceptée tant par les Banques concernées que par l'Emprunteur sans toutefois que lesdites Banques encourent une responsabilité quelconque vis-à-vis de l'Emprunteur si une telle solution n'était pas trouvée pour l'une quelconque desdites Banques. A défaut d'accord à l'issue de cette période, l'Emprunteur remboursera immédiatement l'intégralité de la participation aux Tirages des Banques concernées, et indemnisera les Banques concernées des Coûts de Refinancement.

## 15.5    Compensation

Chaque Emprunteur s'interdit expressément d'opérer compensation entre une somme quelconque due par lui au titre du Contrat et toute créance qu'il pourrait détenir par ailleurs à l'encontre d'une Banque. Chaque Emprunteur s'interdit également d'effectuer un paiement en le soumettant à une quelconque condition ou réserve ou de faire valoir toute exception ou demande reconventionnelle.

## 15.6    Comptabilisation

Chacune des Banques, en ce qui concerne sa propre participation aux Tirages et l'Agent du Crédit pour tout les Tirages, maintiendront dans leurs livres respectifs des comptes spéciaux, qui ne produiront pas les effets juridiques attachés aux comptes courants, sur lesquels seront reportés les montants en principal, intérêts, commissions et tous autres montants qui leur sont dus ainsi que les montants payés. Lesdits comptes, qui seront communiqués aux Emprunteurs, sur demande de ceux-ci, après transmission à l'Agent du Crédit, feront foi, sauf erreur manifeste, quant aux montants dus au titre du Contrat. En cas de désaccord entre les comptes de l'Agent du Crédit et ceux d'une Banque, en l'absence d'erreur manifeste, les comptes de la Banque feront foi.

## 15.7    Paiements effectués un Jour Ouvré

Tout paiement devra être effectué un Jour Ouvré. Sauf stipulation expresse contraire, au cas où un paiement viendrait à échoir à une date qui n'est pas un Jour Ouvré, ledit paiement sera effectué le Jour Ouvré suivant du même mois calendaire. A défaut de Jour Ouvré suivant dans le même mois calendaire, ledit paiement sera effectué le Jour Ouvré immédiatement précédent.

## 15.8    Imputation des paiements

Nonobstant toutes instructions contraires qui pourraient être données par un Emprunteur, l'Agent du Crédit devra affecter toute somme perçue des Emprunteurs à la réduction ou au remboursement de tous montants impayés au titre du Contrat dans l'ordre suivant :

> 15.8.1    les coûts et débours encourus par l'Agent du Crédit et l'Agent des Sûretés au titre des Documents de Financement ;

> 15.8.2    les coûts et débours encourus par les Banques au titre des Documents de Financement qui auront été préalablement communiqués à l'Agent du Crédit, selon le cas ;

> 15.8.3    toutes commissions dues aux Banques, à l'Agent du Crédit et à l'Agent des Sûretés ;

> 15.8.4    les intérêts de retard mentionnés à l'Article 21 (Intérêts de Retard) ;

COPIE CONFORME

15.8.5   les sommes dues en vertu des Articles 13 (Survenance de Circonstances Nouvelles) et 15.4 (Impôts) ;

15.8.6   toute autre somme (autre que le principal) exigible en vertu du Contrat ;

15.8.7   le remboursement des Tirages.

## 16.   DÉCLARATIONS ET GARANTIES

### 16.1   Déclarations et garanties

Chaque Emprunteur déclare et garantit à l'Agent du Crédit, à l'Agent des Sûretés et aux Banques à la Date de Signature :

16.1.1   qu'il est une société de droit français dûment constituée et immatriculée, jouissant de la personnalité morale et possédant la pleine capacité juridique et le pouvoir de signer les Documents de Financement auquel il est partie et d'en exécuter et respecter les termes et conditions ;

16.1.2   qu'il a la capacité requise pour être valablement propriétaire de ses actifs et pour exercer son activité telle qu'il l'exerce actuellement ;

16.1.3   que la conclusion, la signature et l'exécution des Documents de Financement auquel il est partie et les obligations qui en résultent ont été régulièrement autorisés par ses organes compétents ;

16.1.4   que les Documents de Financement auquel il est partie et les obligations qui en résultent ne contreviennent en aucune façon ni à ses statuts, ni aux textes légaux ou réglementaires qui lui sont applicables, ni à un quelconque engagement auquel il pourrait être tenu si, dans ce dernier cas, ledit conflit peut avoir un Effet Défavorable Significatif ;

16.1.5   que les Documents de Financement auxquels il est partie sont des engagements valables qui lui sont opposables conformément à leurs termes ;

16.1.6   que ses obligations de paiement au titre du Contrat sont des dettes chirographaires et non subordonnées venant au moins au même rang que ses autres dettes chirographaires, sous réserve des obligations qui sont privilégiées par l'effet de la loi ;

16.1.7   que tous les paiements au titre du Contrat sont faits nets de tous impôts, taxes et déductions ;

16.1.8   qu'aucun droit de timbre ou autre droit similaire n'est dû au titre des Documents de Financement ;

16.1.9   qu'aucun changement dans son activité, ses actifs ou sa situation financière ou dans l'activité, les actifs et la situation financière du Groupe pouvant avoir un Effet Défavorable Significatif n'est intervenu depuis la publication de ses Derniers Comptes Annuels Sociaux ;

16.1.10   qu'il respecte les dispositions législatives et réglementaires qui lui sont applicables ;

**COPIE CONFORME**

16.1.11  qu'il a procédé au paiement de la totalité des charges sociales, impôts et taxes dus par lui, excepté si le paiement a été légitimement contesté selon les procédures appropriées ou si le retard ou l'absence de paiement a été accepté par le créancier concerné ;

16.1.12  qu'à la Date de Signature, il a procédé au complet remboursement, y compris anticipé, de l'ensemble des concours bancaires mis à sa disposition, et notamment du Crédit Relais, à l'exception de la dette à moyen terme de EUR 20.000.000 de Groupe Berchet ayant fait l'objet d'un protocole avec les banques et l'Etat français ;

16.1.13  que les actifs constituant son patrimoine sont libres de toute Sûreté, à l'exception des Sûretés Autorisées et des Sûretés existantes à la Date de Signature dont une liste figure en Annexe 11 ;

16.1.14  que le Contrat ne doit faire l'objet d'aucun enregistrement auprès d'une quelconque autorité ;

16.1.15  qu'il a souscrit à toutes les polices d'assurances normalement requises dans sa profession pour des montants et des couvertures de risques de dommages et de responsabilités conformes aux pratiques généralement admises dans son domaine d'activité ;

16.1.16  que toutes les informations le concernant ou concernant l'une quelconque des sociétés du Groupe (y compris les informations financières, et tous documents comptables qu'il est tenu de produire) fournies à l'Agent du Crédit ou aux Banques avant la Date de Signature ainsi que durant la période de validité du Contrat, sont ou seront sincères, exactes et conformes à la réglementation qui lui est applicable ou, le cas échéant, qui est applicable à la société du Groupe concernée, donnent une image fidèle du résultat des opérations des exercices concernés ainsi que de sa situation financière et de son patrimoine ou, le cas échéant, de la société du Groupe concernée, à la clôture desdits exercices et qu'il n'a pas connaissance d'événements non révélés aux Banques qui, s'ils avaient été connus, auraient été de nature à modifier la décision des Banques de prêter ;

16.1.17  qu'il n'est en défaut au titre d'aucune de ses obligations au titre des Documents de Financement auquel il est partie et n'a pas connaissance d'un événement constituant ou susceptible de constituer un tel défaut, un Cas d'Exigibilité Anticipée ou un Cas d'Exigibilité Anticipée Potentiel ;

16.1.18  qu'aucune instance, action, aucun procès ou aucune procédure administrative n'est en cours, ou à la connaissance de l'Emprunteur n'est sur le point d'être intenté ou engagé, ayant ou susceptible d'avoir un Effet Défavorable Significatif, à l'exception des instances, actions, procès et procédures administratives existants à la Date de Signature dont une liste figure en Annexe 12 ; et

16.1.19  qu'il n'est pas en état de cessation des paiements au sens de l'Article L. 621-1 du Code de commerce et qu'il ne fait l'objet ou, à sa connaissance, n'est sur le

**EXHIBIT B**

COPIE CONFORME

point de faire l'objet d'aucune procédure de règlement amiable, de sauvegarde, de redressement ou de liquidation judiciaires, ou de toute autre procédure analogue, à l'exception de la dette fiscale et sociale de Groupe Berchet validée par le Comité Interministériel de Restructuration Industrielle.

**16.2   Réitération**

Toutes les déclarations et garanties figurant à l'Article 16.1 (Déclarations et garanties) ci-dessus seront réputées réitérées par chaque Emprunteur sur le fondement des faits et circonstances existants :

16.2.1   à la date de chaque Avis de Tirage, à chaque Date de Tirage et à chaque Date de Paiement d'Intérêt ; et

16.2.2   dans le cas d'un Emprunteur Additionnel, à la date à laquelle il devient (ou il est requis qu'il devienne) un Emprunteur Additionnel.

**17.   ENGAGEMENTS D'INFORMATION**

La Société s'engage pendant toute la durée du Contrat à :

**17.1**   fournir à l'Agent du Crédit, en nombre suffisant pour les Banques :

17.1.1   les Derniers Comptes Annuels Consolidés et les Derniers Comptes Annuels Sociaux de chaque Emprunteur certifiés par les commissaires aux comptes et approuvés par l'assemblée générale des actionnaires, dès que possible et en tout état de cause avant l'expiration d'un délai de 180 (cent quatre-vingts) jours à compter de la clôture de l'exercice considéré ;

17.1.2   les Derniers Comptes Semestriels Consolidés et les Derniers Comptes Semestriels Sociaux certifiés conformes par un représentant légal de la Société, dès que possible et en tout état de cause avant l'expiration d'un délai de 120 (cent vingt) jours après la fin de chaque premier semestre ;

17.1.3   en même temps que la remise des Derniers Comptes Annuels Consolidés prévue à l'Article 17.1.1 ci-dessus, une attestation certifiée par les commissaires aux comptes de la Société dans la forme de l'Annexe 7 indiquant le niveau du Ratio Financier n°1 et attestant du respect du Ratio Financier n°2 figurant à l'Article 18 (Engagement financiers) aux dates considérées, ainsi que les éléments de calcul de ceux-ci ;

17.1.4   en même temps que la remise des Derniers Comptes Annuels Consolidés prévue à l'Article 17.1.1 ci-dessus, la liste des Filiales Principales ;

17.1.5   en même temps que la remise des Derniers Comptes Semestriels Consolidés prévue à l'Article 17.1.2 ci-dessus, une valorisation des titres de Valeurs Mobilières de Placement susceptibles de faire l'objet d'un nantissement à première demande de la Majorité des Banques conformément à l'Article 19.2.1 ;

**17.2**   fournir dès que possible toute information relative à la situation financière, à l'activité et aux opérations du Groupe que l'Agent du Crédit (ou l'une des Banques par l'intermédiaire de l'Agent du Crédit) pourrait raisonnablement lui demander ;

**EXHIBIT B**

COPIE CONFORME

17.3    notifier l'Agent du Crédit sans délai de la survenance de tout événement ou de toute procédure administrative susceptible d'avoir un Effet Défavorable Significatif ; et

17.4    informer l'Agent du Crédit de toute modification significative dans la répartition de son actionnariat majoritaire.

**18.    ENGAGEMENTS FINANCIERS**

18.1    La Société s'engage pendant toute la durée du Contrat à maintenir :

    18.1.1    un Ratio Financier n°1 inférieur à 3,5 ; et

    18.1.2    un Ratio Financier n°2 inférieur à :

        (A)    1,6 au 31 mars 2006,

        (B)    1,5 au 31 mars 2007, et

        (C)    1,4 au 31 mars de chaque année à compter du 31 mars 2008 inclus.

18.2    Les ratios visés à l'Article 18.1 ci-dessus pourront faire l'objet d'une révision dans le cadre de la mise en place des normes internationales dites "IFRS" (*International Financial Reporting Standards*).

**19.    AUTRES ENGAGEMENTS**

19.1    Chaque Emprunteur s'engage pendant toute la durée du Contrat à :

    19.1.1    établir ses comptes annuels et semestriel sociaux (bilan, compte de résultats et annexes) et, le cas échéant, ses comptes annuels et semestriels consolidés en respectant les mêmes principes comptables que ceux utilisés pour l'établissement de ses comptes annuels et semestriels sociaux et, le cas échéant, ses comptes annuels et semestriels consolidés relatifs à l'exercice précédent, ou, en cas de changement de méthode comptable, en veillant à mentionner clairement les modifications adoptées et en remettant à l'Agent du Crédit un rapport d'ajustement permettant à ce dernier d'apprécier lesdits comptes ;

    19.1.2    tenir une comptabilité conforme aux normes comptables généralement admises respectant notamment le principe de permanence des méthodes comptables et donnant une image fidèle et sincère de sa situation financière et de ses résultats d'exploitation ;

    19.1.3    respecter les dispositions législatives et réglementaires qui lui sont applicables ;

    19.1.4    ne pas créer ou consentir au profit de tout créancier des Sûretés de quelque nature que ce soit à l'exception des Sûretés Autorisées ;

    19.1.5    ne pas contracter de Dette Financière d'un montant supérieur à EUR 5.000.000 (cinq millions d'Euros) sans avoir au préalable obtenu l'accord de la Majorité des Banques et sous réserve que la Dette Financière nouvelle soit contractée auprès d'une Banque ;

    19.1.6    ne pas conclure d'opérations de location financière ou de crédit bail, notamment dans le cadre de sociétés civiles immobilières, d'un montant annuel cumulé supérieur à EUR 15.000.000 (quinze millions d'Euros) ;

COPIE CONFORME

19.1.7   limiter l'endettement des filiales étrangères du Groupe à un total de EUR 30.000.000 (trente millions d'Euros) ;

19.1.8   obtenir et maintenir en vigueur tous les accords et autorisations nécessaires à assurer la validité et l'opposabilité des Documents de Financement auquel il est partie ;

19.1.9   obtenir et maintenir en vigueur toutes les autorisations relatives à ses droits de propriété intellectuelle nécessaires ou utiles à l'exercice de son activité et prendre toutes les mesures nécessaires à la préservation de ses droits au titre de sa propriété intellectuelle ;

19.1.10  en ce qui concerne la Société, organiser annuellement une réunion d'information avec les Banques à l'occasion de laquelle la Société présentera le business plan et la situation financière du Groupe ;

19.1.11  faire en sorte que ses obligations de paiement au titre du Contrat soient toujours des dettes chirographaires et non subordonnées venant au même rang que ses autres dettes chirographaires ;

19.1.12  ne pas modifier substantiellement son objet social ou la nature de ses activités sauf si un tel changement résulte du transfert de tout ou partie de son activité à une société ou une Filiale qui est ou deviendrait à l'occasion dudit transfert une Filiale Principale ;

19.1.13  ne pas céder, vendre, ou plus généralement disposer, de l'un quelconque de ses actifs immobilisés à une entité n'appartenant pas au Groupe sans l'autorisation préalable de la Majorité des Banques si le montant des opérations (qu'elles soient isolées ou liées, volontaires ou involontaires), excède un montant annuel cumulé de EUR 15.000.000 (quinze millions d'Euros), à l'exception toutefois des Cessions Autorisées ;

19.1.14  ne pas entamer ou participer à des opérations de fusion, scission, ou apport partiel d'actifs avec des entités extérieures au Groupe, à l'exception, toutefois des opérations de fusion, scission, ou apport partiel d'actifs dans lesquelles (i) l'entité survivante est l'Emprunteur concerné ou une Filiale Principale ou (ii) l'Emprunteur concerné est bénéficiaire de l'apport ou de la scission ;

19.1.15  ne pas procéder à des opérations de croissance externe d'un montant supérieur à EUR 20.000.000 (vingt millions d'Euros) sans l'accord préalable de la Majorité des Banques ;

19.1.16  ne pas participer à des opérations de *joint venture* engageant la responsabilité solidaire d'un Emprunteur ou d'une Filiale, telles que des groupements d'intérêt économique ou des sociétés en nom collectif, sous réserve de l'autorisation préalable des Banques ;

19.1.17  contracter des polices d'assurances normalement requises dans sa profession pour des montants et des couvertures de risques de dommages et de responsabilités conformes aux pratiques généralement admises dans son domaine d'activité ;

19.1.18 conclure avec les Arrangeurs Mandatés dans un délai de 3 (trois) mois suivant la Date de Signature un ou plusieurs contrats de couverture de risque de taux pour un montant au moins égal à 60% de l'Encours et pour une durée de trois ans minimum ;

19.1.19 en cas de survenance d'un Cas d'Exigibilité Anticipée ou d'un Cas d'Exigibilité Anticipée Potentiel, permettre à l'Agent du Crédit, après consultation des Banques, toutes visites des sites et locaux des sociétés membres du Groupe et à permettre à l'Agent du Crédit, sur consultation des Banques, et aux frais de la Société, de procéder ou de faire procéder à toute expertise ou audit sur les comptes des Emprunteurs.

19.2 En outre, la Société s'engage à :

19.2.1 donner en gage au profit des Banques, à première demande de la Majorité des Banques, toute Valeur Mobilière de Placement détenue par la Société en garantie des obligations des Emprunteurs au titre de la Tranche B du Crédit ; et

19.2.2 donner en gage tout titre de capital et tout actif acquis au titre d'une utilisation de la Tranche C du Crédit en garantie de ses obligations au titre de la Tranche C du Crédit.

## 20. EXIGIBILITE ANTICIPÉE

### 20.1 Cas d'Exigibilité Anticipée

En cas de survenance de l'un quelconque des événements prévus ci-dessous, (i) l'ensemble des sommes dues aux Banques en vertu du Contrat, en principal, intérêts, commissions, frais et accessoires deviendrait immédiatement et de plein droit exigible, et (ii) l'Engagement Total sera immédiatement réduit à zéro, sur décision de la Majorité des Banques notifiée par l'Agent du Crédit aux Emprunteurs et ce, sans sommation, mise en demeure ou formalité judiciaire quelconque :

20.1.1 non-paiement par un Emprunteur d'une somme quelconque due au titre du Contrat (i) à son échéance, ou (ii) à l'expiration d'un délai de 3 (trois) Jours Ouvrés à compter de son échéance en cas de retard pour des raisons techniques liées aux systèmes de transfert de fonds ou pour des raisons administratives ;

20.1.2 manquement à l'un quelconque des Ratios Financiers prévus à l'Article 18 (Engagements Financiers) ou non délivrance à l'Agent du Crédit de l'attestation visée à l'Article 17.1.3 ;

20.1.3 manquement à l'une quelconque des obligations d'un Emprunteur au titre du Contrat ou, le cas échéant, des Documents de Sûretés ou du Contrat de Garantie Autonome à Première Demande auxquels il est partie, et notamment au titre des engagements des Articles 17 (Engagements d'information) et 19 (Autres engagements) du Contrat autres que des obligations de paiement ;

20.1.4 l'une quelconque des déclarations et garanties faites, données ou réitérées conformément à l'Article 16 (Déclarations et garanties) ou faites, données ou réitérées dans tout document ou toute attestation fournie au titre des Documents de Financement se révèle être fausse ou inexacte au moment où elle est faite, donnée ou réitérée ou au moment où elle est considérée comme faite, donnée ou

**COPIE CONFORME**

réitérée si cette fausse déclaration ou cette inexactitude est susceptible d'avoir un Effet Défavorable Significatif ;

20.1.5    en cas de défaut de paiement à sa date d'échéance normale (ou selon le cas, avant l'expiration d'une éventuelle période de grâce) par un Emprunteur ou une Filiale Principale d'une dette quelconque, à l'exception d'un défaut de paiement au titre d'une Dette Financière d'un Emprunteur ou d'une Filiale Principale si le montant global exigible de ladite Dette Financière est inférieur à EUR 5.000.000 (cinq millions d'Euros) ;

20.1.6    en cas de réalisation ou de mise en jeu d'une Sûreté sur l'un des actifs d'un Emprunteur ou d'une Filiale Principale ;

20.1.7    au cas où une mesure de saisie conservatoire ou de saisie exécution est pratiquée sur tout actif d'un ou plusieurs Emprunteurs, sous réserve que les actifs faisant l'objet d'une telle mesure soient d'une valeur globale de EUR 3.000.000 (trois millions d'Euros) ;

20.1.8    au cas où l'une quelconque des autorisations nécessaires à l'exécution des Documents de Financements par les Emprunteurs vient à être annulée ou modifiée de telle manière que cette annulation ou modification rendrait impossible l'exécution par l'un des Emprunteurs de ses obligations au titre des Documents de Financement auxquels il est partie ;

20.1.9    en cas de procédure judiciaire, administrative ou arbitrale affectant la capacité d'un Emprunteur à exécuter ses obligations au titre des Documents de Financement auxquels il est partie ;

20.1.10   au cas où, pour quelque raison que ce soit, les Documents de Financement seraient nuls ou illégaux ;

20.1.11   au cas où, pour quelque raison que ce soit, les Documents de Sûretés et le Contrat de Garantie Autonome à Première Demande cessent d'être valables ou ne bénéficient plus entièrement aux Banques ;

20.1.12   en cas de perte par un Emprunteur de tout droit de propriété intellectuelle, et notamment, de toute marque, licence ou brevet nécessaire ou utile à l'exercice de son activité ;

20.1.13   au cas où un Emprunteur ou une Filiale Principale est en état de cessation des paiements au sens de l'article L. 621-1 du Code de commerce ou fait l'objet d'une procédure de règlement amiable avec ses créanciers, d'une procédure de sauvegarde ou d'une procédure de redressement ou de liquidation judiciaires ou de toute autre procédure semblable dans toute juridiction compétente ;

20.1.14   au cas où les commissaires aux comptes refuseraient de certifier les comptes sociaux des Emprunteurs ou de l'une des Filiales Principales ou les certifieraient avec des réserves significatives mentionnées dans leur rapport ;

20.1.15   la survenance de tout événement ayant ou susceptible d'avoir un Effet Défavorable Significatif.

COPIE CONFORME

### 20.2   Indemnisation

Dans tous les cas, les Emprunteurs indemniseront, sur justification, l'Agent du Crédit pour le compte des Banques, de tous frais ou pertes raisonnables subis ou encourus par l'Agent du Crédit ou par les Banques, notamment les Coûts de Refinancement, du fait de l'un quelconque des événements définis ci-dessus et notamment du fait du remboursement anticipé qui en est la conséquence.

## 21.   INTÉRÊTS DE RETARD

21.1   Toute somme exigible en vertu du Contrat qui ne serait pas payée à bonne date portera intérêt au jour le jour à partir de sa date d'exigibilité jusqu'au jour de son paiement effectif, dans toute la mesure permise par la loi au Taux de Référence augmenté de la Marge, le tout majoré de 1% (un pour cent) par an. Les intérêts impayés seront capitalisés au taux ci-dessus lorsqu'ils seront dus au moins pour une année entière.

21.2   L'Agent du Crédit calculera le montant desdits intérêts de retard sur la base du nombre exact de jours de retard écoulés divisé par 360, et en informera les Banques concernées et l'Emprunteur concerné.

21.3   La perception d'intérêts de retard exigibles à tout moment n'impliquera pas la concession de délais de paiement quelconques et les clauses d'exigibilité anticipée seront maintenues.

## 22.   DOCUMENTS DE SURETES

### 22.1   Contrats de Cessions de Créances Professionnelles

Les Emprunteurs s'engagent, en qualité de cédants, à consentir, à la Date de Signature, des Contrats de Cessions de Créances Professionnelles en garantie du paiement ou du remboursement de toute somme due par les Emprunteurs, en principal, intérêts, intérêts de retards, commissions, frais et accessoires au titre de la Tranche B du Crédit, étant entendu que le montant nominal des créances cédées par chaque Emprunteur au titre des Contrats de Cessions de Créances Professionnelles devra, à tout moment, être au moins égal à 70% (soixante-dix pour cent) des Tirages effectués par l'Emprunteur concerné au titre de la Tranche B du Crédit. Par exception, il est convenu que pendant la période annuelle allant de janvier à mai inclus, le montant nominal des créances cédées par la Société au titre du Contrat de Cessions de Créances Professionnelles auquel elle est partie devra être au moins égal à la différence entre (i) 50% (cinquante pour cent) des Tirages effectués par la Société au titre de la Tranche B du Crédit, et (ii) le cas échéant, le montant total des Valeurs Mobilières de Placement données en gage aux Banques aux termes de l'Article 19.2.1 du Contrat.

### 22.2   Contrat de Gage de Compte d'Instruments Financiers Portant sur les Actions de Majorette Solido

La Société s'engage, en qualité de constituant, à consentir, à la Date de Signature, le Contrat de Gage de Compte d'Instruments Financiers Portant sur les Actions de Majorette Solido en garantie du paiement ou du remboursement de toute somme due par la Société au titre de la Tranche A du Crédit, en principal, intérêts, intérêts de retard, commissions, frais et accessoires.

### 22.3   Contrat de Gage de Compte d'Instruments Financiers Portant sur les Actions de J.L.B. Développement

La Société s'engage, en qualité de constituant, à consentir, à la Date de Signature, le Contrat de Gage de Compte d'Instruments Financiers Portant sur les Actions de J.L.B. Développement en garantie du

paiement ou du remboursement de toute somme due par la Société au titre de la Tranche A du Crédit, en principal, intérêts, intérêts de retard, commissions, frais et accessoires.

**22.4   Contrat de Gage de Compte d'Instruments Financiers Portant sur les Actions de Groupe Berchet**

La Société s'engage, en qualité de constituant, à consentir, à la Date de Signature, le Contrat de Gage de Compte d'Instruments Financiers Portant sur les Actions de Groupe Berchet en garantie du paiement ou du remboursement de toute somme due par la Société au titre de la Tranche A du Crédit, en principal, intérêts, intérêts de retard, commissions, frais et accessoires.

**22.5   Contrat de Nantissement de la Marque Smoby**

La Société s'engage, en qualité de constituant, à consentir, à la Date de Signature, le Contrat de Nantissement de la Marque Smoby en garantie du paiement ou du remboursement de toute somme due par la Société au titre de la Tranche A du Crédit et de la Tranche B du Crédit, en principal, intérêts, intérêts de retard, commissions, frais et accessoires.

**23.   AGENT DU CRÉDIT ET AGENT DES SURETES**

**23.1   Mandat**

Chaque Banque donne par le Contrat mandat à l'Agent du Crédit et à l'Agent des Sûretés, qui acceptent, à l'effet de prendre, en ses nom et place, toutes mesures et exercer tous pouvoirs qui leur sont expressément délégués aux termes des Documents de Financement, et notamment, signer les Documents de Sûretés et le Contrat de Garantie Autonome à Première Demande, ainsi que ceux qui en seront raisonnablement la conséquence. Hormis les cas expressément prévus aux Documents de Financement, l'Agent du Crédit et l'Agent des Sûretés n'auront à prendre aucune initiative sous leur propre responsabilité, mais agiront ou s'abstiendront d'agir, sans responsabilité de leur part, valablement en se conformant aux instructions reçues de la Majorité des Banques (ou, le cas échéant, de toutes les Banques), étant entendu que l'Agent du Crédit et l'Agent des Sûretés ne pourront transiger au nom d'une Banque ou entamer aucune procédure à l'encontre des Emprunteurs pour le compte d'une Banque sans instruction de celle-ci à cet effet.

**23.2   Responsabilité**

L'Agent du Crédit et l'Agent des Sûretés, et leurs dirigeants, agents et employés n'encourront aucune responsabilité pour leur action ou inaction dans le cadre du mandat ci-dessus, sauf faute lourde ou intentionnelle. Sans que cette liste soit limitative, il est expressément stipulé que l'Agent du Crédit et l'Agent des Sûretés :

23.2.1    pourront recourir quand ils le jugeront utile aux services d'avocats, experts comptables et autres experts de leur choix et se fier en toute bonne foi à leurs avis et conseils ;

23.2.2    pourront agir ou s'abstenir d'agir en se fiant aux déclarations des Emprunteurs et au contenu de tout avis, certificat, autre document ou acte qu'ils pourront légitimement croire authentique et émanant d'une personne compétente ;

23.2.3    n'auront aucune obligation de procéder à des enquêtes et vérifications en ce qui concerne le respect et l'exécution des obligations et engagements des Emprunteurs ou de leur situation financière ou juridique, leur obligation

d'aviser les Banques de faits et conditions quelconques dans le cadre des Documents de Financement étant limitée à la transmission des informations qu'ils reçoivent dans l'exécution de leur mandat ;

23.2.4   pourront en particulier légitimement considérer qu'aucun Cas d'Exigibilité Anticipée ou événement constituant ou susceptible de constituer un Cas d'Exigibilité Anticipée n'est survenu, à moins que, en ce qui concerne les défauts de paiement uniquement, l'Agent du Crédit n'ait, à l'occasion de son activité aux termes du Contrat, une connaissance effective contraire étant entendu, dans ce dernier cas, que l'Agent du Crédit devra en informer les Banques ;

23.2.5   pourront s'abstenir de prendre des mesures pour protéger ou procéder à l'exécution forcée des droits d'une Banque stipulés dans les Documents de Financement jusqu'à ce qu'ils aient été indemnisés ou garantis contre tout coût, perte, dépense et passif (y compris les frais et honoraires juridiques) qu'ils subiraient ou encourraient ou pourraient subir ou encourir de ce fait ;

23.2.6   ne seront pas responsables de la bonne exécution, de la délivrance, de la légalité, de la validité, du caractère adéquat, de l'opposabilité, de la possibilité d'exécution forcée ou de la production en justice ou du contenu des Documents de Financement ;

23.2.7   ne seront responsables, ni aucun de leurs personnels, du caractère suffisant, précis ou complet des déclarations et garanties, comptes-rendus ou informations contenus dans les documents qui ont été ou seront délivrés par les Emprunteurs ou les Garants conformément aux Documents de Financement sauf en cas de faute lourde ;

23.2.8   ne seront pas responsables de la défaillance de l'un des Emprunteurs, ou de l'une des Banques à respecter et exécuter dûment et ponctuellement leurs obligations respectives d'après les Documents de Financement ;

23.2.9   ne seront en aucune manière obligés de transmettre aux autres Banques l'information relative à l'une des parties aux Documents de Financement dont ils pourront avoir eu communication de toute autre façon qu'en rapport avec les Documents de Financement ;

23.2.10   ne seront pas tenus d'exercer de leur propre initiative de recours contre une Banque défaillante ou contre l'un Emprunteur ;

23.2.11   n'auront aucune obligation de fournir à une Banque soit lors de la conclusion des Documents de Financement, soit lors de leur exécution, de façon ponctuelle ou continue, une quelconque information concernant les Emprunteurs, leur situation ou permettant d'analyser celles-ci sauf en ce qui concerne les informations devant être communiquées par les Emprunteurs au titre des Documents de Financement ;

23.2.12   n'auront pas l'obligation de prendre en compte ou de compenser toute somme, profit ou actif reçus par eux du fait de leurs relations présentes ou futures avec

**EXHIBIT B**

**COPIE CONFORME**

les Emprunteurs avec toute somme qui serait due par les Emprunteurs à l'Agent du Crédit, l'Agent des Sûretés ou à toute Banque au titre des Documents de Financement.

23.3    Chaque Banque déclare et garantit individuellement à l'Agent du Crédit, à l'Agent des Sûretés et aux Arrangeurs Mandatés qu'elle a effectué, et effectuera à tout moment, sans se reposer sur tout avis ou toute information donnés par l'Agent du Crédit, l'Agent des Sûretés ou les Arrangeurs Mandatés, sa propre étude indépendante de la situation des Emprunteurs. En conséquence, il ne pourra résulter pour l'Agent du Crédit, l'Agent des Sûretés ou les Arrangeurs Mandatés aucune responsabilité concernant toute information ou tout avis fournis ou non fournis par eux ou par leur intermédiaire aux Banques.

23.4    **Versements**

23.4.1    Le rôle de l'Agent du Crédit comprend notamment le transfert aux Emprunteurs des sommes reçues des Banques, et aux Banques concernées des sommes reçues pour leur compte, des Emprunteurs ou de tout tiers dans le cadre du Contrat. En aucun cas l'Agent du Crédit ne sera tenu d'avancer des fonds aux Emprunteurs qu'il n'aurait pas reçus des Banques ni d'avancer aux Banques des fonds qu'il n'aurait pas reçus des Emprunteurs. Dans le cas où l'Agent du Crédit aurait néanmoins avancé des fonds non reçus au titre du Contrat, l'Emprunteur concerné ou, selon le cas, les Banques s'engagent à effectuer le remboursement à l'Agent du Crédit à première demande de sa part et à l'indemniser pour tout coût de financement qu'il aurait supporté. Au cas où l'une quelconque des Banques ne satisferait pas à ses obligations, l'Agent du Crédit n'en serait aucunement tenu responsable vis-à-vis des Emprunteurs.

23.4.2    L'Agent du Crédit informera aussitôt les Banques de toute notification reçue des Emprunteurs et répartira, au prorata de l'Engagement de chacune, avec diligence et sous bonne valeur, entre toutes les Banques concernées toute somme à lui remise par les Emprunteurs pour le compte des Banques.

23.4.3    L'Agent du Crédit pourra, à moins qu'il n'ait reçu un avis écrit contraire, conforme aux stipulations du Contrat, traiter toute Banque qui met à disposition sa participation au Tirage comme la personne bénéficiaire du remboursement de ladite participation.

23.5    **Renonciations et Modifications**

23.5.1    L'Agent du Crédit pourra, sous réserve des stipulations de l'alinéa suivant, avec le consentement préalable de la Majorité des Banques (ou, le cas échéant, de la totalité des Banques conformément à l'Article 25 (Avenants)), renoncer au nom des Banques à se prévaloir de l'une quelconque des stipulations du Contrat ou convenir avec les Emprunteurs en tant que mandataire des Banques de toute modification de toute stipulation du Contrat.

23.5.2    Il est entendu, en ce qui concerne toute décision prise ou tout acte conclu par l'Agent du Crédit au nom et après consultation des Banques conformément à l'alinéa précédent, ou conformément aux termes du Contrat (notamment à l'Article 25 (Avenants)), que l'Agent du Crédit et l'ensemble des Banques (y

compris celles qui, lorsqu'elles auront été consultées par l'Agent du Crédit, auront voté dans un sens différent) seront liés par de telles décisions et de tels actes.

### 23.6   Remboursement des frais et indemnisation

Les Emprunteurs s'engagent à rembourser à l'Agent du Crédit et à l'Agent des Sûretés, sur présentation de justificatifs et dans les plus brefs délais, tous les coûts raisonnables encourus par l'Agent du Crédit et l'Agent des Sûretés dans le cadre de l'exécution de leur mandat et à indemniser l'Agent du Crédit et l'Agent des Sûretés, sur présentation de justificatifs, de tous coûts, dommages, débours, frais, pénalités, pertes et dépenses raisonnables (y compris notamment tous honoraires d'avocats) et des conséquences de toute réclamation et de tout jugement supportés par l'Agent du Crédit ou l'Agent des Sûretés du fait du non-respect par les Emprunteurs de leurs obligations au titre des Documents de Financement. Si les Emprunteurs ne remboursaient pas l'Agent du Crédit ou l'Agent des Sûretés, les Banques se substitueraient à eux en proportion de leurs participations respectives aux Tirages. En outre, les Banques s'engagent à indemniser l'Agent du Crédit et l'Agent des Sûretés, sur présentation de justificatifs, de tous coûts supportés par ces derniers du fait de toute action engagée par eux à la demande de la Majorité des Banques ou de la totalité des Banques.

### 23.7   Droits en qualité de Banque

L'Agent du Crédit aura, en sa qualité de Banque, les mêmes droits et obligations au titre du Contrat que toute autre Banque et pourra les exercer comme s'il n'était pas l'Agent du Crédit et, en particulier, il pourra accepter des dépôts des Emprunteurs et leur prêter de l'argent ou leur consentir des facilités de crédit et généralement traiter des affaires avec chacun d'eux sans en rendre compte aux Banques ou encourir de responsabilité particulière à ce titre vis-à-vis de celles-ci.

### 23.8   Séparation des fonctions

L'Agent du Crédit et l'Agent des Sûretés sont réputés exercer leurs fonctions au titre des Documents de Financement par l'intermédiaire d'un même département, distinct de leurs autres départements. Toute information reçue par les autres départements pourra être considérée comme confidentielle par l'Agent du Crédit et l'Agent des Sûretés et toute information ou notification au titre des Documents de Financement reçue par l'Agent du Crédit ou l'Agent des Sûretés à une autre adresse que celle mentionnée à l'Article 28 (Notifications) sera réputée non reçue par l'Agent du Crédit ou l'Agent des Sûretés.

### 23.9   Succession de l'Agent du Crédit ou de l'Agent des Sûretés

L'Agent du Crédit et l'Agent des Sûretés pourront démissionner de leurs fonctions au titre des Documents de Financement ou demander à se substituer une société de leur groupe à tout moment sous réserve de l'avoir notifié, en respectant un préavis d'au moins 90 (quatre-vingt dix) jours, aux Banques et aux Emprunteurs. De même, il pourra être mis fin aux fonctions de l'Agent du Crédit et de l'Agent des Sûretés à tout moment par la Majorité des Banques sans que celles-ci aient à justifier leur décision. Toute révocation de l'Agent du Crédit ou de l'Agent des Sûretés sera notifiée aux Emprunteurs. A la suite d'une telle décision, demande de substitution ou révocation, la Majorité des Banques désignera ou agréera, selon le cas, un nouvel Agent du Crédit ou Agent des Sûretés sous réserve de l'acceptation des Emprunteurs qui ne pourra être refusée sans raison valable et qui sera considérée comme étant accordée en l'absence de réponse de leur part dans les 30 (trente) jours de la demande de ladite acceptation par l'Agent du Crédit, par l'Agent des Sûretés ou par la Majorité des

COPIE CONFORME

Banques. De par leur nomination en tant qu'Agent du Crédit ou Agent des Sûretés, le nouvel Agent du Crédit ou Agent des Sûretés succédera à l'ensemble des droits et obligations de l'Agent du Crédit ou Agent des Sûretés précédent qui sera déchargé de toutes ses obligations aux termes des Documents de Financement.

Au cas où à la fin de la période de préavis donné par l'Agent du Crédit ou l'Agent des Sûretés, la Majorité des Banques n'aurait pas nommé un nouvel Agent du Crédit ou Agent des Sûretés, dans les conditions ci-dessus ou que le nouvel Agent du Crédit ou Agent des Sûretés ainsi choisi n'aurait pas accepté cette fonction ou aurait fait l'objet d'un refus par les Emprunteurs, l'Agent du Crédit ou l'Agent des Sûretés partant aura le droit, avec l'accord des Emprunteurs, de désigner de lui-même un nouvel Agent du Crédit ou Agent des Sûretés qui devra être une banque de premier rang ayant des bureaux à Paris et ayant la capacité de remplir les fonctions attribuées à l'Agent du Crédit ou à l'Agent des Sûretés par les Documents de Financement. Aussi longtemps qu'un nouvel Agent du Crédit ou Agent des Sûretés n'aura pas été désigné et n'aura pas accepté ces fonctions, l'Agent du Crédit ou l'Agent des Sûretés partant restera en fonction.

23.10   L'Agent du Crédit et l'Agent des Sûretés pourront conserver pour eux-mêmes et ne seront pas obligés de les reverser aux autres Banques toutes sommes reçues par eux à titre de remboursement de dépenses supportées par eux.

## 24.   PÉRÉQUATION DES PAIEMENTS

24.1   Si pour quelque cause que ce soit (sauf les cas prévus à l'Article 13 (Survenance de Circonstances Nouvelles) ou à l'Article 15.4 (Impôts)), une Banque reçoit un paiement de toute somme due en vertu du Contrat excédant le montant qui lui est dû proportionnellement aux montants dus aux autres Banques, l'Agent du Crédit procédera ou fera procéder dans les meilleurs délais aux ajustements nécessaires pour que l'excédent soit réparti entre toutes les Banques au prorata des montants qui leur sont respectivement dus. Les Banques ayant reçu un tel paiement devront reverser à l'Agent du Crédit les sommes ainsi reçues en excès dans les 2 (deux) Jours Ouvrés de leur réception.

24.2   Au cas où il s'avérerait, après qu'un tel paiement ait été restitué par une Banque à l'Agent du Crédit et que ce dernier ait déjà redistribué la somme reçue entre les différentes Banques, que ledit paiement revenait entièrement à la Banque l'ayant originellement reçu, chaque Banque à qui une partie quelconque de ce paiement aurait été distribuée devrait reverser cette somme à la demande de l'Agent du Crédit à la Banque concernée.

24.3   Il est entendu toutefois que, lorsqu'une Banque aura recouvré des sommes à la suite de poursuites judiciaires qu'elle aurait intentées indépendamment, après avoir avisé l'Agent du Crédit qui avisera les autres Banques de son intention d'entamer lesdites poursuites et leur avoir donné l'occasion de se joindre à ces poursuites, les sommes ainsi recouvrées le seront au seul bénéfice des Banques ayant participé à cette action qui ne seront alors nullement tenues de partager ces sommes avec les Banques n'ayant pas participé auxdites poursuites.

## 25.   AVENANTS

25.1   Sous réserve des stipulations de l'Article 25.2 ci-dessous, les termes et conditions du Contrat pourront être modifiés d'un commun accord entre les Emprunteurs et la Majorité des Banques.

07M71816_9

**EXHIBIT B**

25.2 Pour toute autre dérogation ou modification des termes du Contrat, les Banques feront leurs meilleurs efforts pour répondre aux requêtes des Emprunteurs dans les meilleurs délais en prenant en compte les contraintes de temps auxquelles les Emprunteurs seraient soumis.

25.3 Aucune modification ne pourra être apportée aux Documents de Financement ni aucune renonciation à un droit quelconque ne pourra intervenir sans l'accord préalable de l'unanimité des Banques et des Emprunteurs, ou de la Banque concernée selon le cas, si cette modification ou renonciation a pour effet :

    25.3.1 d'augmenter la participation au Crédit ;

    25.3.2 de proroger la Date d'Echéance Finale de la Tranche A du Crédit, la Date d' Echéance Finale de la Tranche B du Crédit ou la Date d' Echéance Finale de la Tranche C du Crédit ;

    25.3.3 de proroger la date à laquelle toute somme est due aux Banques, de réduire tout montant dû aux Banques ou de modifier la monnaie de paiement dans laquelle un tel montant est libellé étant entendu qu'une telle stipulation ne réduit pas la capacité d'une Banque à accepter, indépendamment, une réduction du montant dû à cette Banque par un Emprunteur ;

    25.3.4 de modifier les montants mensuels du Montant Maximum Autorisé figurant dans le tableau afférent à la définition *"Montant Maximum Autorisé"* de l'Article 1.1 (Définitions) ;

    25.3.5 de modifier le ou les taux des intérêts, le Taux de Référence, la Marge ou le montant des commissions dues aux Banques au titre du Contrat ;

    25.3.6 de modifier la définition de Majorité des Banques ;

    25.3.7 de modifier l'Article 4 (Conditions d'utilisation), l'Article 24 (Péréquation des Paiements), le présent Article 25 (Avenants), l'Article 26 (Changements d'Emprunteurs) ou l'Article 27 (Cession par les Banques) ;

    25.3.8 de modifier les Documents de Sûretés ou le Contrat de Garantie Autonome à Première Demande ;

    25.3.9 de modifier toute stipulation du Contrat qui prévoit expressément qu'une notification ou décision ne peut intervenir sans l'accord de l'unanimité des Banques, au titre de ladite stipulation.

25.4 Aucune modification ne pourra être apportée aux stipulations relatives aux droits et obligations de l'Agent du Crédit au titre du Contrat sans l'accord préalable de ce dernier.

25.5 Tous les frais liés à la négociation, la rédaction et la signature d'un avenant ou tout document modifiant les termes du Contrat à la demande d'un ou de plusieurs Emprunteurs (y compris, notamment, les frais juridiques dont le plafond aura été préalablement approuvé par la Société) et raisonnablement encourus par l'Agent du Crédit pour répondre à une telle demande, l'évaluer ou la négocier, seront à la charge de la Société, qui les remboursera à l'Agent du Crédit à première demande de celui-ci et en tout état de cause dans les 3 (trois) Jours Ouvrés suivant une telle demande.

COPIE CONFORME

## 26.    CHANGEMENTS D'EMPRUNTEURS

### 26.1    Cession par les Emprunteurs

Les Emprunteurs ne pourront en aucun cas céder ni transférer tout ou partie de leurs droits et obligations au titre des Documents de Financement.

### 26.2    Emprunteurs Additionnels

26.2.1    La Société peut demander que l'une quelconque de ses Filiales immatriculée en France (à l'exclusion de MOB) devienne un Emprunteur Additionnel. Cette Filiale deviendra un Emprunteur Additionnel si :

(A)    toutes les Banques approuvent l'adhésion de cette Filiale ;

(B)    la Société remet à l'Agent du Crédit une Lettre d'Adhésion dûment complétée et signée ;

(C)    la Société confirme que l'adhésion de cette Filiale au Contrat en tant qu'Emprunteur Additionnel n'entraîne pas et n'est pas susceptible d'entraîner un Cas d'Exigibilité Anticipée ; et

(D)    l'Agent du Crédit a reçu pour cet Emprunteur Additionnel l'ensemble des documents suivants satisfaisants tant sur la forme que sur le fond :

(i)    une Lettre d'Adhésion dûment signée par celui-ci et par la Société ;

(ii)    un Contrat de Cessions de Créances Professionnelles signé ;

(iii)    une copie certifiée conforme et à jour de ses statuts ;

(iv)    un extrait K-bis daté de moins d'un mois ;

(v)    un certificat de non faillite daté de moins d'un mois ;

(vi)    un état des inscriptions des privilèges et nantissements daté de moins d'un mois ;

(vii)    une copie certifiée conforme par le représentant légal de l'Emprunteur Additionnel du procès-verbal des décisions de ses organes compétents approuvant la conclusion, la signature et l'exécution de la Lettre d'Adhésion ;

(viii)    une copie originale des pouvoirs des signataires de la Lettre d'Adhésion ou de tout document devant être remis par l'Emprunteur Additionnel conformément aux Documents de Financement ;

(ix)    un document signé par un représentant légal de l'Emprunteur Additionnel contenant les noms et spécimens de signature des signataires autorisés à signer la Lettre d'Adhésion et à effectuer les Tirages au nom et pour le compte de l'Emprunteur Additionnel ;

(x)    une copie de ses Derniers Comptes Annuels Sociaux.

COPIE CONFORME

26.2.2 L'Agent du Crédit avisera la Société et les Banques dans les meilleurs délais de la réception de l'ensemble des documents énumérés à l'Article 26.2.1(D), dès lors qu'il les trouve satisfaisants tant sur la forme que sur le fond.

26.2.3 La remise d'une Lettre d'Adhésion par la Filiale concernée emporte confirmation de sa part qu'à cette date les déclarations et garanties visées à l'Article 16.1 (Déclarations et garanties) sont exactes en ce qui la concerne.

26.3 **Retrait d'un Emprunteur**

26.3.1 La Société pourra demander, par la remise à l'Agent d'une Lettre de Retrait, qu'un Emprunteur (autre que la Société) cesse d'être un Emprunteur.

26.3.2 L'Agent du Crédit acceptera la Lettre de Retrait et avisera la Société et les Banques de cette acceptation si :

(A) aucun Cas d'Exigibilité Anticipée n'est en cours ou n'est susceptible de survenir du fait de l'acceptation de la Lettre de Retrait (et à condition que la Société l'ait confirmé de son côté) ; et

(B) l'Emprunteur concerné n'a plus aucune obligation existante ou éventuelle au titre des Documents de Financement.

26.3.3 Si les conditions posées aux Articles 26.3.2(A) et 26.3.2(B) sont remplies, la société visée cessera d'être un Emprunteur et n'aura plus aucune obligation au titre des Documents de Financement.

27. **CESSION PAR LES BANQUES**

27.1 Toute cession par une Banque de ses droits et obligations découlant du Contrat (la "**Banque Cédante**") à tout établissement de crédit ou institution financière qui en acceptera la transmission dans les conditions ci-après (la "**Banque Cessionnaire**"), nécessitera l'accord écrit préalable de la Société, laquelle toutefois ne pourra le refuser sans motif légitime. Il est néanmoins d'ores et déjà accepté par la Société que l'accord de la Société sera réputé accordé si le refus de la Société n'a pas été reçu par l'Agent du Crédit 8 (huit) Jours Ouvrés suivant la notification de la proposition de cession.

27.2 Il est également d'ores et déjà accepté par la Société que cet accord sera réputé donné dans le cas de survenance d'un Cas d'Exigibilité Anticipée, tel que prévu à l'Article 20 (Exigibilité Anticipée) ci-dessus, ou d'une cession par la Banque Cédante de ses droits et obligations découlant du Contrat à une Banque Cessionnaire ayant la qualité de Banque au sens du présent Contrat ou à un établissement du crédit ou une institution financière contrôlé(e) par une Banque Cédante, contrôlant une Banque Cédante ou conjointement contrôlé(e) avec la Banque Cédante par une même société. Le terme "contrôlé" ci-dessus est entendu au sens de l'article L. 233-3 du Code de Commerce.

27.3 Le montant minimum cédé doit être égal ou supérieur à EUR 5.000.000 (cinq millions d'euros) et, au-delà de cette somme, doit être un multiple entier de EUR 1.000.000 (un million d'euros), à l'exception toutefois (i) de la cession par une Banque de ses droits et obligations découlant du Contrat dont la conséquence serait pour la Banque Cédante de ne plus avoir la qualité de Banque au titre du présent Contrat et (ii) de toute cession intervenue à la Date de Signature.

COPIE CONFORME

27.4 Les Emprunteurs reconnaissent d'ores et déjà qu'à la suite d'une cession, la Banque Cessionnaire se substituera dans les droits et obligations de la Banque Cédante pour la quote-part cédée de la participation de la Banque Cédante au Crédit.

27.5 Toute cession donnera lieu au paiement à l'Agent du Crédit, de la part de la Banque Cédante, d'une commission forfaitaire de EUR 2.000 (deux mille euros) hors taxes, destinée à couvrir les frais administratifs encourus du fait de ladite cession, à l'exception toutefois des cessions par une Banque Cédante à un établissement de crédit ou une institution financière contrôlé(e) par ladite Banque Cédante, contrôlant ladite Banque Cédante ou conjointement contrôlé(e) avec ladite Banque Cédante par une même société. Le terme "contrôlé" ci-dessus est entendu au sens de l'article L. 233-3 du Code de Commerce.

27.6 La cession par une ou plusieurs Banque(s) de sa/leur participation dans le Contrat ne deviendra effective qu'une fois que la Banque Cessionnaire aura fait connaître par écrit à l'Agent du Crédit qu'elle s'engage à reprendre l'ensemble des droits et obligations de la Banque Cédante, tels qu'ils apparaissent dans le Contrat ou dans tout document y afférent, en envoyant à l'Agent du Crédit un exemplaire original signé de la notification de cession dans la forme de l'Annexe 4.

27.7 La Banque Cessionnaire fera signifier à ses frais la cession ainsi intervenue à aux Emprunteurs concernés, conformément à l'article 1690 du Code Civil.

## 28. NOTIFICATIONS

### 28.1 Mode de notification

Sauf stipulations expresses prévues au Contrat ou ultérieurement agréées par les parties concernées, toutes les communications effectuées au titre du Contrat seront envoyées par :

28.1.1 lettre recommandée avec avis de réception s'il s'agit de la notification d'un Cas d'Exigibilité Anticipée ou d'un Cas d'Exigibilité Anticipée Potentiel ;

28.1.2 lettre recommandée avec avis de réception accompagnée d'une télécopie ou d'un courrier électronique s'il s'agit d'une notification de proposition de cession au titre de l'Article 27 (Cession par les Banques) ;

28.1.3 courrier électronique, lettre simple ou télécopie pour la gestion administrative du Contrat ; ou

28.1.4 lettre simple avec délivrance d'un reçu ou avis de réception, accompagnée des originaux sur support papier, en ce qui concerne la communication des documents prévus à l'Article 17.1 ou en matière de respect des obligations des Emprunteurs, étant précisé que l'attestation prévue à l'Article 17.1.3 devra être également envoyée à l'Agent du Crédit par télécopie ;

aux adresses et aux numéros suivants (ou à tout autre adresse ou numéro qui aura été ultérieurement notifié par le destinataire aux autres parties au moins cinq (5) Jours Ouvrés au préalable), étant entendu que l'Agent du Crédit n'aura à vérifier ni les signatures ni les pouvoirs des signataires desdites communications

COPIE CONFORME

| Parties au Contrat | Coordonnées |
|---|---|
| Société :<br>**Smoby** | Quartier Bourg Dessus<br>39170 Lavans Les St Claude, France<br>à l'attention de M. Gérard Bondier<br>Tél. : + 33 3 84 41 38 26<br>Fax : + 33 3 84 42 29 65<br>e-mail : nroz@smoby.fr |
| Autres Emprunteurs Initiaux | Adresses et numéros respectifs indiqués en Partie 1 de l'Annexe 1 |
| Agent du Crédit / Agent des Sûretés :<br>**CALYON** | 9 quai du Président Paul Doumer<br>92920 Paris la Défense Cedex, France<br>à l'attention de Sophie Robert / Sylvie Charre<br>Tél. : + 33 1 41 89 38 01 / 60 70<br>Fax : + 33 1 41 89 60 73<br>e-mail : sophie.robert@calyon.com /<br>sylvie.charre@calyon.com |
| Arrangeurs Mandatés :<br>**CALYON**<br><br><br><br><br>**SOCIETE GENERALE** | 9, quai du Président Paul Doumer, 92920 Paris la Défense Cedex, France<br>à l'attention de Patrick Josse / Ghislain Descamps<br>Tél. : + 33 1 41 89 66 88 / + 33 4 72 40 76 28<br>Fax : + 33 1 41 89 60 73 / + 33 4 72 40 76 19<br>e-mail : patrick.josse@calyon.fr /<br>ghislain.descamps@calyon.com<br><br>7, rue Voirin<br>BP1049 – 25001 Besançon Cedex, France<br>à l'attention de Jacky Quettier<br>Tél. : + 33 3 81 84 57 12<br>Fax : + 33 3 81 84 57 49<br>e-mail : jacky.quettier@socgen.com |
| Banques | Adresses et numéros respectifs indiqués en Partie 2 de l'Annexe 1 |

28.2    Réception

Toute communication effectuée en application des stipulations qui précèdent sera réputée reçue :

        28.2.1    en cas de lettre simple visée à l'Article 28.1.3 ci-dessus, dès la remise de cette lettre ;

        28.2.2    en cas de lettre simple avec délivrance d'un reçu ou avis de réception visée à l'Article 28.1.4 ci-dessus, dès la remise du reçu ou de l'avis de réception ;

COPIE CONFORME

28.2.3    en cas de courrier électronique, dès la réception de l'accusé de réception électronique ;

28.2.4    en cas d'envoi de lettre recommandée avec demande d'avis de réception, à la date portée sur l'avis de réception ; et

28.2.5    en cas de transmission par télécopie, le jour ouvré à Paris de sa transmission (indiqué par le récépissé d'envoi) ou, si la transmission est effectuée après dix-sept heures (17h00), le Jour Ouvré suivant.

## 29. NON-RENONCIATION

Le fait que l'une des Banques, l'Agent du Crédit ou les Emprunteurs n'exerce pas un droit ou un recours ou ne l'exerce qu'en partie, ou avec retard, ne constituera pas une renonciation audit droit ou recours.

## 30. INTERPRETATION ET AUTONOMIE DES STIPULATIONS

30.1    Les titres des Articles et des Annexes sont convenus dans le seul but de faciliter la lecture du Contrat et ne peuvent en aucun cas être utilisés par les parties à des fins d'interprétation.

30.2    Au cas où l'une quelconque des stipulations du Contrat deviendrait ou serait déclarée nulle, interdite ou sans effet, la validité des autres stipulations du Contrat n'en serait pas pour autant remise en question.

## 31. DROIT APPLICABLE ET COMPÉTENCE

Le Contrat sera régi et interprété conformément au droit français.

Les parties acceptent que tout différend entre elles quant à son interprétation ou son exécution sera porté devant le Tribunal de Commerce de Paris.

ANNEXE 1
PARTIE 1
LISTE DES EMPRUNTEURS INITIAUX AUTRES QUE LA SOCIETE

| Emprunteurs Initiaux autres que la Société | Coordonnées |
|---|---|
| Etablissements Ecoiffier Albert & Fils, société par actions simplifiée au capital social de EUR 180.000 dont le siège social est sis 12 bis, avenue de la Gare Bellignat 01810, France, immatriculée au Registre du Commerce et des Sociétés de Bourg-en-Bresse sous le numéro 773 201 330 | c/o Smoby<br>Quartier Bourg Dessus<br>39170 Lavans Les St Claude, France<br>à l'attention de M. Gérard Bondier<br>Tél. : + 33 3 84 41 38 26<br>Fax : + 33 3 84 42 29 65<br>e-mail : nroz@smoby.fr |
| Groupe Berchet, société anonyme au capital social de EUR 39.500.000 dont le siège social est sis 31, Cours de Verdun 01100 Oyonnax, France, immatriculée au Registre du Commerce et des Sociétés de Bourg-En-Bresse sous le numéro 400 432 381 | c/o Smoby<br>Quartier Bourg Dessus<br>39170 Lavans Les St Claude, France<br>à l'attention de M. Gérard Bondier<br>Tél. : + 33 3 84 41 38 26<br>Fax : + 33 3 84 42 29 65<br>e-mail : nroz@smoby.fr |
| Majorette Solido, société par actions simplifiée au capital social de EUR 10.000.000 dont le siège social est sis 110, rue du Companct 69140 Rillieux La Pape, France, immatriculée au Registre du Commerce et des Sociétés de Lyon sous le numéro 391 579 836 | c/o Smoby<br>Quartier Bourg Dessus<br>39170 Lavans Les St Claude, France<br>à l'attention de M. Gérard Bondier<br>Tél. : + 33 3 84 41 38 26<br>Fax : + 33 3 84 42 29 65<br>e-mail : nroz@smoby.fr |

ANNEXE 1
PARTIE 2
LISTE DES BANQUES

| Banque | Engagement de la Tranche A du Crédit | Engagement de de la Tranche B du Crédit | Engagement de la Tranche C du Crédit |
|---|---|---|---|
| Banque Populaire Bourgogne Franche Comté<br>1, place de la 1ère Armée Française<br>25087 Besançon Cedex, France<br>Attention : Christine Rozet / Jocelyne Girardi<br>Téléphone : + 33 3 81 65 28 46 / 91 24<br>Télécopie : + 33 3 81 65 28 85<br>e-mail :<br>christine.rozet@bpbfc.banquepopulaire.fr /<br>jocelyne.girardi@bpbfc.banquepopulaire.fr | 2.600.000 | 8.900.000 | 1.000.000 |
| BECM<br>6, rue de Ventadour<br>75001 Paris, France<br>Attention : Back Office Credit<br>Téléphone : + 33 1 44 58 42 34<br>Télécopie : + 33 1 44 58 41 47<br>e-mail : bocredit@c-i.com | 3.120.000 | 10.680.000 | 1.200.000 |
| Calyon<br>9, quai du Président Paul Doumer<br>92920 Paris la Défense, France<br>Attention : Laurence Lebeau / Brigitte Boddaert<br>Téléphone : + 33 1 41 89 37 70 / 15 46<br>Télécopie : + 33 1 41 89 11 14<br>e-mail : laurence.lebeau@calyon.com /<br>brigitte.boddaert@calyon.com | 7.800.000 | 26.700.000 | 3.000.000 |
| CIC Lyonnaise de Banque<br>8, rue de la République<br>69001 Lyon, France<br>Attention : Cécile Pueyo Cointepas / Alain Buathier<br>Téléphone : + 33 4 78 92 08 43 / 08 78<br>Télécopie : + 33 4 78 92 04 14<br>e-mail : pueyocce@lb.cic.fr /<br>buathial@lb.cic.fr | 7.280.000 | 24.920.000 | 2.800.000 |
| Crédit Agricole de Franche Comté<br>340, avenue Offenbourg<br>39000 Lons Le Saunier, France<br>Attention : Jean-Pierre Baud<br>Téléphone : + 33 3 84 87 80 16 | 6.240.000 | 21.360.000 | 2.400.000 |

| | | | |
|---|---|---|---|
| Télécopie : + 33 3 84 87 82 26<br>e-mail : jean-pierre.baud@ca-francheconte.fr | | | |
| Crédit Lyonnais<br>US Contrats 23170<br>136, cours Lafayette<br>69489 Lyon Cédex 3, France<br>Attention : Maria de Lorette Cayet /<br>Isabelle Cherchelay<br>Téléphone : + 33 4.72 60 62 27 / 68 13<br>Télécopie : + 33 4.72.60.66.41 / + 33<br>1.45.16.76.07 | 4.160.000 | 14.240.000 | 1.600.000 |
| KBC Bank<br>Synergie Park<br>6, rue Nicolas Appert<br>59260 Lezennes, France<br>Attention : Yvon Vasseur / Delphine<br>Schelfhout<br>Téléphone : + 33 3 20 11 61 62 / 61 08<br>Télécopie : + 33 3 20 11 61 50<br>e-mail : yvon.vasseur@kbc.be /<br>delphine.schelfhout@kbc.be | 2.600.000 | 8.900.000 | 1.000.000 |
| Société Générale<br>253, route de Mittelhausbergen<br>BP60026 – 67012 Strasbourg Cedex,<br>France<br>Attention : Pole Services Clients<br>Téléphone : + 33 3 88 10 77 00<br>Télécopie : + 33 3 88 10 77 56<br>e-mail :<br>pscstrasbourg.entreprises@socgen.com | 18.200.000 | 62.300.000 | 7.000.000 |
| Total | EUR 52.000.000 | EUR<br>178.000.000 | EUR 20.000.000 |

COPIE CONFORME

## ANNEXE 2
### PARTIE 1
### MODELE D'AVIS DE TIRAGE DE LA TRANCHE A DU CREDIT

A :        Calyon, Agent du Crédit (Agence)
              ATT : Sophie Robert / Sylvie Charre
              9 quai du Président Paul Doumer
              92920 Paris la Défense Cedex

Télécopie : + 33 1 41 89 60 73

Avec copie à :

              ATT : Brigitte Boddaert (Back-Office)
              9 quai du Président Paul Doumer
              92920 Paris la Défense Cedex

Télécopie : + 33 1 41 89 11 14

De :       Smoby

le [●] septembre 2005

### OUVERTURE DE CREDIT DE EUR 250.000.000

### Contrat du 26 septembre 2005

Nous nous référons au Contrat d'Ouverture de Crédit du 26 septembre 2005 (le **"Contrat"**). En application de l'Article 5 (Modalités de Tirage) du Contrat, nous vous notifions le présent Avis de Tirage au titre de la Tranche A du Crédit.

Nous vous informons par le présent avis que nous désirons effectuer un Tirage conformément au Contrat ayant les caractéristiques suivantes :

Montant en Euros du Tirage : EUR 52.000.000

Date de Tirage : [●] 2005

Période d'Intérêt : [●] mois

Le produit du Tirage est à verser au compte n° [●] chez [●] en faveur de [●] sous la référence [●].

Nous vous confirmons la non-survenance de tout événement constituant un Cas d'Exigibilité Anticipée et déclarons que toutes les déclarations et garanties faites ou données au titre de l'Article 16 (Déclarations et garanties) du Contrat sont exactes à la date du présent Avis de Tirage.

COPIE CONFORME

Nous vous confirmons que, dans l'hypothèse où, pour une raison quelconque, le Tirage demandé dans le présent avis n'aurait pas effectivement lieu, nous nous engageons à indemniser immédiatement les Banques, l'Agent du Crédit et l'Agent des Sûretés, contre tous frais ou pertes, y compris, notamment, les Coûts de Refinancement relatifs aux fonds réservés par les Banques à la suite de la remise du présent Avis de Tirage, que la non-survenance du Tirage entraîneraient.

Les expressions définies au Contrat sont utilisées dans le même sens au présent avis.

[●]

(signature d'une personne habilitée à signer pour la Société)

**EXHIBIT B**

COPIE CONFORME

ANNEXE 2
PARTIE 2
MODELE D'AVIS DE TIRAGE DE LA TRANCHE B DU CREDIT

A :        Calyon, Agent du Crédit (Agence)
           ATT : Sophie Robert / Sylvie Charre
           9 quai du Président Paul Doumer
           92920 Paris la Défense Cedex

Télécopie : + 33 1 41 89 60 73


Avec copie à :

           ATT : Brigitte Boddaert (Back-Office)
           9 quai du Président Paul Doumer
           92920 Paris la Défense Cedex

Télécopie : + 33 1 41 89 11 14


De :       [•]

le [•]


OUVERTURE DE CREDIT DE EUR 250.000.000

Contrat du 26 septembre 2005


Nous nous référons au Contrat d'Ouverture de Crédit du 26 septembre 2005 (le "Contrat"). En application de l'Article 5 (Modalités de Tirage) du Contrat, nous vous notifions le présent Avis de Tirage au titre de la Tranche B du Crédit.

Nous vous informons par le présent avis que nous désirons effectuer un Tirage conformément au Contrat ayant les caractéristiques suivantes :

Montant en Euro du Tirage : [•]

Monnaie du Tirage : [Euro / Dollar]

Montant du Tirage dans la monnaie du Tirage : [EUR/USD] [•]

Date de Tirage : [•]

Période d'Intérêt : [•] mois

Le produit du Tirage est à verser au compte n° [•] chez [•] en faveur de [•] sous la référence [•].

Nous vous confirmons la non-survenance de tout événement constituant un Cas d'Exigibilité Anticipée et déclarons que toutes les déclarations et garanties faites ou données au titre de l'Article 16 (Déclarations et garanties) du Contrat sont exactes à la date du présent Avis de Tirage.

COPIE CONFORME

Nous vous confirmons que, dans l'hypothèse où, pour une raison quelconque, le Tirage demandé dans le présent avis n'aurait pas effectivement lieu, nous nous engageons à indemniser immédiatement les Banques, l'Agent du Crédit et l'Agent des Sûretés, contre tous frais ou pertes, y compris, notamment, les Coûts de Refinancement relatifs aux fonds réservés par les Banques à la suite de la remise du présent Avis de Tirage, que la non-survenance du Tirage entraîneraient.

Les expressions définies au Contrat sont utilisées dans le même sens au présent avis.

[•]

(signature d'une personne habilitée à signer pour l'Emprunteur)

COPIE CONFORME

## ANNEXE 2
### PARTIE 3
### MODELE D'AVIS DE TIRAGE DE LA TRANCHE C DU CREDIT

A :        Calyon, Agent du Crédit (Agence)

        ATT : Sophie Robert / Sylvie Charre

        9 quai du Président Paul Doumer

        92920 Paris la Défense Cedex

Télécopie : + 33 1 41 89 60 73

Avec copie à :

        ATT : Brigitte Boddaert (Back-Office)

        9 quai du Président Paul Doumer

        92920 Paris la Défense Cedex

Télécopie : + 33 1 41 89 11 14

De :        Smoby

le [●]

### OUVERTURE DE CREDIT DE EUR 250.000.000

### Contrat du 26 septembre 2005

Nous nous référons au Contrat d'Ouverture de Crédit du 26 septembre 2005 (le "**Contrat**"). En application de l'Article 5 (Modalités de Tirage) du Contrat, nous vous notifions le présent Avis de Tirage au titre de la Tranche C du Crédit.

Nous vous informons par le présent avis que nous désirons effectuer un Tirage conformément au Contrat ayant les caractéristiques suivantes :

Montant en Euro du Tirage : EUR [●]

Date de Tirage : [●]

Période d'Intérêt : [●] mois

Le produit du Tirage est à verser au compte n° [●] chez [●] en faveur de [●] sous la référence [●].

Nous vous confirmons la non-survenance de tout événement constituant un Cas d'Exigibilité Anticipée et déclarons que toutes les déclarations et garanties faites ou données au titre de l'Article 16 (Déclarations et garanties) du Contrat sont exactes à la date du présent Avis de Tirage.

Nous vous confirmons que, dans l'hypothèse où, pour une raison quelconque, le Tirage demandé dans le présent avis n'aurait pas effectivement lieu, nous nous engageons à indemniser immédiatement les Banques, l'Agent du Crédit et l'Agent des Sûretés, contre tous frais ou pertes, y compris, notamment,

COPIE CONFORME

les Coûts de Refinancement relatifs aux fonds réservés par les Banques à la suite de la remise du présent Avis de Tirage, que la non-survenance du Tirage entraîneraient.

Les expressions définies au Contrat sont utilisées dans le même sens au présent avis.

[•]

(signature d'une personne habilitée à signer pour la Société)

COPIE CONFORME

### ANNEXE 3
### MODELE DE NOTIFICATION DE PERIODE D'INTERET

A :          Calyon, Agent du Crédit (Agence)
              ATT : Sophie Robert / Sylvie Charre
              9 quai du Président Paul Doumer
              92920 Paris la Défense Cedex

Télécopie : + 33 1 41 89 60 73

Avec copie à :

              ATT : Brigitte Boddaert (Back-Office)
              9 quai du Président Paul Doumer
              92920 Paris la Défense Cedex

Télécopie : + 33 1 41 89 11 14

De :         Smoby

le [●]

### OUVERTURE DE CREDIT EUR 250.000.000
### Contrat du 26 septembre 2005

Nous nous référons au Contrat de Crédit du 26 septembre 2005 (le **"Contrat"**). En application de l'Article 10.4 (Notification de Période d'Intérêt), nous vous adressons la présente Notification de Période d'Intérêt.

Nous nous référons à l'Avis de Tirage [de la Tranche A du Crédit] [de la Tranche C du Crédit] dont les caractéristiques sont les suivantes [●].

Nous vous informons par la présente que la prochaine Période d'Intérêt pour le Tirage effectué au titre de l'Avis de Tirage visé ci-dessus débutera le [●] et aura une durée de [●] mois.

Les expressions définies au Contrat sont utilisées dans le même sens dans la présente Notification de Période d'Intérêt.

[●]

Signature d'une personne habilitée à signer pour l'Emprunteur

**COPIE CONFORME**

### ANNEXE 4
### MODELE DE NOTIFICATION DE CESSION

A :          Calyon, Agent du Crédit (Agence)
             ATT : Sophie Robert / Sylvie Charre
             9 quai du Président Paul Doumer
             92920 Paris la Défense Cedex

Télécopie : + 33 1 41 89 60 73


De :         Banque Cédante et Banque Cessionnaire


### OUVERTURE DE CREDIT DE EUR 250.000.000
### Contrat du 26 septembre 2005


Messieurs,

La Banque soussignée (la "**Banque Cédante**") s'est engagée à céder et transférer à [•] (la "**Banque Cessionnaire**") le [•] (ci-après la "**Date d'Effet**") ses droits et obligations à hauteur d'un Montant en Euro de [•] ([•]) et la Banque Cessionnaire s'est engagée à les acquérir.

La Banque Cessionnaire demande à l'Agent du Crédit de noter qu'à compter de la Date d'Effet, elle reprendra à son compte les droits et obligations de [•] (i) à hauteur d'un Montant Euro de [•] ([•]) au titre de la Tranche A du Crédit, (ii) [•] à hauteur d'un Montant Euro de [•] ([•]) au titre de la Tranche B du Crédit et (iii) [•] à hauteur d'un Montant Euro de [•] ([•]) au titre de la Tranche C du Crédit. Elle confirme qu'elle est en possession d'un exemplaire ou d'une copie conforme du Contrat, des Documents de Sûretés et du Contrat de Garantie Autonome à Première Demande, reconnaît qu'elle sera liée par les termes et conditions du Contrat à compter de cette date et en conséquence qu'elle en exécutera les obligations qui en découlent pour elle, et qu'elle bénéficiera des sûretés résultant des Documents de Sûretés et du Contrat de Garantie Autonome à Première Demande sous réserve de l'accomplissement des formalités prévues à l'Article 27.7 du Contrat.

Les coordonnées de la Banque Cessionnaire aux fins du Contrat sont les suivantes :

Nom de la Banque Cessionnaire :      [•]
Agence :                             [•]
A l'attention de :                   [•]
Téléphone :                          [•]
Télécopie :                          [•]
Courrier électronique :              [•]

Les règlements relatifs aux Tirages devront être adressés à la Banque Cessionnaire au compte n° [•] chez la banque [•] sous référence [•].


07471816_9                       **EXHIBIT B**                       139

**COPIE CONFORME**

Les expressions définies au Contrat sont utilisées dans le même sens dans le présent Acte de Cession.

_____          _____
  Banque Cédante                            Banque Cessionnaire

COPIE CONFORME

**ANNEXE 5**
**MODELE DE LETTRE D'ADHESION**

A :        Calyon, Agent du Crédit (Agence)
           ATT : Sophie Robert / Sylvie Charre
           9 quai du Président Paul Doumer
           92920 Paris la Défense Cedex

Télécopie : + 33 1 41 89 60 73

De :        Smoby et [*Filiale*]

**OUVERTURE DE CREDIT DE EUR 250.000.000**

**Contrat du 26 septembre 2005**

Messieurs

Nous nous référons au Contrat de Crédit du 26 septembre 2005 (le **"Contrat"**).

Le présent document constitue une Lettre d'Adhésion.

Les termes définis dans le Contrat auront, sauf stipulation contraire, le même sens dans la présente Lettre d'Adhésion.

[*Filiale*] accepte de devenir Emprunteur Additionnel et d'être liée par les termes du Contrat en qualité d'Emprunteur Additionnel conformément aux stipulations de l'Article 26.2 (Emprunteurs Additionnels) du Contrat.

Les renseignements administratifs de [*Filiale*] sont les suivants :

Adresse :

Télécopie :

A l'attention de :

La présente Lettre d'Adhésion est régie par le droit français.

_____        _____

Emprunteur Additionnel                    Société

07471816_9                    **EXHIBIT B**                    141

COPIE CONFORME

**ANNEXE 6**
**MODELE DE LETTRE DE RETRAIT**

A :          Calyon, Agent du Crédit (Agence)
             ATT : Sophie Robert / Sylvie Charre
             9 quai du Président Paul Doumer
             92920 Paris la Défense Cedex

Télécopie : + 33 1 41 89 60 73


De :         Smoby et [*Filiale*]


**OUVERTURE DE CREDIT DE EUR 250.000.000**

**Contrat du 26 septembre 2005**


Messieurs

Nous nous référons au Contrat de Crédit du 26 septembre 2005 (le "**Contrat**").

Le présent document constitue une Lettre de Retrait.

Les termes définis dans le Contrat ont, sauf stipulation contraire, le même sens dans la présente Lettre de Retrait.

Conformément aux stipulations de l'Article 26.3 (Retrait d'un Emprunteur), nous demandons à ce que [*Emprunteur qui se retire*] soit délié de toute obligation en qualité d'Emprunteur au titre des Documents de Financement.

Nous confirmons que :

(i)    aucun Cas d'Exigibilité Anticipée n'est en cours ou n'est susceptible de survenir du fait de l'acceptation de la Lettre de Retrait ; et

(ii)   [*Emprunteur qui se retire*] n'a plus aucune obligation existante ou éventuelle au titre des Documents de Financement.

La présente Lettre de Retrait est régie par le droit français.


_____              _____
[*Emprunteur qui se retire*]                        Société

COPIE CONFORME

**ANNEXE 7**

**MODELE D'ATTESTATION DE RESPECT DES RATIOS FINANCIERS**

*[par télécopie et lettre simple avec reçu ou avis de réception]*

A :         Calyon, Agent du Crédit (Agence)
            ATT : Sophie Robert / Sylvie Charre
            9 quai du Président Paul Doumer
            92920 Paris la Défense Cedex

Télécopie : + 33 1 41 89 60 73

De :        Smoby

le [●]

**OUVERTURE DE CREDIT DE EUR 250.000.000**
**Contrat du 26 septembre 2005**

Nous nous référons au Contrat d'Ouverture de Crédit du 26 septembre 2005 (le "**Contrat**") et en particulier l'Article 18 (Engagements Financiers) du Contrat.

Les expressions définies au Contrat sont utilisées dans le même sens à la présente attestation.

Nous vous confirmons que le Groupe respecte les Ratios Financiers prévus à l'Article 18 du Contrat et que, à la date du [●] :

(i)         le Ratio Financier n°1 est de [●] ;

(ii)        le Ratio Financier n°2 est de [●] ;

Les Ratios Financiers ont été calculés sur la base des Comptes Annuels Consolidés.

Fait à [●], le [●],

En [●] ([●]) exemplaires originaux,

_____

Directeur Administratif et Financier du
Groupe

[●]

*Visa des commissaires aux comptes*

**COPIE CONFORME**

**ANNEXE 8**
**MODELE D'ATTESTATION DES BANQUES PRETEUSES AU TITRE DES CONCOURS BANCAIRES EXISTANTS**

A :      [•]

De :     [•]

Date :   [•]

Messieurs,

Nous nous référons au contrat de crédit de EUR [•] en date du [•] consenti à [*nom de l'Emprunteur concerné*] par [•] en qualité de [banque] [agent et certains établissements financiers en qualité de prêteurs].

Nous vous confirmons par la présente que nous avons reçu une notification écrite de [*nom de l'Emprunteur concerné*] en date du [•] et relative à l'intention de [*nom de l'Emprunteur concerné*] de (i) annuler les engagements totaux des prêteurs au titre du contrat de crédit sus-visé et (ii) rembourser [par anticipation] les tirages en cours.

Nous certifions par la présente que, immédiatement après la réception des fonds de [*nom de l'Emprunteur concerné*] relatifs à la notification du remboursement [anticipé] sus-visée, nous affecterons lesdits fonds au remboursement [anticipé] du contrat de crédit sus-visé.

[•]

_____

Par : [•]

COPIE CONFORME

## ANNEXE 9
## CALCUL DES COÛTS OBLIGATOIRES

**1.**  **Disposition Générale**

Le Coût Obligatoire est la moyenne pondérée des taux de Coûts Obligatoires pour chaque Banque calculé par l'Agent du Crédit comme il est indiqué ci-dessous au premier jour de chaque Période d'Intérêt. L'Agent du Crédit distribuera chaque montant du Coût Obligatoire entre les Banques sur la base du taux des coûts obligatoires calculé pour chaque Banque.

**2.**  **Pour une Banque prêtant d'une Agence de Crédit située au Royaume-Uni**

A.  Le taux de Coûts Obligatoires applicable pour chaque Banque ayant une Agence de Crédit au Royaume-Uni est calculé selon la formule suivante :

Pour un Prêt en Livre Sterling :

$$\frac{AB + C(B-D) + E \times 0.01}{100-(A+C)} \text{ pour cent par an}$$

Pour tout Prêt autre qu'un Prêt en livre Sterling :

$$\frac{E \times 0.01}{300} \% \text{ par an}$$

étant entendu que le jour où la formule est appliquée :

(a)  est le pourcentage d'obligations éligibles (*eligible liabilities*) (s'ajoutant à tout minimum requis) de la Banque que la Banque d'Angleterre impose à la Banque de détenir sur un compte non-rémunéré conformément à sa réglementation sur les ratios de liquidité ;

(b)  est le LIBOR applicable pour la Période d'Intérêt ;

(c)  est le pourcentage d'obligations éligibles (*eligible liabilities*) de la Banque que la Banque d'Angleterre impose à la Banque de placer sur un compte de dépôt spécial;

(d)  est taux d'intérêt annuel autorisé par la Banque d'Angleterre sur un compte de dépôt spécial (*special deposit*); et

(e)  est calculé par l'Agent du Crédit comme étant la moyenne des taux de commission fourni par les Banques de Référence à l'Agent du Crédit au titre du Paragraphe (d) exprimée en livres pour chaque £1 million.

B.  Pour les besoins du présent Paragraphe 2 :

(i)  "**obligations éligibles**" (*eligible liabilities*) et "**compte de dépôt spécial**" (*special deposit*) ont le sens qui leur est attribué par la Banque d'Angleterre au moment de l'application de la formule ;

(ii)  "**règles de commission**" (*fee rules*) désigne les règles en vigueur relatives aux commissions périodiques dans le Recueil de Réglementation et de Contrôle de la FSA (*Supervision Manual of the FSA Handbook*) ;

COPIE CONFORME

(iii) "**base de commission** " (*tariff base*) a le sens qui est attribué à ce terme dans les "règles de commission".

C.   (i)   Dans le calcul de la formule, A, B, C et D sont pris comme des chiffres et non des pourcentages, par exemple si A = 0,5% et B = 15%, AB se calcule comme 0,5 x 15. Un résultat négatif obtenu en soustrayant B à D sera traité comme valant zéro.

(ii)   Le taux calculé en application de la formule est arrondi à la quatrième décimale supérieure, si nécessaire.

D.   (i)   Chaque Banque de Référence fournira à l'Agent du Crédit le taux de commission payable au *Financial Service Authority* au titre des règles de commissions (calculé par cette Banque de Référence comme étant la moyenne des taux de commissions applicables à cette Banque de Référence en intégrant à cette fin toute remise applicable et en excluant toute commission minimum prescrite par les règles de commission) exprimé en livres pour chaque £1 million de base de commission applicable à cette Banque de Référence.

(ii)   Chaque Banque de Référence doit informer promptement l'Agent du Crédit de tout changement du taux de commission.

E.   (i)   Chaque Banque et chaque Banque de Référence fournira à l'Agent du Crédit toute information que celui-ci pourrait réclamer afin de calculer le taux de Coûts Obligatoires pour chaque Banque ou Banque de Référence. L'Agent du Crédit pourra présumer que toute information qui lui est fournie est correcte à tous égards.

(ii)   Si une Banque ou une Banque de Référence n'est pas en mesure de transmettre à l'Agent du Crédit ces informations, l'Agent du Crédit pourra présumer que les obligations de la Banque ou de la Banque de Référence en matière de ratio de liquidité, d'obligations de dépôt et de "règles de commission" sont les mêmes que celles d'une banque équivalente située dans le pays d'immatriculation de ladite Banque et ayant une Agence de Crédit située au Royaume-Uni.

(iii)   L'Agent du Crédit n'encoura aucune responsabilité envers quiconque si son calcul sur-compense ou sous-compense un quelconque des Banques.

3.   **Pour une Banque prêtant à partir d'une Agence de Crédit située sur le territoire d'un Etat Membre Participant**

A.   Le taux des Coûts Obligatoires applicable à une Banque prêtant à partir d'une Agence de Crédit située sur le territoire d'un Etat Membre Participant est le taux de pourcentage annuel notifié par cette Banque à l'Agent du Crédit comme étant le coût qu'elle supporte du fait du respect des règles sur les réserves minimum imposées par la Banque Centrale Européenne.

B.   Si une Banque est dans l'incapacité de fournir le taux mentionné au Paragraphe (a) ci-dessus, l'Agent du Crédit pourra présumer que cette Banque ne supporte aucun coût de cet ordre.

4.   **Modifications**

L'Agent du Crédit peut, après consultation avec l'Emprunteur et les Banques, notifier à toutes les parties qu'un amendement à cette Annexe est nécessaire pour refléter :

(a)   tout changement dans la réglementation en vigueur ; ou

**EXHIBIT B**

COPIE CONFORME

(b)     toute prescription imposée par la Banque d'Angleterre, le *Financial Services Authority* ou la Banque Centrale Européenne (ou, le cas échéant, l'un quelconque de leur successeur).

Sauf erreur manifeste, toute notification faite par l'Agent du Crédit sera obligatoire pour toutes les parties.

**EXHIBIT B**

COPIE CONFORME

**ANNEXE 10**
**MODELE DE CONTRAT DE CESSION DE CREANCES PROFESSIONNELLES**

07M71816_9                    **EXHIBIT B**                    148

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Percy Anderson and the assigned discovery Magistrate Judge is Ralph Zarefsky.

The case number on all documents filed with the Court should read as follows:

## CV11- 4932 PA (RZx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

========================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[X] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[ ] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)        NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| MGA ENTERTAINMENT, INC., a California Corporation | DEUTSCHE BANK AG, a German Company; BARCLAYS BANK PLC, a British Corporation, et al. |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| CAPELLO & NOEL LLP<br>831 State Street<br>Santa Barbara, CA 93101<br>805-564-2444 | Christopher J. Cox<br>WEIL, GOTSHAL & MANGES LLP<br>201 Redwood Shores Parkway<br>Redwood Shores, CA 94065<br>650-802-3000 |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff  ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant  ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☒ 3 | Foreign Nation | ☐ 6 | ☒ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☐ 1 Original Proceeding  ☒ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No     ☒ **MONEY DEMANDED IN COMPLAINT: $** 428,815,760

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

28 U.S.C. section 1441(a). Defendant Deutsche Bank AG seeks removal of Plaintiff's State Court case (Case No. BC458341) because all the parties are completely diverse and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs. (Continued on attachment.)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☒ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE/ PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 443 Housing/Acco-mmodations | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | REAL PROPERTY | IMMIGRATION | | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety/Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | FEDERAL TAX SUITS |
| | ☐ 240 Torts to Land | ☐ 465 Other Immigration Actions | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS - Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

CV11-04932

FOR OFFICE USE ONLY: Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a).   IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  | X | No   | | Yes

If yes, list case number(s): _____

**VIII(b).   RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  | X | No   | | Yes

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   | | A. Arise from the same or closely related transactions, happenings, or events; or

| | B. Call for determination of the same or substantially related or similar questions of law and fact; or

| | C. For other reasons would entail substantial duplication of labor if heard by different judges; or

| | D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
| Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
| --- | --- |
| Los Angeles County | |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
| Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
| --- | --- |
| | Germany, Great Britain, France and Luxembourg |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
   **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
| --- | --- |
| | All the claims alleged in Plaintiff's First Amended Complaint arose in France. |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**

Note: In land condemnation cases, use the location of the tract of land involved

**X.  SIGNATURE OF ATTORNEY (OR PRO PER):**   Christopher J. Cox          Date June 9, 2011

**Notice to Counsel/Parties:**  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
| --- | --- | --- |
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

CIVIL COVER SHEET ATTACHMENT - MGA v. DEUTSCHE BANK, et al.

The Court, therefore, has diversity jurisdiction under 28 U.S.C. section 1221(a)(3).  The Court also has federal question original jurisdiction over the Plaintiff's claims pursuant to 12 U.S.C. section 632 because the Plaintiff's claims arise out of transactions involving international or foreign banking.